UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :

            -v.-                  :        S1 06 Cr. 442 (LAP)

SYED HASHMI,                      :
      a/k/a "Fahad,"
                                 :

                Defendant.        :

                                 :

- - - - - - - - - - - - - - - - X


**GOVERNMENT'S OMNIBUS RESPONSE TO THE DEFENDANT'S MOTIONS IN
LIMINE SEEKING TO PRECLUDE OR LIMIT EVIDENCE AT TRIAL**


                              PREET BHARARA
                              United States Attorney
                               Southern District of New York
                              Attorney for the United States
                               of America


Brendan R. McGuire
Iris Lan
Assistant United States Attorneys

      - Of Counsel -

## Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . iv

I.   Hashmi's Challenge To The Government's Proposed Expert
     Witness Should Be Denied. . . . . . . . . . . . . . . . 2

     A.   Relevant Facts . . . . . . . . . . . . . . . . . . 2

          1.   Evan Kohlmann's Proffered Testimony . . . . . 2

          2.   Hashmi's Motion to Preclude Expert Testimony . . 4

     B.   Applicable Law . . . . . . . . . . . . . . . . . . 4

     C.   Discussion . . . . . . . . . . . . . . . . . . . . 6

          1.   Mr. Kohlmann's Testimony Is Reliable . . . . . 6

          2.   Mr. Kohlmann's Testimony Is Both Relevant and
               Helpful to the Jury . . . . . . . . . . . . . 10

          3.   Mr. Kohlmann's Testimony Is Not Unfairly
               Prejudicial . . . . . . . . . . . . . . . . . 17

II.  Hashmi's Motion To Limit Evidence Of Al Qaeda And Other
     Matters To Kohlmann's Testimony Should Be Rejected . . . 18

     A.   Al Qaeda and Bin Laden . . . . . . . . . . . . . . 19

     B.   ALM . . . . . . . . . . . . . . . . . . . . . . . 20

     C.   Hamas and Hizballah . . . . . . . . . . . . . . . 21

III. Hashmi's Motion To Preclude His Post-Arrest Statements
     Should Be Denied . . . . . . . . . . . . . . . . . . . 21

IV.  Evidence Regarding Omar Khyam's Relationships Of Trust With
     Babar and Hashmi Is Admissible . . . . . . . . . . . . 24

     A.   Overview of the Operation Crevice Fertilizer
          Bomb Plot . . . . . . . . . . . . . . . . . . . . 26

B.   The Scope of Babar's Testimony . . . . . . . . . . 28

    1.   Evidence the Government Intends to Introduce
       Regarding Khyam . . . . . . . . . . . . . . . 28

    2.   Evidence the Government Does Not Intend To
       Introduce Regarding the Bomb Plot . . . . . . 32

C.   The Government's Proposal Is Reasonable
and Efficient . . . . . . . . . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . 35

# Table of Authorities

## Federal Cases

Barapind v. Enomoto, 360 F.3d 1061 (9th Cir. 2004) . . . . . 14

Calloway v. United States, 399 F.2d 1006 (D.C. Cir. 1968) . . 23

Campazano v. Islamic Republic of Iran, 281 F. Supp. 2d 258
(D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . 14

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . 5, 8

Diaz v. Greiner, 110 F. Supp. 2d 225 (S.D.N.Y. 2000) . . . . 22

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) . . . . . . 5-6

Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46
(D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Al-Hussayen, No. 03-48 (D. Idaho 2004)   . . 14

United States v. Alwan, 279 F.3d 431 (7th Cir. 2002) . . . . 14

United States v. Amuso, 21 F.3d 1251 (2d Cir. 1994) . .  6, 11-12

United States v. Angiulo, 847 F.2d 956 (1st Cir. 1988) . . . 11

United States v. Ardito, 782 F.2d 358 (2d Cir. 1986) . . . . 11

United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988) . . 11

United States v. Damrah, 334 F. Supp. 2d 967 (N.D. Ohio 2004) 14

United States v. Duncan, 42 F.3d 97 (2d Cir. 1994) . . . . . 18

United States v. Gallo, 118 F.R.D. 316 (E.D.N.Y. 1987) . . . 11

United States v. Gotti, No. S8 02 Cr. 743 (Casey, J.) . . . 11-12

United States v. Graham, 548 F.2d 1302 (8th Cir. 1977) . . . 22

United States v. Hammoud, 381 F.3d 316 (4th Cir. 2004) . . 12-14

United States v. Kassir, S2 04 Cr. 356 (Keenan, J.) . . . . . . 7

United States v. Locascio, 6 F.3d 924 (2d Cir. 1993)   5-6, 10-11

United States v. Matera, 489 F.3d 115 (2d Cir. 2007) . . . . . 6

United States v. Mejia, 545 F.3d 179 (2d Cir. 2008) . . . . . . 6

United States v. Paracha, 03 Cr. 1197 (Stein, J.) . . . 7, 8, 15

United States v. Payne, No. 91-CR-811(DRH), 1993 WL 17456
(E.D.N.Y. Jan. 12, 1993) . . . . . . . . . . . . . . . . . . 23

United States v. Pungitore, 910 F.2d 1084 (3d Cir. 1990) . . 11

United States v. Ramirez, 460 F.2d 1322 (10th Cir. 1972) . . 22

United States v. Sabir, S4 05 Cr. 673 (Preska, J.) . . . . 7, 8

United States v. Santoro, 302 F.3d 76, 83 (2d Cir. 2002) . . 24

United States v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992) 11

United States v. Tutino, 883 F.2d 1125 (2d Cir. 1989) . . . . 11

United States v. Wright, 392 F.3d 1269 (11th Cir. 2004) . 22, 23

**Federal Rules**

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . 4, 18, 23

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . 4-5, 8-9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :

          -v.-                    :          S1 06 Cr. 442 (LAP)

SYED HASHMI,                      :
     a/k/a "Fahad,"
                                  :

               Defendant.         :

- - - - - - - - - - - - - - - - X

### GOVERNMENT'S OMNIBUS RESPONSE TO THE DEFENDANT'S MOTIONS IN LIMINE SEEKING TO PRECLUDE OR LIMIT EVIDENCE AT TRIAL

The Government respectfully submits this memorandum of law in opposition to: (i) Defendant's Motion in Limine to Exclude Testimony of Proposed Expert Evan Kohlmann ("Defendant's Kohlmann Motion," or "Def. Kohlmann Mot."); (ii) Defendant's Motion in Limine To Limit Evidence Related to Al Qaeda, Osama Bin Laden, Al Muhajiroun, Hamas, Hezbollah, and the Taliban ("Defendant's Motion to Limit Organizational Evidence," or "Def. Lim. Evid. Mot."); (iii) Defendant's Motion in Limine To Limit Evidence Concerning Mr. Hashmi's Arrest ("Defendant's Motion To Exclude Arrest Evidence," or "Def. Arrest Evid. Mot."); and (iv) Defendant's Motion in Limine To Exclude Evidence Concerning "Operation Crevice" and To Limit Evidence Concerning Omar Khyam ("Defendant's Operation Crevice Motion," or "Def. Op. Crevice

Mot.").[1]

For the reasons set forth below, the Government respectfully submits that each of these motions should be denied, and this Memorandum of Law addresses each motion in turn.  To the extent that certain motions seek a hearing in the alternative, the Government respectfully submits that the defendant has not set forth sufficient facts or allegations to mandate a hearing on any of the motions.

## I.   HASHMI'S CHALLENGE TO THE GOVERNMENT'S PROPOSED EXPERT WITNESS SHOULD BE DENIED

In the Defendant's Kohlmann Motion, Hashmi seeks to prevent the Government's proposed terrorism expert from testifying about (1) the history, structure, and membership of al Qaeda, as well as its relationship with the terrorist organizations known as Hamas and Hizballah; and (2) the history, structure, and membership of al Muhajiroun ("ALM").[2]

## A.   Relevant Facts

### 1.   Evan Kohlmann's Proffered Testimony

--------------------------------------------------

[1]   Although the defendant filed four separate motions, for the convenience of the Court and to avoid repetition of overlapping arguments, the Government files this single omnibus response.

[2]   The defense also seeks to prevent Kohlmann from testifying about Omar Khyam and the Taliban.  The Government no longer intends to elicit any testimony from Kohlmann regarding Omar Khyam or the Taliban so those claims are now moot.

As set out more fully in the expert notice regarding his testimony (attached as Exhibit A), Evan Kohlmann will help put the Government's evidence in context in this case.  For example, Mr. Kohlmann will explain the history and structure of the terrorist organization known as al Qaeda during the period covered in the Indictment.  Mr. Kohlmann will identify key leaders and members of al Qaeda during the period covered in the Indictment, some of whom will be mentioned during the trial.

For example, as the Court knows, the charges in this case stem from Hashmi's participation in a conspiracy to provide material support to Abd al Hadi al Iraqi ("Hadi al Iraqi"), a high-ranking al Qaeda military leader who commanded al Qaeda soldiers against coalition forces in Afghanistan.  Mr. Kohlmann will explain to the jury the role Hadi al Iraqi played for al Qaeda at the time of the charged conduct, and how al Qaeda members and supporters from all over the world were able to supply him and his soldiers with money, clothing, and other types of necessary support from other parts of the world.  Indeed, Mr. Kohlmann's testimony is critical in ensuring that the jury understands how al Qaeda depends upon a network of various types of supporters at different levels of the organization to sustain itself and achieve its goals.  Moreover, Mr. Kohlmann will also explain how al Qaeda recruits supporters and new members, including its dependence on and use of clerics and

extremist political organizations to attract unemployed and disenfranchised young men to its cause. Finally, based upon Hashmi's expression of support for Hamas and Hizballah at the 2002 ALM protest, Mr. Kohlmann will provide a very brief overview of the mission and the methods of those two terrorist organizations, and then describe their respective relationships with al Qaeda.

With respect to ALM, Mr. Kohlmann will also explain the history and structure of the organization during the period covered in the Indictment. Based in part on his 2002 interview with ALM founder Omar Bakri at the ALM headquarters in London, Mr. Kohlmann will testify about ALM's international reach from Pakistan to London to New York, the stated objectives of ALM, including its public support of jihad, Usama bin Laden and al Qaeda, and the means ALM employed to achieve those objectives, including protests and rallies.

### 2.  Hashmi's Motion to Preclude Expert Testimony

Hashmi mounts a three-pronged attack on Mr. Kohlmann's testimony, arguing that his proffered testimony is (1) unreliable, (2) irrelevant and unnecessary, and (3) should be severely limited by Rule 403. Hashmi's objections, however, are without merit and should be rejected by this Court for the reasons that follow.

### B.  Applicable Law

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In making the determination whether expert testimony would assist the trier of fact, the trial court "must make a common sense inquiry" into "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702, Advisory Committee Note (quotation omitted); see also United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1993) (quoting Fed. R. Evid. 702).

Before admitting expert testimony under Rule 702, a trial court must also determine that the proffered expert testimony "rests on a reliable foundation." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). A "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The object is to "make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field." Id. at 152.

Under these standards, this Court has repeatedly "approved the admission of expert testimony concerning the 'operation, structure, membership, and terminology of organized crime families.'" United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007) (quoting United States v. Locascio, 6 F.3d at 936). "Despite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony," both because the information gleaned from such sources may be inaccurate and because these topics remain outside the knowledge of the average juror. United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994); see United States v. Locascio, 6 F.3d at 937. The Second Circuit has been careful to state, however, that "[t]he Government cannot satisfy its burden of proof by taking the easy route of calling an "expert" whose expertise happens to be the defendant." United States v. Mejia, 545 F.3d 179, 191 (2d Cir. 2008).

C. Discussion

    1.  Mr. Kohlmann's Testimony Is Reliable.

Mr. Kohlmann has previously testified as an expert witness in thirteen different federal criminal trials in the United States.

He has testified twice in the military commission trials held in Guantanamo Bay, Cuba.  And he has testified in nine different foreign courts and tribunals as an expert witness on terrorism issues.  Mr. Kohlmann is a civilian, who is often retained by various law enforcement agencies around the world because of his expertise on terrorism matters.  As set out in his attached curriculum vitae (attached as Exhibit B), he is the founder and president of an information clearinghouse regarding international terrorism, known as Globalterroralert.com, and a senior investigator at the Nine/Eleven Finding Answers Foundation.

Five different United States District Court Judges in this Circuit have qualified Mr. Kohlmann as an expert witness on terrorism-related issues, including this Court in United States v. Sabir, S4 05 Cr. 673 (LAP), the Honorable Sidney H. Stein in United States v. Paracha, 03 Cr. 1197 (SHS), and, earlier this year, the Honorable John F. Keenan in United States v. Kassir, S2 04 Cr. 356 (JFK).  Each of these judges was satisfied that Mr. Kohlmann's testimony was sufficiently reliable such that it should be heard by the jury.  Indeed, in Paracha, Judge Stein conducted a day-long Daubert hearing before concluding that Mr. Kohlmann had sufficient education, experience and training to qualify as an expert and that

his methodology was sufficiently reliable.[3]  Judge Stein held that:

> [Mr. Kohlmann's] methodology consists of gathering
> multiple sources of information, including original and
> secondary sources, cross-checking and juxtaposing new
> information against existing information and evaluating
> new information to determine whether his conclusions
> remain consonant with the most reliable sources. . . .
> His methodology is similar to that employed by his peers
> in his field; indeed, he explained that he works
> collaboratively with his peers, gathering additional
> information and seeking out and receiving comments on his
> own work.

United States v. Paracha, 03 Cr. 1197 (SHS), 2006 U.S. Dist. LEXIS

1, at *62 (S.D.N.Y. Jan. 3, 2006).  Judge Stein further held that

Mr. Kohlmann's expert opinions "regarding al Qaeda's origins,

leaders and certain tradecraft are generally accepted within the

relevant community" and that his methodology was "a sufficiently

reliable methodology to meet the requirements of Fed. R. Evid.

702."  Id. at *63-64.

On appeal, the Second Circuit agreed with Judge Stein's

conclusions.  In rejecting the defendant's challenge to the

admission of Mr. Kohlmann's testimony, the Second Circuit held

---

[3]  In Sabir, this Court relied on the Daubert hearing held
in Paracha in finding that "Mr. Kohlmann is qualified as an
expert to provide testimony" on terrorism issues.  United States
v. Sabir, 2007 U.S. Dist. LEXIS 34372, at *35 (S.D.N.Y. 2007)
("the Court has conducted an independent review of Mr. Kohlmann's
curriculum vitae and the transcript from the Daubert hearing held
in Paracha").  For the Court's reference, a copy of Mr.
Kohlmann's testimony during the Daubert hearing in Paracha is
attached as Exhibit C.

that "the Court was well within its discretion in ruling that Kohlmann's methodology was sufficiently reliable and his testimony relevant to the jury's understanding of al Qaeda so as to be admissible under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)." United States v. Paracha, 2008 U.S. App. LEXIS 12937, at *9 (2d Cir. June 19, 2008) (unpublished opinion).[4]

Mr. Kohlmann's methodology has not changed since he testified in Paracha and Sabir. If anything, in the years since that testimony, he has gained more experience and gathered additional information and sources, which could only enhance the reliability of his conclusions. Moreover, while Mr. Kohlmann has not previously been qualified to testify as an expert on ALM, his testimony about that organization will be based on the same methodology underlying his research on al Qaeda and will be founded upon his lengthy face-to-face interview with ALM's founder and

---

[4] As discussed in the Government's Memorandum Of Law In Support Of Its Motion To Preclude The Testimony Of Ellen Wolf Schrecker filed under separate cover tomorrow, Mr. Kohlmann's methodology appears to be similar to the methodology employed by the defendant's proposed expert on al Qaeda and ALM, Fawaz Gerges. Nevertheless, the defense offers Mr. Gerges as an expert but seeks to disqualify Mr. Kohlmann. In light of Mr. Kohlmann's prior qualification as an expert witness by this Court and twelve others and the similarity between his methodology and that of Mr. Gerges, the Government does not object to the proposed testimony of Mr. Gerges.

leader, Omar Bakri, in 2002.    Because the Second Circuit has already held that it would be well within Your Honor's discretion to conclude that Mr. Kohlmann's methodology is reliable, the Government respectfully requests that you make such a finding based on the materials that we have submitted to the Court.

> ###    2.    Mr. Kohlmann's Testimony Is Both Relevant and Helpful to the Jury.

Likewise, as set out above, the Second Circuit has already held in a material support case that Mr. Kohlmann's testimony is "relevant to the jury's understanding of al Qaeda."    United States v. Paracha, 2008 U.S. App. LEXIS 12937, at *9 (2d Cir. 2008) (unpublished opinion).   This conclusion follows from a long line of organized crime cases in which the Second Circuit has repeatedly approved of the admission of expert testimony concerning the organization and operations of traditional La Cosa Nostra organized crime families, and the identification of key leaders and members of those families.   For example, in United States v. Locascio, 6 F.3d 924 (2d Cir. 1993), the Second Circuit considered the District Court's decision to allow an FBI agent to testify, as an expert witness, "at great length on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of La Cosa Nostra."   Id. at 936.

In its decision, the Locasio Court emphasized that there

-10-

existed a long line of precedent permitting such testimony, and
cited seven different cases supporting the Court's holding:

> We have, however, previously upheld the use of expert
> testimony to help explain the operation, structure,
> membership, and terminology of organized crime families.
> See United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.),
> cert. denied, 488 U.S. 821 (1988); see also United States
> v. Skowronski, 968 F.2d 242, 246 (2d Cir. 1992)
> (upholding expert testimony of government agents
> explaining organized crime jargon); United States v.
> Tutino, 883 F.2d 1125, 1134 (2d Cir. 1989) (same), cert.
> denied, 493 U.S. 1081, 107 L. Ed. 2d 1044, 110 S. Ct.
> 1139 (1990); United States v. Ardito, 782 F.2d 358, 363
> (2d Cir.) (same), cert. denied, 475 U.S. 1141 (1986);
> United States v. Gallo, 118 F.R.D. 316, 317-18 (E.D.N.Y.
> 1987) (FBI agents could testify as experts as to methods
> of operation of organized crime).   Other circuits
> considering the issue are in agreement.   See United
> States v. Pungitore, 910 F.2d 1084, 1148-49 (3d Cir.
> 1990) (upholding testimony of organized crime families),
> cert. denied, 111 S. Ct. 2009 (1991); United States v.
> Angiulo, 847 F.2d 956, 973-75 (1st Cir.)(same), cert.
> denied, 488 U.S. 852 (1988).

Locascio, 6 F.3d at 936-37.

In 1994, the year after the Locascio decision, the Second
Circuit again affirmed the admission of testimony "regarding the
organization, structure and terminology of organized crime
families." United States v. Amuso, 21 F.3d 1251, 1263-64 (2d Cir.
1994).   At the Amuso trial, an FBI agent gave expert testimony
"about a broad range of topics including common cosa nostra
terminology . . . and the existence and structure of New York crime
families." Id. at 1263.   The agent also testified "that only the
boss 'can order executions or any execution performed by the family

-11-

has to have his authority.'" Id.   In affirming the admission of
such testimony, the Second Circuit cited to Locascio and Daly, and
concluded that "[d]espite the prevalence of organized crime stories
in the news and popular media, these topics remain proper subjects
for expert testimony." Id. at 1264.   The Amuso Court further noted
that "[a]side from the probability that the depiction of organized
crime in movies and television is misleading, the fact remains that
the operational methods of organized crime families are still
beyond the knowledge of the average citizen." Id.; see also United
States v. Gotti, No. S8 02 Cr. 743 (RCC), 2004 WL 2423799, at *1-2
(S.D.N.Y. Oct. 29, 2004) (permitting expert testimony in a number
of areas, including structure of organized crime families, rules of
conduct, methods of controlling businesses and the identities of
specific members of organized crime families).

     In this case, Mr. Kohlmann will simply testify about a
different type of criminal organization.   Instead of a traditional
Italian organized crime family, Mr. Kohlmann will testify
principally about the history and structure of criminal
organizations known as al Qaeda and ALM, identify certain key
leaders, and describe certain methods employed by these
organization to ensure their survival.   Indeed, in recent years –
as the United States has faced increased threats from al Qaeda and
other terrorist organizations and has responded with an increased

level of criminal prosecutions against its members – Courts have similarly begun to allow expert testimony concerning the structure, organization, and membership of terrorist organizations.   For example, the Fourth Circuit upheld the district court's decision to admit expert testimony concerning the designated foreign terrorist organization, Hizballah.   United States v. Hammoud, 381 F.3d 316, 337 (4th Cir. 2004).   In Hammoud, the defendant, who was acquainted with the spiritual leader of Hizballah, Sheikh Fadlallah, and its general secretary, Hassan Nasserallah, was charged with providing material support to Hizballah.   Id. at 326.   The Government presented evidence that the defendant solicited donations for Hizballah at a weekly prayer service that he led, and forwarded the money to Abbas Harake, a senior Hizballah military commander.   Id. In support of its case, the government presented testimony of an expert in Middle East terrorist organizations, Matthew Levitt, concerning a number of topics:

> Levitt testified regarding the structure of Hizballah and
> identified its leaders.   Levitt also explained the
> significance of Hammoud's contact with those leaders
> (most notably Sheikh Fadlallah, the spiritual leader of
> Hizballah).   And, Levitt discussed the nature of
> Hizballah's funding activities with specific reference to
> Hammoud's activities.

Id. at 337-38.   The Court upheld the district court's admission of the expert's testimony in these areas, concluding that "this testimony was critical in helping the jury understand the issues

before it." Id. at 338.  Other courts have also permitted expert
testimony on terrorist organizations in material support cases.
See, e.g., United States v. Khan, Crim. No. 03-296-A (E.D. Va.
2004) (material support of al Qaeda; permitting expert testimony
from Evan Kohlmann concerning relationships between al Qaeda, the
Taliban, Lashkar-e-Tayiba, Laskar Jihad and jihad fighters in
Bosnia and Chechnya); United States v. Al-Hussayen, Crim. No. 03-48
(D. Idaho 2004) (permitted expert testimony concerning use of
internet by terrorist organizations for recruitment and fund-
raising).[5]

_____

[5]   See also United States v. Alwan, 279 F.3d 431, 439-40
(7th Cir. 2002) (finding proper government's use of Hamas expert
to rebut defendant's coercion defense in a contempt case); United
States v. Damrah, 334 F. Supp. 2d 967, 982 (N.D. Ohio 2004) (in
prosecution for unlawfully obtaining citizenship, government's
terrorism expert testified regarding violent nature and
activities of Palestinian Islamic Jihad to demonstrate
materiality of defendant's omission about association with the
group in his citizenship application); Peterson v. Islamic
Republic of Iran, 264 F. Supp. 2d 46, 51-52 (D.D.C. 2003) (in
wrongful death suit under Foreign Sovereign Immunities Act for
terrorist bombing of U.S. Marine barracks in Beiruit, court
permitted extensive expert testimony on nature of Hizballah and
Hizballah's responsibility for the bombing); Barapind v. Enomoto,
360 F.3d 1061, 1065 (9th Cir. 2004) (in extradition proceeding,
noting testimony of "expert on international violence and
terrorism" that petitioner was "a folk hero who has great popular
support among Sikh Separatists"); Campazano v. Islamic Republic
of Iran, 281 F. Supp. 2d 258, 262 (D.D.C. 2003) (in civil damages
action relating to Hamas suicide bombing, relying on expert
testimony to establish that, inter alia, Iran's support of Hamas
was $30,000,000 in 1995 and between $20,000,000 to $50,000,000
annually in the past).

In this case, Mr. Kohlmann's testimony is imperative to a proper jury determination of whether Hashmi provided material support to al Qaeda. As a threshold matter, it is fairly self-evident that, in order to make such a determination, the jury must have at least a working knowledge of what al Qaeda is. More importantly, the jury needs to understand how al Qaeda works — that its members and supporters have established a network with a global reach to provide vital support to al Qaeda military commanders, like Hadi al Iraqi, fighting against coalition forces in Afghanistan, and how that network operates. Indeed, this background information will be essential to the jury's understanding of the charges against Hashmi. It is highly unlikely that the jury will come to this trial with a detailed understanding of who Hadi al Iraqi is and how he and his soldiers relied upon groups of al Qaeda supporters in various parts of the world, including London, for money and supplies. Without some background, therefore, the jury will be left without the tools to properly evaluate the Government's evidence.[6]

---

[6]   Indeed, the use of an expert witness like Evan Kohlmann is even more important in this case than in a case like Paracha. In Paracha, the defendant was charged with conspiring to assist an al Qaeda operative re-enter the United States so that he could perform a terrorist attack. In that case, although an expert was entirely appropriate to explain how al Qaeda operated, the accusation regarding the assistance being provided to al Qaeda was fairly direct - i.e., entry into the United States to carry

Although not a formally designated terrorist organization, these arguments apply with equal force to Mr. Kohlmann's testimony about ALM because the jury will be far less familiar with its leadership, ideology and methods as compared to al Qaeda.  Unlike Usama bin Laden and al Qaeda, Omar Bakri and ALM are not household names in the United States.  The Government's cooperating witness, Mohammed Junaid Babar, will testify that he became close friends with Hashmi in 2000 and 2001 while they were both active members of ALM in New York.[7]  During that time, Babar will testify that he and Hashmi: (1) arranged ALM meetings in New York in which Omar Bakri participated by telephone from London; (2) organized dozens of ALM protests and speeches; and (3) discussed their mutual support of Usama bin Laden and al Qaeda.  Accordingly, a basic understanding of ALM's mission and methods, which will almost certainly be beyond the common knowledge of most jurors, will allow the jury to place

---

out a terrorist attack.  In this case, the charged assistance to al Qaeda is less intuitive, especially to a layperson.  Here, Hashmi has been charged with providing material support to al Qaeda by (1) allowing his apartment in London to be used to store clothing that was delivered to al Qaeda; and (2) providing money and his cellphone to a co-conspirator to facilitate the delivery of the clothing to al Qaeda.  Without being placed in context, the link between these activities and the support it provides to al Qaeda is less direct and obvious; it therefore requires more explanation, thereby making it an even more appropriate subject for expert testimony.

[7]  For the convenience of the defense, the Government agreed to provide — and did provide — Jencks Act material for Babar thirty days in advance of trial, i.e., on November 2, 2009.

Babar's testimony about Bakri and ALM into proper context, and will provide the jury with an understanding of the relationship between al Qaeda and ALM, and between Babar and Hashmi.

Indeed, a jury will not be able to comprehend what constitutes providing material support to al Qaeda without understanding al Qaeda itself.   Without Kohlman's testimony regarding the relationship between ALM and al Qaeda, a jury will not be unable to understand how Hashmi himself progressed from being a member of ALM to providing material support to al Qaeda.

Put simply, Mr. Kohlmann's testimony will be relatively brief, but extremely important, in order to give the jury the necessary tools and appropriate background in order to fairly weigh the Government's evidence in this matter.   His testimony should be permitted.

### 3.   Mr. Kohlmann's Testimony Is Not Unfairly Prejudicial

As set out above, the evidence in this case will contain references to al Qaeda, Usama bin Laden, and support for al Qaeda's cause in Afghanistan against coalition forces.   Where a defendant is charged with providing material support to al Qaeda by facilitating the delivery of goods through an international network of al Qaeda supporters to a senior al Qaeda military leader, expert testimony about how the network functioned and the role the leader played within al Qaeda is undeniably relevant.   Similarly, the

defendant's active participation, at the time of the charged
conduct, in an international Islamic extremist organization that
has publicly supported al Qaeda, Usama bin Laden and jihad is also
relevant.  To have Mr. Kohlmann provide testimony on these discrete
topics so that the jury can understand the evidence before them is
not unfairly prejudicial.  Rather, it is necessary for the jury to
fairly evaluate the evidence before them and render a decision in
this case.  See United States v. Duncan, 42 F.3d 97, 101 (2d Cir.
1994) ("Expert witnesses are often uniquely qualified in guiding
the trier of fact through a complicated morass of obscure terms and
concepts.  Because of their specialized knowledge, their testimony
can be extremely valuable and probative . . . ."); Fed. R. Evid.
403, Advisory Committee Note ("'Unfair prejudice' within [Rule
403's] context means an undue tendency to suggest decision on an
improper basis, commonly, though not necessarily, an emotional
one.").  Accordingly, the Government respectfully requests that the
Court deny Hashmi's motion to exclude Mr. Kohlmann's testimony
based on the materials provided by the Government and without a
hearing.

## II.  HASHMI'S MOTION TO LIMIT EVIDENCE OF AL QAEDA AND OTHER MATTERS TO KOHLMANN'S TESTIMONY SHOULD BE REJECTED

In a separate motion, Hashmi seeks to limit evidence regarding
al Qaeda, Usama bin Laden, ALM, Hamas, Hizballah, and the Taliban

to the testimony of expert witness Evan Kohlmann. (Def. Lim. Evid. Mot. at 1). Specifically, "[i]n so far as the government will seek to use any witness other than Evan Kohlman to introduce evidence about al Qaeda, Osama Bin Laden, al Muhajiroun, Hamas, Hezbollah, and the Taliban, the defense moves for such evidence to be excluded." (Id. at 3). For the reasons described below, the Government intends to admit relevant and probative evidence in addition to the testimony of Mr. Kohlmann with respect to each of these matters, except the Taliban, regarding which the Government currently does not intend to offer any evidence. We discuss the relevant entities in turn and in the following three categories: (i) al Qaeda and bin Laden; (ii) ALM; and (iii) Hamas and Hizballah.

## A.    Al Qaeda and Bin Laden

In a case charging the defendant with providing material support to al Qaeda, it is completely reasonable — indeed, to be expected — that the Government would seek to introduce non-expert witness evidence related to al Qaeda and Usama Bin Laden, especially evidence concerning the defendant's own statements regarding both. Such evidence is probative not only of the defendant's knowledge of al Qaeda's existence, nature, and goals, but also of his intent to advance the goals of al Qaeda. Accordingly, the Government intends to introduce at least two

-19-

relevant pieces of evidence towards that end: (1) testimony by the Government's cooperating witness, Babar, about his discussions with Hashmi concerning al Qaeda and bin Laden; and (2) statements by the defendant himself, as recorded on a videotape of a 2002 ALM protest (e.g., statement that "bin Laden is not a terrrorist"), the relevance and probative value of which is set forth in greater detail in the Government's Memorandum in Support of Its Motion To Admit Certain Evidence at Trial, dated Oct. 23, 2009 ("Government's 10/23/09 Motion").

**B.    ALM**

Similarly, as described in further detail in the Government's 10/23/09 Motion, the Government intends to introduce evidence regarding the defendant's prior involvement in ALM, including his participation in a 2002 ALM protest and a 2003 ALM meeting, given that such evidence is not only probative of the defendant's knowledge as it relates to the charged conspiracy, but also relevant as background to the charged conspiracy.   (See Govt. 10/23/09 Mot. at 6-12).   Such evidence would include not only testimony by journalist Aaron Klein, who was present at the 2003 ALM meeting, and excerpts from the videotape of the 2002 ALM protest, as described in the Government's 10/23/09 Motion (id. at 6-7), but also testimony by the Government's cooperating witness, Babar, with whom Hashmi had numerous discussions about ALM that are

-20-

probative of his (Hashmi's) knowledge and intent related to the charged conduct (id. at 4-6).

**C.    Hamas and Hizballah**

Finally, the only evidence that the Government intends to introduce with respect to Hamas and Hizballah is an excerpt from the videotape of the 2002 ALM protest, in which the defendant himself invokes both the names of "Hamas" and "Hizballah" in leading a crowd to chant in support of those organizations. Hashmi's knowledge of and public support for two international terrorist organizations like Hamas and Hizballah are relevant to his knowledge of al Qaeda and his intent to support its terrorist objectives.

For these reasons, the Government respectfully submits that the Court reject Hashmi's motion to limit testimony related to al Qaeda, Bin Laden, ALM, Hamas, and Hizballah to the testimony of Evan Kohlmann.

**III. HASHMI'S MOTION TO PRECLUDE HIS POST-ARREST STATEMENTS SHOULD BE DENIED**

Hashmi does not dispute that the Court has already found that his post-arrest statements are "constitutionally admissible," but argues nevertheless — and without any elaboration — that (1) "any resisting arrest" or (2) "derogatory remarks made . . . at the time of his arrest" are "not relevant to the charged crimes and,

alternatively, that any probative value of the evidence would be outweighed by the 'danger of unfair prejudice'" under Rule 403. (Def. Arrest Evid. Mot. at 2).  Hashmi is wrong as to both aspects of his post-arrest conduct.

First, evidence that a defendant resisted arrest — as Hashmi did here — "comes within a broad category of conduct evidencing a 'consciousness of guilt' and, therefore, is admissible and relevant." Diaz v. Greiner, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) (citing 2 J. Wigmore, Evidence §276, at 111 (3d ed. 1940)). Indeed, "[i]t is today universally conceded that the fact of an accused's flight, escape from custody, *resistance to arrest*, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." Wigmore §276, at 111 (3d ed. 1940) (emphasis added). "This principle has been sanctioned so many times that its frequent modern repetition has become redundant. . . ." Id.; see also United States v. Wright, 392 F.3d 1269, 1279 (11th Cir. 2004) (admitting as relevant evidence that defendant resisted arrest following a traffic stop as consciousness of guilt of possessing a firearm); United States v. Graham, 548 F.2d 1302, 1313 n.13 (8th Cir. 1977) (holding evidence "admissible to show that [defendant] resisted arrest, thus showing consciousness of guilt"); United States v. Ramirez, 460 F.2d 1322, 1323 (10th Cir. 1972) (per curiam)

("Resistance to arrest is admissible to show consciousness of guilt and thus guilt itself."); Calloway v. United States, 399 F.2d 1006, 1009 n.4 (D.C. Cir. 1968) (resistance to arrest can be probative of consciousness of guilt "where defendant was aware he was being arrested for the offense on trial"); United States v. Payne, No. 91-CR-811(DRH), 1993 WL 17456, at *2 (E.D.N.Y. Jan. 12, 1993) (suggesting that evidence relating to resisting arrest would be "admissible . . . as evidence of consciousness of guilt"). Accordingly, Hashmi's sustained and violent resistance to British law enforcement — which included kicking, spitting, and attempts to bite the officers — is admissible as probative of and relevant to his "consciousness of guilt." Moreover, under Rule 403, evidence of Hashmi's resistance is not "unfairly prejudicial." See United States v. Wright, 392 F.3d at 1276-79 (judge's instruction that jury could draw inference of consciousness of guilt from evidence of resistance was not unfairly prejudicial).

Likewise, Hashmi's post-arrest statements are relevant.[8]

---

[8] As summarized in the Government's Memorandum of Law in Opposition to Hashmi's Motions to Suppress Statements and Evidence, dated Feb. 13, 2009 ("Govt. Suppression Resp."), Hashmi made the following statements, in sum and substance, at the time of his arrest. First, in response to learning that he was arrested, Hashmi called the British officers "crusaders," "sons of monkeys and pigs," among other things, and said that: (i) he was happy that U.S. soldiers and British soldiers were dying in Afghanistan and in Iraq; (ii) we are going to kill U.S. and British soldiers; (iii) we are the hand of Allah; (iv) we are the

-23-

Specifically, Hashmi's statements in support of jihad help demonstrate Hashmi's knowledge of al Qaeda's existence, nature, and goals and his knowledge that the goals of al Qaeda would be advanced by the support he provided in furtherance of the charged conspiracy.  Indeed, his ardent statements help "rebut a claim of ignorance" – *i.e.*, that he was merely attempting to help Babar without knowledge that the assistance was in support of al Qaeda. <u>United States</u> v. <u>Santoro</u>, 302 F.3d 76, 83 (2d Cir. 2002).

## IV.  EVIDENCE REGARDING OMAR KHYAM'S RELATIONSHIPS OF TRUST WITH BABAR AND HASHMI IS ADMISSIBLE

Hashmi also moves to exclude all evidence relating to the 2004 investigation of a fertilizer bomb plot in England known as Operation Crevice, and to limit the admission of evidence relating to the leader of the plot, Omar Khyam.  However, as discussed in more detail below, aspects of evidence related to Operation Crevice

---

sword of Allah; and (v) a particular jihad leader will make the arresting officers pay for what they were doing to him.  (Govt. Suppression Resp. at 5).  Subsequently, during the drive from the police station to court, Hashmi then stated, in sum and substance, that (i) the Muslim religion will take over; (ii) Western society is dying; and (iii) his views and actions are justified because the West is killing his Muslim brothers in Afghanistan and Iraq.  (<u>Id.</u> at 7).  Finally, when officers went to pick up Hashmi to drive him to the airport for his flight to the United States, Hashmi stated the following, in sum and substance and without being questioned: (i) he had met some good "brothers" in the prison where he had stayed, a facility holding other charged terrorists; (ii) he had learned a lot from them; and (iii) it was the best experience of his life.  (<u>Id.</u> at 7-8).

and Omar Khyam are central to the Government's proof.   Omar Khyam was not only the leader of the Operation Crevice fertilizer bomb plot, he also played a central role in the conspiracy to provide material support to al Qaeda charged in this case.   Indeed, Mohammed Junaid Babar will testify, among other things, that, over the course of their friendship from 2002 to 2004, he and Khyam frequently discussed their desire to deliver gear and money to Hadi al Iraqi, and that he (Babar) actually sent gear to Hadi al Iraqi on Khyam's behalf in late 2003.   In addition, Babar will testify, and Hashmi's cellphone records and emails will corroborate, that Babar introduced Hashmi to Khyam in London in January 2004, that the three of them attended meetings with other al Qaeda supporters where the need to continue supporting Hadi al Iraqi and al Qaeda was discussed, and that Khyam agreed to reimburse Hashmi for the £100 to £150 he gave to Babar for a return ticket to Pakistan so that Babar could deliver gear to Hadi al Iraqi.   Moreover, after Babar left London in early 2004, Hashmi served as an intermediary between Khyam and Babar, relaying messages from Khyam in London to Babar in Pakistan via email.   The Government respectfully submits, therefore, that evidence relating to the relationships of trust that Khyam developed with Babar and with Hashmi is not only relevant, but central, to the Government's proof of the charges in this case.

-25-

However, the Government recognizes the potential for confusion if the jury is also presented with evidence of Babar and Khyam's simultaneous involvement in the Operation Crevice fertilizer bomb plot. Accordingly, the Government does not intend to introduce any evidence, including testimony from Babar, that directly relates to the Operation Crevice fertilizer bomb plot, even though such evidence is arguably relevant to understanding and crediting Babar's testimony regarding the relationship of trust among Hashmi, Babar, and Khyam in connection with the crimes charged in this case. Because a detailed understanding of the Government's expected evidence relating to Khyam is necessary to determine the relevance of such evidence, the Government sets forth below for the Court's and defense counsel's reference an overview of the Operation Crevice bomb plot and a description of the evidence the Government intends to present relating to Khyam. The Government then provides a description of the evidence directly relating to the Operation Crevice fertilizer bomb plot that it does not intend to present.

A.    Overview of the Operation Crevice Fertilizer Bomb Plot

As documented in public sources, in March 2006, Omar Khyam and seventeen others, including Khyam's brother, were arrested for their role in a plot to detonate fertilizer bombs in various locations across England, including a shopping center and a

nightclub.   Over the course of at least five months, the group planned to make an improvised explosive device from ammonium nitrate fertilizer, which they intended to mix with aluminum powder, the necessary fuel for the detonation of the fertilizer. They also discussed using a remotely operated detonation system to detonate the bomb.   In November 2003, in furtherance of the plot, the conspirators bought 600 kilograms (approximately 1,300 pounds) of fertilizer at a wholesale agricultural company in rural England, and rented a storage unit to secure the 600 kilogram bag of fertilizer.   In February 2003, Khyam and other members of the plot were recorded discussing the distance needed for the remote detonation system and the use of a cellphone as a transmitter for the detonater.   Later that month, Khyam and others were recorded discussing an attack on water and gas utilities as well as a large night club in central London.   Throughout March 2003, various members of the plot, including Khyam, visited the storage facility where the 600 kilograms of fertilizer were secured, and continued to discuss potential targets, including the largest shopping mall in England.

Khyam and the other members of the plot were arrested by English authorities on March 30, 2006.   A search of the residence Khyam shared with his brother yielded a tin containing aluminum powder bearing the fingerprints of Khyam and his brother, airline

-27-

tickets for Khyam and his brother to Pakistan for April 7, 2004, and a list of synagogues.  In April 2007, after a trial and jury deliberations that spanned 13 months, Khyam and four other members of the plot were convicted of various terrorism offenses.  The prosecution's lead witness was Mohammed Junaid Babar who was on the stand for 15 days.  Khyam was subsequently sentenced to at least 20 years' imprisonment.

**B.    The Scope of Babar's Testimony**

### 1.    Evidence the Government Intends To Introduce Regarding Khyam

The Government expects that Mohammed Junaid Babar will provide the following testimony, in sum and substance, regarding his relationship with Omar Khyam:

Babar met Khyam in December 2002 during a visit to London. Babar, who was living in Pakistan at the time, had traveled to London to raise money for jihadist activities in Pakistan.  Babar met Khyam at a lecture, and asked Khyam for money for jihad.  Khyam refused to give Babar any money at that time.

After a one-month stay in London, Babar returned to Pakistan. In early 2003, Babar attended a meeting of al Qaeda supporters in Islamabad and saw Khyam again.  During that meeting, another al Qaeda supporter, Khalid, discussed the different types of training he could arrange for members of the group.  Approximately one month

later, Babar met with Khyam again in Pakistan, and Khyam discussed for the first time with Babar the fact that he worked for Hadi al Iraqi.

Shortly after this meeting, Babar returned to London to meet with al Qaeda supporters based there.  During this visit, he met with Khyam again at a hotel outside the city.  During this meeting, Khyam introduced Babar to his brother and told Babar that he was in England to buy equipment to send back to Pakistan for a training camp he was setting up.  After approximately one month in England, Babar returned to Pakistan.

In May 2003, Khyam contacted Babar in Pakistan, and asked Babar if he could live in the guest quarters of Babar's house in Lahore.  Babar agreed, and in June 2003, Khyam and a friend of his, Anthony Garcia, moved in with Babar.  At this time, Khyam had a dispute with Omar Bakri, the leader of ALM, and Khyam and Babar talked at length about Bakri and the problems within ALM.  Also at this time, Khyam asked Babar if he could arrange a training camp for him and his associates to conduct physical training and weapons training.  Thereafter, in July 2003, Babar arranged a three-week training camp in a remote region of Pakistan where Khyam and about ten other young men received training on various types of weapons.  Babar only attended the last few days of the camp but during that time, he saw Khyam detonate a one pound ammonium nitrate bomb.

After returning from the camp, at Khyam's suggestion, Khyam and Babar together bought different types of substances for use in making bombs, including aluminum powder, ammonium nitrate and urea. They kept the substances in a closet in Babar's residence in Lahore.  Around that time, Khyam and Babar constructed a bomb using a jar from Babar's kitchen and then detonated it in the backyard of Babar's residence.

Khyam returned to London in September 2003.  In October 2003, Khyam and Khalid asked Babar to send gear to Hadi al Iraqi that Khyam had left behind in Pakistan with Khalid.  Babar met with Khalid to receive the gear and Khalid confirmed to Babar that he also worked for Hadi al Iraqi.  After receiving the gear from Khalid, Babar sent it to Hadi al Iraqi.  During Babar's first meeting with Hadi al Iraqi approximately two months later, Babar showed Hadi al Iraqi photographs of the gear to confirm Hadi al Iraqi's receipt of the gear.  Hadi al Iraqi confirmed that he had received the gear.

In January 2004, Babar traveled again to London in an effort to resolve a dispute among al Qaeda supporters about who was actually working for Hadi al Iraqi.  During that visit, Babar stayed with Hashmi, and used Hashmi's cellphone to contact Khyam and other al Qaeda supporters.  Babar also introduced Hashmi to Khyam and Khyam's brother.  Babar and Hashmi also stayed overnight

at Khyam's apartment the night before a meeting of al Qaeda supporters to discuss the dispute relating to Hadi al Iraqi, which Hashmi, Babar and Khyam attended together.  Babar and Hashmi also attended other meetings with al Qaeda supporters about the need to support Hadi al Iraqi, some of which Khyam was present for.  There was also one meeting Babar attended without Hashmi because Khyam asked Babar not to invite Hashmi.

In addition to Babar's testimony about Khyam, the Government intends to present the testimony of a cell site expert who will testify about telephonic contacts between a cellphone subscribed to by Hashmi and a cellphone used by Khyam during the period of the charged conspiracy.  The Government also intends to introduce emails between Hashmi and Babar that demonstrate Hashmi's role as an intermediary between Babar and Khyam after Babar left London and also reference the money that Hashmi gave to Babar for his plane ticket back to Pakistan.  These emails also include an email from Hashmi to Babar on April 1, 2004, the day after the arrests in Operation Crevice, in which Hashmi writes at the end of the email, "i was just hoping that u were safe inshaallah."  Babar will testify that he learned of the Operation Crevice arrests around March 30, 2009, through the news, and that he understood "safe" in this context to mean safe from the authorities or not under arrest.

**2.**   **Evidence the Government Does Not Intend To Introduce Regarding the Bomb Plot**

Although arguably relevant to establishing the relationship of trust between Babar and Khyam, the Government does not intend to introduce the following evidence from Babar that directly relates to the Operation Crevice fertilizer bomb plot:

1.   In June 2003, after Khyam moved into the guest quarters at Babar's residence in Pakistan, Khyam told Babar that he wanted to bomb soft targets, including trains and nightclubs, in England.  Khyam also spoke in positive terms about a recent suicide bombing at a restaurant in Israel.  In response, Babar said that more needed to be done.  This conversation was the first of several that Khyam and Babar had about potential targets for detonating a bomb, though Babar was never aware of any specific targets identified by Khyam and the other members of the Operation Crevice plot.

2.   As part of the conversations about the bomb plot in England, Khyam asked Babar to transport detonators in radios from Pakistan to Khyam in Belgium who would then transport them to England.  In furtherance of this plan, Khyam gave Babar several detonators.  Khyam also sent Babar approximately 230,000 Pakistani rupees via a wire

transfer and told Babar that some of the money was for expenses related to Babar's transport of the detonators. Babar never bought any additional aluminum powder and never brought any detonators to England.

3.   In September 2003 when Khyam left Pakistan for England, he brought some of the aluminum powder he and Babar had bought with him.  He also asked Babar to bring additional aluminum powder with him on his next trip to England, and later sent Babar several hundred pounds to pay for Babar's airfare and for the additional aluminum powder. Babar never brought any aluminum powder to England.

4.   In January 2004, shortly after Babar had arrived in London, he and Khyam met in Khyam's car.  During this meeting, for which Hashmi was not present, Khyam asked Babar, "Are you with us?"  Babar understood Khyam to be asking whether Babar planned to be part of the bomb plot. In response, Babar indicated to Khyam that he planned to work on his own.

## C.   The Government's Proposal Is Reasonable and Efficient

At a minimum, Babar's testimony regarding his relationship with Khyam through the planning for Operation Crevice, including all of the details about the ultimate fertilizer plot, is relevant as background to the conspiracy.  The Government's proposed

limitation on Babar's testimony, however, will allow the introduction of crucial evidence to explain the relationship among Hashmi, Babar, and Khyam, while, at the same time, streamline Babar's testimony and reduce the potential for jury confusion stemming from learning about the actual plans for the fertilizer bomb plot. In particular, by focusing on the development of Babar and Khyam's relationship, _i.e._, the discussions they had and the activities they participated in together, while excluding all references to the fertilizer bomb plot and the transportation of chemicals and detonators to England, the Government will be able to present evidence to the jury about Khyam and his relationships with Babar and Hashmi in a reasonable and efficient manner. Without this evidence regarding Khyam, the jury will not be able to understand the ultimate roles of Hashmi, Babar, and Khyam as they relate to each other and within the charged conspiracy. Accordingly, the Government respectfully submits that the evidence regarding Khyam in the limited form proposed <u>supra</u> at III.B.1 be admitted at trial.

**CONCLUSION**

For the reasons set forth above, the defendant's pre-trial motions _in limine_ should be denied.

Dated:    New York, New York
          November 4, 2009

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney

                    By: _____/s/_____
                         BRENDAN R. MCGUIRE
                         IRIS LAN
                         Assistant United States Attorneys
                         Tel. No.: (212) 637-2220/2263