5B23PARH                    Kohlmann - direct

1   that it was a minor issue and it was more important to defeat

2   the enemy.

3   Q.  I want to ask you about an individual named Mohammed al

4   Massari.  While you were in London, did you get a chance to

5   interview that person?

6   A.  Yes, I did.

7   Q.  Who is he?

8   A.  He's a Saudi dissident who runs an organization that is

9   known as the Committee for the Defense of Legitimate Rights.

10  Dr. al Massari is also considered to be one of the world's

11  foremost spokesmen in the West for Osama bin Laden.  He has

12  been cited as an operational by al Qaeda terrorists who have

13  conducted bombings, including the 1995 bombing of a joint Saudi

14  U.S. national guard headquarters in Riyadh.  Massari has also

15  participated in the purchase of equipment destined for Osama

16  bin Laden, including a satellite telephone that was used in the

17  commission of the 1998 bombings of two U.S. embassies in East

18  Africa.

19  Q.  This group, the Committee for the Defense of Legitimate

20  Rights, can you describe that group?

21  A.  Sure.  It's a rather small group, mainly of militant Saudi

22  dissidents.  It began as a prodemocracy movement, but it was

23  hijacked by radical Islamists.  By the mid-1990s it became --

24              THE COURT:  You have to slow down.

25              THE WITNESS:  Excuse me, your Honor.

HA 08965

5B23PARH                    Kohlmann - direct

1          THE COURT:  Did you grow up in New York?

2          THE WITNESS:  Yes, I did, your Honor.

3          THE COURT:  All right.

4    A.   It was initially founded as a human rights organization.  A

5    means to promote human rights in Saudi Arabia.  However, after

6    the original founders were arrested, a group of radical

7    Islamists led by Dr. al Massari seized control of the

8    organization.  They began turning it towards their own methods

9    and their own means.  By 1996 CDLR communiques and reports were

10   openly offering support and enthusiasm for Osama bin Laden,

11   were discussing the need to overthrow the Saudi regime and to

12   strike directly at the United States.  As a result, CDLR

13   created a suborganization in approximately 1996 known as the

14   Global Jihad Fund.  Its express purpose was to, quote, provide

15   support to Osama bin Laden.

16   Q.   I want to ask you about another group call Hizbut Tahrir.

17   Are you familiar with that group?

18   A.   Hizbut Tahrir.  In English it means liberation party.

19   Q.   And did you speak with anyone associated with that group?

20   A.   Yes, I spoke with several of their leaders in the United

21   Kingdom.

22   Q.   Briefly, what does that group advocate; what is its goals?

23   A.   Hizbut Tahrir shares the same ideological roots as Sheikh

24   Bakri Mohammed.  The only difference is Hizbut Tahrir, while

25   emphasizing the need for an Islamic empire that would wipe away

HA 08966

5B23PARH                        Kohlmann - direct

1   the United States and United Kingdom and other Western regimes,

2   suggests this process can also be done non-violently.  However,

3   the organization has been tied to terrorist cells in Egypt and

4   in Central Asia.

5   Q.  I want to talk about for a moment work trips you've taken,

6   not necessarily to interview people but to see things.

7   A.  Sure.

8   Q.  Did you take a trip to San Diego?

9   A.  Yes, I did.

10  Q.  For what purpose was that?

11  A.  I wanted to get an idea for the 9/11 hijackers who had been

12  living in San Diego to check out where they were living, to

13  check out the mosque they had attended, to see where they were

14  gathering, to see the points which they had met other

15  conspirators in the plot, try to get a feel for how they all

16  worked together.  As a result I was able to take a tour and see

17  their houses and see the various points that they met at, and

18  it was helpful to gain an understanding what they were doing in

19  San Diego.

20  Q.  When did you take that trip?

21  A.  That was in 2003.

22  Q.  Did you also take a trip to Portland in connection with

23  your trip?

24  A.  Yes, I did.

25  Q.  For what purpose was that?

HA 08967

5B23PARH                    Kohlmann - direct

1    A.  Well, we were interested in quite a bit of activity in

2    Portland, Oregon, surrounding the --

3         MR. WILFORD:  I am going to object to the

4    characterization of "we."

5         THE COURT:  Sustained.

6         THE WITNESS:  Me.

7    A.  I was quite interested in developments in Portland, general

8    terrorism developments but specifically related to the Portland

9    7 jihad cell case.

10   Q.  Is that a case you've worked on?

11   A.  Yes.

12   Q.  What types things did you do when you were doing fieldwork

13   in Portland?

14   A.  I got a chance to go out, and much like what I did for the

15   9/11 hijackers, I got a chance to see where some of the

16   conspirators lived.  I saw the mosques they were attending,

17   some of the businesses owned by coconspirators.  The places of

18   employment of some of those involved in the plot.  Trying to

19   get a feel for what the daily life was of these folks, what was

20   their relationship with various religious institutions, private

21   institutions, etc.

22   Q.  You mentioned earlier in your testimony that you also took

23   a trip to Bosnia in connection with your work?

24   A.  That's correct, yeah.

25   Q.  When was that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 08968

5B23PARH                    Kohlmann - direct

1    A.   I took a trip for several weeks back this spring.

2    Q.   And what types of things did you do in the field in Bosnia?

3    A.   Well, my primary purpose for being there was to do contract

4    work on behalf of the British office of the high representative

5    in Sarajevo.  I was there to provide expert analysis and

6    expertise on the issue of militant Middle Eastern groups,

7    Saudis, North Africans involved in the Balkans.  In addition to

8    that, in addition to testifying at the Bosnian Supreme Court,

9    while I was there I also went out in the fields to places like

10   Setna and around Sarajevo, checking out fundamental mosques,

11   purchasing videotapes, researching and going out and seeing and

12   videotaping different institutions that are currently be used

13   to support militancy, and also checking out where some of the

14   former mujahideen now live in central Bosnia.

15   Q.   You mentioned you actually did testify while you were in

16   Bosnia?

17   A.   Yes.  I testified on behalf of the international

18   prosecutors at the BIH which was operating under a three judge

19   panel under the jurisdiction of the International Criminal

20   Tribunal for the former Yugoslavia at the Hague.

21   Q.   Can you briefly describe the nature or the subject areas of

22   your expert testimony in that case?

23   A.   Sure.  First of all, I was to give a general background as

24   to the Arab Afghans, the Arab Afghan movement, Osama bin Laden.

25   I was to explain the relationship between the Arab Afghans

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 08969

5B23PARH                    Kohlmann - direct

1    foreign mujahideen in the Balkans.  I was to explain the

2    structure, leadership, structure, history and ideology of the

3    foreign mujahideen in the Balkans who had traveled there from

4    Afghanistan.  I was also meant to give a detailed analysis of

5    al Qaeda's view as to regards to Shiite Muslims.

6    Q.  In addition to in person interviews in connection with your

7    work, have you conducted any telephone interviews?

8    A.  I have.

9    Q.  Can you briefly describe for us who you've interviewed on

10   the telephone in the past year or so?

11   A.  Sure.  As part of a project that I started by myself which

12   is a project to track suicide bombers in Iraq, I've made

13   several telephone calls to families of suicide bombers in Saudi

14   Arabia and Kuwait who have joined al Qaeda in Iraq and have

15   blown themselves up in the last two years.  I've spoken with

16   their family to get an idea of what their background was, where

17   they were from, what religious institutions they might be

18   attending, who their colleagues were, why they had gone to

19   Iraq, how they had gone to Iraq --

20              THE COURT:  Do you speak Arabic, sir?

21              THE WITNESS:  I only speak a little bit.  Luckily I

22   have translators that do work with me.

23   Q.  In addition to these telephone interviews, have you

24   communicated by e-mail with anyone in connection with your

25   work?

HA 08970

5B23PARH                    Kohlmann - direct

1    A.   Yeah.   I've communicated with several representatives of

2    terrorist groups.   And terrorists groups themselves over the

3    Internet such as the Islamic Great Eastern Radars Front, the

4    Algerian Salafist Group for Prayer and Combat.   GSPC.

5    Q.   Now, have you been retained by the government as an expert

6    witness prior to this case?

7    A.   Yes, I have.

8    Q.   Have you been retained as a consulting expert or a

9    testifying expert or both?

10   A.   Both.

11   Q.   I want to walk through some of those cases.   Are you

12   familiar with United States v. Jeffrey Leon Battle?

13   A.   Yes, I am.

14   Q.   Were you retained as an expert in that case?

15   A.   Yes, I was.

16   Q.   Can you briefly describe what the nature of the allegations

17   were in that case?

18   A.   This was the so-called Portland 7 jihad cell case.   The

19   allegations centered around a group of American Muslims who

20   were alleged to have travelled to China with the hopes of

21   entering Afghanistan or Pakistan and fighting against U.S.

22   forces alongside the Taliban.

23   Q.   What subject matters were you scheduled to testify as an

24   expert on?

25   A.   I was scheduled to testify about the history of al Qaeda,

5B23PARH                    Kohlmann - direct

1   the history of Arab Afghans, ideological underpinnings behind

2   al Qaeda such as Sheikh Abdullah Azzam.  I was also supposed to

3   testify about the geographic locations of the Taliban al Qaeda

4   training camps, etc.

5   Q.  Did you end up testifying in that case?

6   A.  No, I did not.

7   Q.  Why not?

8   A.  The defendants pled guilty.

9   Q.  Okay.  Although there was a guilty plea and you didn't

10  testify, did you do anything active in that case; did you play

11  any role?

12  A.  Yes, I did.

13  Q.  Can you describe that for us?

14  A.  I played several roles on behalf of the prosecution.

15  Number one, I provided a lengthy detailed expert witness report

16  where I went through the various exhibits that the prosecution

17  and bureau had collected in that case, and I provided a

18  detailed summary for each exhibit I thought was significant as

19  per its background, its significance, its relationship to the

20  case.

21       Secondly, I interviewed a cooperating defendant,

22  defendant who had pled guilty in that case, in order to help

23  the bureau and the Department of Justice get as much

24  information as possible out of this cooperating defendant.

25       Finally, I also was present during sentencing as an

HA 08972

5B23PARH                    Kohlmann - direct

1    assistant to the prosecutors during that phase of the trial.

2    Q.  The next case I want to ask you about, United States v.

3    Randall Royer.  Are you familiar with that case?

4    A.  Yes, I am.

5    Q.  Were you retained as an expert by the government in that

6    case?

7    A.  Yes.

8    Q.  Can you briefly describe the nature of the allegations in

9    that case?

10   A.  Sure.  The defendant in that case was accused of having

11   traveled to a foreign country, with the purpose of recruiting

12   others to participate in a war against another country, another

13   sovereign nation, and they had also participated in a

14   conspiracy to provide material support to a foreign terrorist

15   organization.

16          THE COURT:  What was that foreign terrorist

17   organization?

18          THE WITNESS:  It was a group known as Lashkar

19   E-Tayiba, and that means army of the pure, sometimes translated

20   as Army of Medina.

21          The idea behind this group is it's a group that was

22   founded during the Soviet Afghan jihad of the 1980s in order to

23   help encourage Pakistanis to participate in jihad.

24   Q.  Did you end up testifying in that case?

25   A.  No, I didn't.

HA 08973

5B23PARH                    Kohlmann - direct

1   Q.   What district was that case in?

2   A.   The Eastern District of Virginia.

3   Q.   Why didn't you end up testifying in case?

4   A.   The defendant pled guilty.

5   Q.   Did you have any role in that case after the defendant pled

6   guilty?

7   A.   Yes, I did.

8   Q.   Can you explain that for us.

9   A.   After the defendant pled guilty, prosecutors in the bureau

10  asked me to interview Randall Royer in an attempt to gain as

11  much information as possible, again because of the fact he was

12  cooperating from his experiences both in Bosnia Herzegovina and

13  also in Pakistan.

14  Q.   Next case, United States v. Masoud Khan.  Are you familiar

15  with that case?

16  A.   Yes, I am.

17  Q.   Were you retained by the government as an expert in that

18  case?

19  A.   Yes, I was.

20  Q.   Which district was that case in?

21  A.   Also the Eastern District of Virginia.

22  Q.   Can you again briefly describe the nature of the

23  allegations in that case?

24  A.   Sure.  Masoud Khan case was also linked to the Randall

25  Royer case.  This was also an instance of an American citizen

HA 08974

1   who was alleged to have traveled to a foreign country for

2   purposes of providing material support, to seek military

3   training, ultimately perhaps even to aid the Taliban in

4   Afghanistan.

5   Q.  Was the nature of your expert testimony, your proffered

6   expert testimony in that case, the same as in the Randall Royer

7   case?

8   A.  Yeah.  The general subject was to be for me to talk about

9   al Qaeda, the Taliban, the location of terrorist training

10  camps, the relationship between Lashkar E-Tayiba and al Qaeda,

11  and the relationship between Lashkar and the Taliban.

12  Q.  Did you end up testifying in the Khan case?

13  A.  I did, but not as an expert.

14  Q.  Why didn't you testify as an expert in that case?

15  A.  Government didn't need me to testify as an expert.  They

16  needed me to testify as a fact witness.

17  Q.  You did testify as a fact witness?

18  A.  No.

19  Q.  You weren't precluded by the judge --

20          MR. WILFORD:  Objection.

21          THE COURT:  Sustained.

22  Q.  Were you precluded?

23          MR. WILFORD:  Objection.

24          MR. BRUCE:  I don't understand the basis.

25          THE COURT:  I take it it's a matter of public record.

HA 08975

5B23PARH                         Kohlmann - direct

1    Go ahead.

2              THE WITNESS:  No, I was not precluded.  My expert

3    testimony simply wasn't needed.

4              THE COURT:  Did the judge make a ruling one way or

5    another?

6              THE WITNESS:  No, your Honor.

7              THE COURT:  It wasn't an issue?

8              THE WITNESS:  No, it wasn't an issue, your Honor.

9    Q.   Which judge was that?

10   A.   That was Judge Leonie Brinkema.

11   Q.   Next case, United States v. Sabri Benkhala.  Are you

12   familiar with that case?

13   A.   Yes, I am.

14   Q.   Were you retained by the government as an expert in that

15   case?

16   A.   Yes, I was.

17   Q.   What was the nature of the allegations in that case?

18   A.   The Sabri Benkhala case was again linked to the previous

19   two cases.  The allegations were that the defendant had engaged

20   in a conspiracy to assist others in traveling to terrorist

21   training camps and providing material support to a designated

22   foreign terrorist organization.

23   Q.   Did you testify as an expert witness in that case?

24   A.   Yes.

25   Q.   What areas of expertise did you testify?

HA 08976

1   A.  Much the same areas I was proffered for.  I talked about al

2   Qaeda training camps, I talked about the history and ideology

3   of the Taliban, I talked about the history ideology of Lashkar

4   E-Tayiba, I explained the relationship between Lashkar, the

5   Taliban, and al Qaeda, both religiously and politically.  I

6   also went through a brief history of al Qaeda itself.

7   Q.  Who was the judge in the Benkhala case?

8   A.  It was judge Leonie Brinkema.

9   Q.  Next case.  United States v. Ali al Timimi.  Were you

10  retained by the government as an expert witness in that case?

11  A.  Yes.

12  Q.  What were the nature of the allegations there?

13  A.  The nature of the allegations were that the defendant had

14  recruited a group of individuals to travel to a foreign country

15  and to wage war against the United States and its allies.

16  Q.  And did you testify as an expert witness in that case?

17  A.  Yes, I did.

18  Q.  On what areas?

19  A.  Similar areas, again I testified about the history and

20  ideology of al Qaeda, the history and ideology of the Taliban,

21  the history and ideology of Lashkar E-Tayiba, the relationship

22  between those three groups, the location and names of al Qaeda

23  terrorist training camps, material related to those subjects.

24  Q.  Who was the judge in the al Timimi case?

25  A.  It was Judge Leonie Brinkema.

HA 08977

5B23PARH                    Kohlmann - direct

1   Q.   Have you ever been precluded by a judge in testifying as an

2   expert witness?

3   A.   Yes.

4   Q.   When did that happen?

5   A.   Last Friday.

6   Q.   In which case?

7   A.   The case of United States v. Ahmed Omar Abuali.

8   Q.   Before you were precluded from testifying in that case, was

9   any Daubert hearing conducted in that case such as the one we

10  are having today?

11  A.   No.   I actually never entered the courtroom.   I never

12  presented any credentials to anyone.

13  Q.   You mentioned previously that you've been retained by the

14  British government as an expert as well?

15  A.   That's correct, yes.

16  Q.   Can you just real briefly describe that for us.

17  A.   Sure.   I've been asked by to be an expert witness in an

18  upcoming case by the metropolitan police antiterrorism branch

19  which is commonly known as Scotland Yard.   They've asked me to

20  provide expert testimony about the group Lashkar E-Tayiba, army

21  of the pure, and its relationship to the Taliban, al Qaeda, and

22  its recruitment efforts inside the United Kingdom.

23  Q.   In addition to the case you mentioned you testified in

24  Bosnia, are you scheduled to testify in any other cases, other

25  than the one you just mentioned on behalf of Scotland Yard,

HA 08978

5B23PARH                    Kohlmann - direct

1  outside the United States?

2  A.  Yes.  I've been requested by attorneys, prosecutors at the

3  International Criminal Tribunal for the former Yugoslavia at

4  the Hague to serve as an expert witness in an upcoming case

5  that will be carried out directly under their jurisdiction at

6  the Hague.

7  Q.  What's the nature of your expert testimony or your proposed

8  expert testimony in that case?

9  A.  My proposed expert testimony would cover the Arab Afghans,

10  the foreign mujahideen in Bosnia, the relationship between the

11  Arab Afghans, the foreign mujahideen in Bosnia, the history,

12  structure, leadership and ideology of the foreign fighters in

13  Bosnia.  The Arab Afghans, and finally their relationship,

14  their detailed relationship with the Bosnian government and

15  military.

16  Q.  Now --

17          THE COURT:  That does not involve al Qaeda; is that

18  correct?

19          THE WITNESS:  Actually, yes, your Honor, it does.  The

20  context, the subject of my material involves several

21  individuals who are known al Qaeda representatives who are

22  ideologues or clerics or operatives.

23  Q.  Mr. Kohlmann, when you're retained as an expert witness,

24  can you walk us through how you go about arriving at an expert

25  opinion, what methodology do you use?



HA 08979

5B23PARH                    Kohlmann - direct

1    A.   Sure.  Well, I mean, typically what happens in a case such

2    as this is I'm provided with several exhibits, several

3    documents by who's ever retaining me.  On the basis of those

4    documents I'm asked to come up with a comprehensive report,

5    which not only includes material taken from those documents but

6    more importantly contains my analysis information that I have

7    gathered independently and puts all of that information into a

8    comprehensive narrative, into an understandable narrative with

9    an argument and with my, you know, my expert analysis involved.

10   Typically, it would involve hours, many hours of research,

11   cross checking through some of the digital databases we talked

12   to before, taking a look and seeing what other information that

13   I've gathered from other documents, other open source

14   documents, and like I said, ultimately producing a final

15   report.

16   Q.   How do you go about checking the information that's given

17   to you or that you obtain through open sources before you reach

18   your expert conclusion?

19   A.   Well, I cross check everything.

20   Q.   What does that mean?

21   A.   Well, one of the advantages to having everything digitized

22   is one can do searches through these documents for key words.

23   So if I am focusing on a particular individual, I can do a

24   search for that particular individual.  I can find all

25   documents that relate to that individual.  Thus I can compare a

HA 08980

5B23PARH                    Kohlmann - direct

1   wide variety of sources, a wide variety of open sources that

2   discuss this individual.

3           Again, those sources could be anything from court

4   transcripts, trial transcripts, exhibits submitted in trials,

5   open source intelligence documents, original materials from

6   terrorist groups, even if they are particularly knowledgeable,

7   perhaps even a newspaper article.

8           THE COURT:  That requires this information to be on

9   your database, correct?

10          THE WITNESS:  Yeah.  But potentially I could also find

11  the information outside of my database through means such as

12  Lexis Nexis.

13          THE COURT:  In other words, can you do a word search

14  of the newspapers that are available on Lexis Nexis for

15  example?

16          THE WITNESS:  That would be one example, yeah, sure.

17  It's a little bit deeper than that though, because a lot of the

18  documents I would be doing searches for would not just be

19  newspapers, but they would be, particularly on Foreign

20  Broadcast Information Service, there would be translations of

21  actual terrorist documents, communiques and whatnot.

22          THE COURT:  Where are these available?

23          THE WITNESS:  They are available via closed databases

24  online.  Foreign Broadcast Information Service maintains a

25  service called World News Connection which allows you to log on

HA 08981

5B23PARH                    Kohlmann - direct

1    and do a search through all their materials using key words.

2    Q.   When you say you cross check all these various materials,

3    what are you checking them for?

4    A.   I'm checking to see if there's anything varying, if any of

5    the facts seem to vary or whether they are consonant, whether

6    or not there is any background material, whether or not these

7    people are known by any particular aliases.  If I find

8    pseudonyms or aliases, I will check those aliases.  I am

9    looking for virtually anything I can find.  And then again try

10   to take that information together and produce a narrative of

11   what's agreed upon, what's known about the subject at hand.

12   Q.   Now, is your field of expertise a traditional scientific

13   field?

14   A.   I would consider it a modification of a traditional social

15   science field.  It's really a -- it is a microhistory.  I study

16   the microhistory of al Qaeda and its involvement in regional

17   conflicts.  So it's slightly different to a traditional social

18   science.  The methods of information gathering are slightly

19   different, but they do have some remarkable similarity, yes.

20   Q.   Now, how does the methodology that you've described that

21   you use compare to the methodology that other people use in

22   your field?

23   A.   I mean, it's strikingly similar.  I work again closely with

24   a group of colleagues who don't necessarily work for me, but we

25   work cooperatively, other academics around the world, we

HA 08982

1    conduct research together.  Many times if I go on a research

2    trip, I'll go with another colleague.  We generally do about

3    the same thing.  It is the same general process for collecting

4    information on terrorism.  There aren't that many sources of

5    information, so you know, it's fairly easy to figure out what

6    the most valuable ones are.

7    Q.  Now, I want to ask you to focus on your proffered expert

8    opinion in this case that Ammar al-Baluchi was a al Qaeda

9    financier and contributor.  What types of materials did you

10   gather and look at to come to that conclusion?

11   A.  Well, I mean, first of all one document that was extremely

12   helpful was the 9/11 Commission final report.  9/11 Commission

13   final report goes into some detail about Ammar al-Baluchi and

14   his role in 9/11 and his role in other terrorist activities.

15   This document probably provides one of the best declassified

16   summaries of what Ammar al-Baluchi knows and has admitted to.

17          In addition there are a number of other publicly

18   available documents that have been issued by various government

19   agencies which contain either information or references to

20   Ammar al-Baluchi which are also instructive in the fact they

21   are consonant with the conclusions and material presented in

22   the 9/11 Commission report and they add further to what he was

23   doing after 9/11.

24   Q.  Although the 9/11 Commission report -- how would you

25   characterize that as what kind of source; primary, secondary?

HA 08983

5B23PARH                    Kohlmann - direct

1   A.  I would consider it as a secondary source.  It's distilled

2   information.  But it is based upon, especially this particular

3   point, is based upon interviews, direct interviews.  So, I

4   would consider it to be a secondary source of extreme value.

5   Q.  In this case, have you been permitted by the government to

6   view any of the hard data underlying any of the assertions in

7   the 9/11 report?

8   A.  Yes, I have.

9   Q.  Can you briefly describe those.

10  A.  Sure.  I was able to view the actual receipts from money

11  transfers sent by Ammar al-Baluchi to 9/11 hijackers, both in

12  the United Arab Emirates and also here in the United States.

13  Q.  In addition to the materials you've discussed so far, have

14  you relied on any statements reported to have been made by

15  coconspirators of Ammar al-Baluchi in reaching your conclusion?

16  A.  Yes, I was provided with summaries of declassified

17  statements made by conspirators in this case.  One of which is

18  a statement by Ammar al-Baluchi and one of which is a statement

19  by Majid Khan.

20  Q.  Before we get to those, have you been provided with any

21  other or have you obtained on your own any other statements by

22  Ammar al-Baluchi or any of his coconspirators?

23  A.  Yes.  I was, again, I was able to obtain documents

24  particularly relating to the case of Jose Padilla, which

25  discussed Omar al-Baluchi, his involvement with Khalid Sheikh

HA 08984

1   Mohammed, and his attempts at carrying out a terrorist attack

2   in the United States post-9/11.

3   Q.  Can you describe what those statements by Jose Padilla

4   were.

5   A.  Sure.

6   Q.  How they were disseminated?

7   A.  Sure, sure.  They were disseminated in form of a memorandum

8   from I believe it was the Department of Justice on behalf of

9   the Pentagon.  They were statements apparently taken by

10  military interrogators and then used by the Department of

11  Justice to provide a summary of the case both for legal

12  purposes and I think also probably for public relations

13  purposes.

14  Q.  And did those statements reported to have been made by Jose

15  Padilla talk about Ammar al-Baluchi at all?

16  A.  Yes they did.

17  Q.  Can, you briefly describe that for us.

18  A.  Sure.  Jose Padilla discussed in those -- or Jose Padilla

19  is quoted as discussing in those documents how he was in

20  contact with Ammar al-Baluchi, and Ammar al-Baluchi served as

21  almost a lieutenant or fixer for Khalid Sheikh Mohammed in the

22  sense he would present ideas that Jose Padilla would have to

23  Khalid Sheikh Mohammed, he would help facilitate communication

24  between Jose Padilla and Khalid Sheikh Mohammed, and most

25  importantly, that he would, on behalf of Khalid Sheikh

HA 08985

5B23PARH                    Kohlmann - direct

1   Mohammed, he would provide Jose Padilla with financial and

2   material means to carry out the plot.

3             MR. BRUCE:  I am going hand the witness what's been

4   marked as Government Exhibits 4 and 5.

5   Q.  I want to focus you first, Mr. Kohlmann, on Government

6   Exhibit 4.  Do you have that in front of you?

7   A.  Yes, I do.

8             THE COURT:  Mr. Bruce, the reporter understandably

9   would like a break.

10            MR. BRUCE:  Certainly.

11            THE COURT:  Is there a logical point?

12            MR. BRUCE:  Now is fine with me.

13            THE COURT:  All right.  Let's take 10 minutes.

14            (Recess taken)

15            (In open court)

16            THE COURT:  I have a slightly different issue it's

17   been pointed out to me.  The questionnaires that I sent to the

18   parties yesterday has blanks in it for the potential witnesses

19   who are going to be mentioned.  How do the parties want to

20   handle that?  Because obviously I'll need names for that.  We

21   could either have the government put it in or I can put it in,

22   makes no difference to me, but I'll need names if there are

23   going to be any names from the defense and the government

24   parties.

25            MR. WILFORD:  Your Honor, we had discussed that

HA 08986

5B23PARH                     Kohlmann - direct

1    earlier. Mr. Metzner had asked your clerk to e-mail the copy

2    of the questionnaire, we'll insert the necessary names and then

3    forward it back.

4            THE COURT:  That's all right with me.  In other words

5    both parties will insert the names.

6            MR. WILFORD:  Yes.

7            THE COURT:  That's fine.  You'll e-mail it back and

8    I'll present it to the jury clerk.

9            MR. WILFORD:  Yes.

10           THE COURT:  All right, fine.  Mr. Bruce, you may

11   proceed.

12           MR. METZNER:  On the very last point do you want to

13   then take the final to the jury clerk or would you like us to

14   make 175 blank copies?

15           THE COURT:  That's easier.  Let's get the mechanics

16   down.  We will e-mail it to you, because I just faxed it to

17   you.  We'll e-mail it to you so you have it in electronic form.

18   You'll put your names in, you'll get the names from

19   Mr. Wilford.  You will make 175 copies and give them to the

20   jury clerk.  But make the 175 copies, please either e-mail to

21   me back an e-mail, or fax it to me, because I want to look at

22   it before 175 copies are made.

23           MR. METZNER:  The understanding is the only thing we

24   intend to add and the change is the names that the jury might

25   be hearing during the trial.

HA 08987

5B23PARH                    Kohlmann - direct

1           THE COURT:  Yes.  The way I phrased it, that might be

2    witnesses at the trial.

3           MR. METZNER:  That's right.

4           THE COURT:  Proceed.

5           MR. BRUCE:  Thank you your Honor.

6    BY MR. BRUCE:

7    Q.  Mr. Kohlmann, before we broke, I had given you Government

8    Exhibit 4.  Do you have that in front of you?

9    A.  Yes, I do.

10   Q.  Can you tell us what Government Exhibit 4 is?

11   A.  I was given Government Exhibit 4 as the declassified

12   statements -- excuse me, declassified summaries of statements

13   of conspirators in this case.

14   Q.  Okay.  Just the piece of paper marked as 4, who are those

15   statements made by, reported to have been made by?

16   A.  The person known as Mustafa who I know to be Ammar

17   al-Baluchi.

18   Q.  Did you rely on that in reaching your expert opinion in

19   this case?

20   A.  Yes, I did.

21           MR. BRUCE:  Your Honor, I offer Government Exhibit 4.

22           MR. WILFORD:  No objection for purposes of the

23   hearing.

24           THE COURT:  Yes, admitted.

25           (Government's Exhibit 4 received in evidence)

HA 08988

5B23PARH                     Kohlmann - direct

1   Q.  Now, Mr. Kohlmann, can you sort of scan down the page and

2   tell us beginning with the first paragraph that's relevant, how

3   you relied upon this document in reaching your expert opinion

4   in this case?

5   A.  Well, this document contains a number of admissions, even

6   though there are a number of denials, there are also a number

7   of patent admissions in here.  Starting with the second

8   paragraph.

9   Q.  The second bullet point?

10  A.  Yes, excuse me.  Defendant was totally unwitting of

11  Mustafa's al Qaeda affiliation.  Or of Mustafa's intention to

12  use another individual for broader operational plan.  That

13  statement, number one, suggests that Mustafa has an affiliation

14  to al Qaeda, it's inherent in the statement; and second of all,

15  that Mustafa has some sort of broader operational plan in

16  cooperation with al Qaeda.  That's -- I believe that's it for

17  bullet point two.

18  Q.  So you used that in reaching your conclusion that Ammar

19  al-Baluchi was in fact related to al Qaeda?

20  A.  It's inherit in the statement.

21          THE COURT:  What is your expert opinion in regard to

22  Ammar al-Baluchi?

23          THE WITNESS:  I believe Ammar al-Baluchi served as an

24  operational leader on behalf of al Qaeda as a fixer, as someone

25  between an operational commander like Khalid Sheikh Mohammed

HA 08989

5B23PARH                    Kohlmann - direct

1   and those tasks to carry out a operation such as in this case

2   Majid Khan or others.

3           THE COURT:  Madam reporter, would you read that back

4   to me please.

5           (The record was read)

6           MR. WILFORD:  Excuse me, your Honor.  I have a little

7   different recollection in my notes.  He didn't say "leader"

8   specifically.  And he did say "Majid Khan and others."

9           THE COURT:  Well, we have what the testimony is.  Did

10  you say leader, sir?

11          THE WITNESS:  I believe so, yes, your Honor.

12          THE COURT:  All right.  Did you say Majid Khan and

13  others?

14          THE WITNESS:  Yes, I did.

15          THE COURT:  All right.

16  Q.  Mr. Kohlmann, scanning down from the point you just read to

17  us, can you tell us whether any other portions of this document

18  were helpful to you in reaching your expert conclusion in this

19  case?

20  A.  Yes.  Bullet point number three, individual was unwittingly

21  being used to assist in Mustafa a/k/a Ammar al-Baluchi's

22  broader plans with al Qaeda operative Majid Khan.

23          Inherent in this statement is Mustafa otherwise known

24  as Ammar al-Baluchi has broader plans with another al Qaeda

25  operative.

HA 08990

5B23PARH                    Kohlmann - direct

1        Next sentence:  Individual was someone Mustafa a/k/a

2   Ammar al-Baluchi used for information, but from whom he kept

3   his al Qaeda connections hidden.

4        Once again, inherent in this statement is the

5   admission by the conspirator that he has connections with al

6   Qaeda.

7   Q.  Moving down the rest of the page, is anything else on that

8   page that was of assistance to you in reaching your conclusion?

9   A.  Sure.  Bullet point number four or bullet point four,

10  starting with the second line:  Individual did not know it was

11  Uzair's true identity or other name for Uzair.  Mustafa, a/k/a

12  Ammar al-Baluchi, did not believe that another individual was

13  aware that he and Uzair were al Qaeda, suggesting that Mustafa

14  a/k/a Ammar al-Baluchi was indeed al Qaeda.  Continuing on

15  but --

16        MR. WILFORD:  Excuse me, your Honor.  Just for the

17  clarity of the record with respect to the reference to Uzair,

18  that reference is in quotations.  I think that is specifically

19  designed to differentiate that particular reference as Uzair

20  from Uzair Paracha.  It just won't be clear just from the

21  testimony being read the way it was.

22        THE COURT:  Yes.  Uzair is in quotes, that's correct.

23  Go ahead.

24        THE WITNESS:  Okay.

25        THE COURT:  No, I don't know if there's question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 08991

5B23PARH                    Kohlmann - direct

1   Q.  Why don't I pose one.  Is there anything still in bullet

2   point number four that was of assistance to you in reaching

3   your expert conclusion in this case?

4   A.  Yeah, I mean continuing on with the rest of the sentence.

5   But Mustafa a/k/a Ammar al-Baluchi believed that individual

6   likely knew that Mustafa and Uzair were associated with

7   mujahideen and could be associated with the Taliban or al

8   Qaeda.

9            Again, inherent in this statement is the admission

10  that Mustafa a/k/a Ammar al-Baluchi is quote associated with

11  mujahideen and could be associated with the Taliban or al

12  Qaeda.

13  Q.  How about in the remainder of that paragraph, is there

14  anything else that was of assistance?

15  A.  Yeah.  The final line in that paragraph.  At the time of

16  Uzair's arrest, and Uzair in quotation marks, individual

17  probably knew of Mustafa's al Qaeda affiliation.  In other

18  words, the affiliation between al Qaeda and Ammar al-Baluchi.

19  Do you want me to keep going?

20  Q.  Yes, if anything else was of assistance to you, please

21  point it out.

22  A.  Here we go.  The next bullet point actually has, because

23  individual had never been properly vetted, he was never tasked

24  by al Qaeda i.e. Uzair in quotes or Mustafa a/k/a Ammar

25  al-Baluchi.  In this case Ammar al-Baluchi is synonymous with

HA 08992

5B23PARH                    Kohlmann - direct

1    al Qaeda.  Synonymous with those within al Qaeda who would be

2    responsible with others for tasking operations.

3    Q.  Anything further?

4    A.  Yes.  Actually no, I think that's it.

5           MR. WILFORD:  I'm sorry.  Just so the record is clear,

6    again in this particular document, it doesn't say

7    "individuals," it specifically references Saifullah Paracha.

8           THE COURT:  Proceed.

9    Q.  Now, Mr. Kohlmann, I want to turn now to your expert

10   opinion regarding Majid Khan in this case.  In one sentence,

11   would you sort of generally describe for us what your expert

12   opinion is regarding Majid Khan?

13   A.  Majid Khan worked initially as a foot soldier within al

14   Qaeda, but eventually became a lower level fixer, someone who

15   operated as an aid to a fixer, someone that would cooperate

16   with senior operational leaders of al Qaeda in terms of

17   organizing other lower level al Qaeda members into carrying out

18   a terrorist plot.

19   Q.  Okay.  What materials did you review and gather in order to

20   reach that expert conclusion regarding Majid Khan in specific?

21   A.  In order to reach that opinion, I used open source

22   documents and I also was provided with summaries of

23   declassified statements made by Majid Khan.

24   Q.  First, as to the open source materials, who is reported to

25   have provided information that led to the reporting in those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 08993

5B23PARH                    Kohlmann - direct

1    open source materials?

2    A.   I believe it's from the interrogation of Khalid Sheikh

3    Mohammed.

4    Q.   Who is Khalid Sheikh Mohammed?

5    A.   Khalid Sheikh Mohammed is the former chief operational

6    planner on behalf of al Qaeda's terrorist network.  He

7    initially was trained at the al Sada military camp along the

8    Afghanistan Pakistan border, grew closer and closer with bin

9    Laden until 1996 when he swore a bayaat or oath of allegiance

10   to Osama bin Laden in Afghanistan.  Thereafter he assisted bin

11   Laden in conceiving and carrying out major international

12   terrorist plots directed against the United States and its

13   allies.

14   Q.   Is Khalid Sheikh Mohammed someone who would be in a

15   position to know whether someone like Majid Khan was an al

16   Qaeda operative or not?

17             MR. WILFORD:  Objection.

18             THE COURT:  I'll allow it.

19   A.   Majid Khan was for all intents and purposes --

20   Q.   You said Majid Khan.

21   A.   Excuse me, excuse me.  Khalid Sheikh Mohammed was for all

22   intents and purposes the head of al Qaeda aspirational wing,

23   thus it's fair to presume he would've had knowledge of most

24   major operations that the al Qaeda network was involved in,

25   particularly those operations in his area of jurisdiction, i.e.

HA 08994

5B23PARH                    Kohlmann - direct

1    Afghanistan and Pakistan.

2    Q.  You mentioned in addition to the open source materials you

3    also relied on unclassified summaries of statements made by

4    Majid Khan?

5    A.  That's correct, yes.

6    Q.  Can I refer you to Government Exhibit 5, sir.  What is that

7    document?

8    A.  This is again a summary of declassified statements

9    allegedly made by Majid Khan.

10   Q.  Did you rely on this document in reaching your expert

11   conclusion in this case?

12   A.  Yes, I did.

13              MR. BRUCE:  Your Honor, I offer it for purposes of

14   this hearing.

15              MR. WILFORD:  Just so it's clear, Exhibit 5 also

16   includes statements attributed to a person known as Uzair in

17   quotation marks as well.

18              THE COURT:  It's clear Uzair at various times is in

19   quotation marks, but there are also references to Uzair

20   Paracha.  When it's Uzair and it's in quotations, it appears to

21   be referring to somebody else.  Go ahead.

22              (Government's Exhibit 5 received in evidence)

23   Q.  Mr. Kohlmann, can you sort of follow the same procedure you

24   used with Government Exhibit 4 and scan down this page and tell

25   us what was of assistance to you in this document containing

HA 08995

5B23PARH                    Kohlmann - direct

1    statements reported to have been made by Majid Khan?

2    A.   Sure.  I think the most relevant sections would probably

3    be, first of all, bullet points number four and five.

4    Q.   Let's start with number four.

5    A.   Sure.

6    Q.   How did that assist you in your expert --

7    A.   Bullet point number four.  He, i.e. Majid Khan, had no al

8    Qaeda contacts in the United States.  That sentence by its very

9    nature suggests that what Majid Khan is attempting to

10   communicate here is that he had al Qaeda contact elsewhere.

11   But not in the United States.  That conclusion is buttressed by

12   the next bullet point which is that none of his, i.e. Majid

13   Khan's, contacts were aware of his, i.e. Majid Khan's, gas

14   station attack plan or any other actions he might have taken on

15   behalf of al Qaeda.

16          Again, in this statement, Majid Khan is acknowledging

17   that he had a gas station attack plan, that he was undergoing

18   potentially other actions, that he was taking on behalf of al

19   Qaeda.

20   Q.   Is there anything further in the document above and beyond

21   bullet points four and five that assisted you in your expert

22   conclusion?

23   A.   Well, going forward with bullet point six, he, i.e. Majid

24   Khan, assessed Uzair Paracha -- I am going to move forward to

25   the second sentence -- he, i.e. Majid Khan, did not assess

HA 08996

5B23PARH                        Kohlmann - direct

1    Uzair Paracha as being suitable for any other assistance to al

2    Qaeda besides helping with Majid Khan's documents at the time.

3         This suggests that Majid Khan was searching for

4    individuals that could be useful or suitable for use in

5    assistance to al Qaeda.

6    Q.   Moving forward, were there any other points that were of

7    assistance to you?

8    A.   Yes.   The next bullet point, he, i.e. Majid Khan, would

9    only give Uzair Paracha a five to 10 percent suitability

10   assessment.   That suitability assessment refers to his

11   suitability as a terrorist operative on behalf of al Qaeda.

12   Inherent in that sentence is the suggestion that Majid Khan has

13   some control or some judgment over who is and who is not a

14   suitable candidate for al Qaeda.

15   Q.   Does that paragraph also refer to the word recruiting?

16   A.   Yeah, it does.   Majid Khan might have been interested in

17   recruiting Uzair Paracha.

18   Q.   What did you take from that?

19   A.   Well, taken along with the next sentence of that bullet

20   point, one could assume then that Majid Khan was interested in

21   potentially recruiting the defendant as an operative.

22   Q.   Is there anything else on Government Exhibit 5 that was of

23   assistance to you?

24   A.   I don't believe, no.

25   Q.   Okay.   In addition to the open source materials you

HA 08997

5B23PARH                    Kohlmann - direct

1    described regarding Majid Khan and Government Exhibit 5, is

2    there anything else you used in reaching your expert conclusion

3    regarding Majid Khan?

4    A.   Yes, I did.

5    Q.   What was that?

6    A.   I was provided with two summaries of interviews conducted

7    by the Federal Bureau of Investigation with two family members

8    of Majid Khan.

9    Q.   How did those in general assist you in your expert

10   conclusion in this case?

11   A.   Well, both relatives of Majid Khan had expressed that they

12   were not supporters of al Qaeda and not supporters of jihad,

13   but acknowledged that they had direct knowledge that their

14   relative Majid Khan had been recruited by individuals in

15   Pakistan for the purpose of providing support and aid to al

16   Qaeda and the Taliban.

17   Q.   Now, I want to talk about a more general topic,

18   Mr. Kohlmann.   In the various discussions and debates that

19   you've had that you've testified about today, have you ever in

20   those circles, in either government or academics, heard anyone

21   seriously argue that Osama bin Laden is not the head of al

22   Qaeda?

23             MR. WILFORD:  Objection.

24             MR. BRUCE:  Your Honor, I can address it if you like.

25             THE COURT:  Go ahead.

HA 08998

5B23PARH                        Kohlmann - direct

1          MR. BRUCE:  Address it?

2          THE COURT:  Yes.

3          MR. BRUCE:  Go ahead with the question?

4          THE COURT:  No, you can respond to the objection.

5          MR. BRUCE:  I'd like to.  One of the factors under

6    Daubert is essentially the old fry test which is whether the

7    expert's opinions are generally accepted in the community.  I

8    think it goes to that generally accepted in that field of

9    expertise.  If there's been debate --

10         THE COURT:  Mr. Wilford, what's your objection?

11         MR. WILFORD:  Your Honor, it's the form.

12         THE COURT:  Just "seriously," is that your objection,

13   the objection to the adverb "seriously"?

14         MR. WILFORD:  No.  The entire form of the question

15   presupposes what we have to establish here.  The question

16   revolves around whether or not there is any debate in the

17   community regarding -- in his particular community regarding

18   this particular topic.  And it presupposes we have a group of

19   experts, which this particular gentleman is including himself

20   in, who are then able to make a determination.  I think that's

21   putting it backwards.  We need to establish there is some

22   community of experts number one, number two, whether or not

23   there is, there is or is not some debate within that community

24   with respect to the question that was posed by the government.

25         THE COURT:  There's no jury here.  I will allow it.

HA 08999

5B23PARH                    Kohlmann - direct

1   Go ahead ask the question.

2   Q.  In the circle --

3           THE COURT:  Don't use the word "seriously."

4           MR. BRUCE:  Certainly.

5   Q.  In the academic and government circles where you've had

6   discussions that you've described previously, have you heard

7   anyone put forth the proposition or argue that Osama bin Laden

8   is not the head of al Qaeda?

9   A.  No.

10  Q.  In those same circles, have you ever heard someone put

11  forth the proposition that Khalid Sheikh Mohammed is not an

12  operational manager for al Qaeda?

13  A.  Never.

14  Q.  Those same circles, have you heard anyone put forth the

15  proposition or argue that Ammar al-Baluchi is not a financier

16  and facilitator on behalf of al Qaeda?

17  A.  No.

18  Q.  And same circles, have you heard anyone put forth the

19  proposition or argue that even after the September 11 attacks,

20  Ammar al-Baluchi continued to try to facilitate terrorist

21  attacks against the United States?

22          MR. WILFORD:  Objection.

23          THE COURT:  Again, I will allow it at this point.  Go

24  ahead.

25  A.  You're asking whether or not does anyone dispute that?

HA 09000

5B23PARH                    Kohlmann - direct

1   Q.   Correct.

2   A.   No.

3   Q.   That you've been exposed to?

4   A.   No.

5            MR. BRUCE:   I have no further questions, your Honor.

6            THE COURT:   All right.

7   CROSS-EXAMINATION

8   BY MR. WILFORD:

9   Q.   Good afternoon, Mr. Kohlmann.

10  A.   Good afternoon.

11  Q.   You graduated from Georgetown in 2001?

12  A.   That's correct.

13  Q.   How old are you now, sir?

14  A.   I'm almost 27.

15  Q.   And you talked about theses that you worked on while you

16  were at Georgetown; is that correct?

17  A.   That's correct.

18  Q.   These were basically research papers that every

19  undergraduate has to do, right?

20  A.   No.

21  Q.   They weren't?

22  A.   No.

23  Q.   What were they?

24  A.   Two of them or actually all three of them were projects I

25  had independent taken upon myself.  Georgetown offers the

HA 09001

5B23PARH                    Kohlmann - cross

1   opportunity for students who are interested, who really want to

2   get into the field, they offer opportunities at graduate level

3   research, but they're not required.  They're only if you take

4   them upon yourself.  I took those burdens upon myself because I

5   was very very interested in this particular area of study and

6   it happened that Georgetown University has a plethora of

7   professors who have various expertise on this issue.

8           But I mean, the honors thesis was entirely my own

9   option.  There were individuals who are part of that program

10  who never even completed their thesis.  So.

11  Q.  But my question was inartful.  The so-called thesis you did

12  it was simply a research paper, it wasn't a doctoral thesis?

13  A.  No, it was called a thesis.  The thesis I wrote for the

14  CMCU is known as a cap stone thesis.  It is actually, if you

15  read Georgetown University materials, they refer to it as a cap

16  stone thesis, that's why I called it that, and my international

17  politics honors thesis is actually on my transcript as an

18  international politics honors thesis.

19  Q.  It wasn't a doctoral thesis; is that correct?

20  A.  No.  Georgetown offers opportunity for undergrad students

21  that want to do graduate level research to conduct that

22  research.

23          THE COURT:  It did not lead to a PhD.

24          THE WITNESS:  No.

25  Q.  It did not lead to any degrees, master's or anything else,

HA 09002

1   right, no credit or anything else?

2   A.   That's not exactly true, because the work I did in law

3   school for my J.D. was directly related to work I had done in

4   undergrad and work I was doing on terrorism.

5   Q.   Sir, did you receive a degree from Georgetown University

6   based on your thesis, a master's or doctoral postgraduate

7   degree; yes or no?

8   A.   I was never given a PhD, no.

9   Q.   You didn't get a master's either, did you?

10   A.   No.

11   Q.   You went straight from Georgetown to law school?

12   A.   That's correct.

13   Q.   You mentioned you worked for the Investigative Project; is

14   that correct?

15   A.   That's correct.

16   Q.   And that was founded by somebody named Steve Emerson; is

17   that correct?

18   A.   That's correct.

19   Q.   And were you at the Investigative Project subsequent to the

20   Oklahoma City bombings; is that correct?

21   A.   Very subsequent, but yeah.

22   Q.   You are familiar with the fact that the Investigative

23   Project put out a report, or Steve Emerson put out a report

24   that the Oklahoma City bombings were the responsibility of

25   Islamic terrorists; is that correct?

HA 09003

5B23PARH                     Kohlmann - cross

1   A.   Actually no, he didn't.

2   Q.   He didn't?

3   A.   No, he didn't put out a report.  He went on TV and

4   suggested that the Oklahoma City bombing evinced

5   characteristics that were similar to Middle Eastern terrorist

6   bombings, but I wasn't working for him at the time so.

7   Q.   He went on TV the same way you do, right?

8        MR. BRUCE:  Objection, relevance.  If the witness

9   wasn't working with the Investigative Project at the time, I

10  don't think it's relevant.

11       MR. WILFORD:  Goes to his methodology.

12       THE COURT:  I'll allow this question.  Go ahead.

13  Q.   Steve Emerson went on TV the same way you do and made a

14  pronouncement that this bombing in Oklahoma City was based or

15  was in fact the work of Islamic terrorists; isn't that correct?

16  A.   You are characterizing what he said.  That's not exactly

17  what he said.  He said the attack evinced characteristics

18  similar to those bombings that had happened in the Middle East.

19  I don't believe he blamed it on anyone in particular.  Again, I

20  wasn't working for him at the time so I can't -- I started

21  working for him three years after that happened.

22  Q.   Well, did you see the program?

23  A.   No.

24  Q.   So you don't know what he said, right?

25  A.   I've seen the transcript of it.

HA 09004

99

5B23PARH                    Kohlmann - cross

1   Q.  When?

2   A.  I really -- I can't tell you.  I don't know.

3   Q.  Is it on your database with the other 20 million documents?

4   A.  Could be.  I don't know.

5   Q.  You have an index?

6   A.  If I was to do a search for it, I might be able to find it,

7   but I don't know if it's there.  It is not relevant to my work.

8   I don't know why it would be on there.

9   Q.  By the way, do you have an index with you of your database?

10  A.  The document's 20 million files.  The index file is

11  approximately two to three or four gigabytes in size.  If you

12  were to print out that index file, in the form of a -- it would

13  take up probably this room in terms of paper.

14  Q.  But you don't have it with you on a disk?

15  A.  It doesn't fit on a disk, it's --

16          THE COURT:  You don't have your index with you.

17          THE WITNESS:  No.  No, your Honor.

18          THE COURT:  That's it.

19          THE WITNESS:  Okay.

20          THE COURT:  Next question.

21  Q.  With respect to your thesis, your first thesis, your cap

22  stone thesis, at Georgetown, that was on early religious

23  development in the 20th Century in Afghanistan; is that

24  correct?

25  A.  Yes, that's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09005

5B23PARH                    Kohlmann - cross

1   Q.  Nothing at all to do the subject matter that you're

2   testifying as an expert today, right?

3   A.  Not that I am aware of, no.

4   Q.  And the second thesis that you did, you said you had a

5   professor who was your mentor; is that correct?

6   A.  That's correct.

7   Q.  Who was that professor?

8   A.  Professor Anthony Bennett.

9   Q.  Bennett?

10  A.  Bennett.

11  Q.  What department was he affiliated with?

12  A.  He is affiliated I believe with the Department of

13  Government and Political Science.

14  Q.  And did you discuss with Dr. Bennett the methodology that

15  you would use in gathering information that would support your

16  thesis?

17  A.  Yeah.

18  Q.  What discussions did you have with him?

19  A.  I had several meetings with him.  First, my first meeting

20  laid out the actual idea behind the paper, behind what I was

21  trying to research.  Throughout that process he would give me

22  sources that he thought were useful, for me to rely on in terms

23  of my research.  He would ask me what I had gotten, he would

24  ask me to compare and contrast what he had provided with what I

25  had obtained on my own.  And in the end my final product, my

HA 09006

5B23PARH                    Kohlmann - cross

1   final paper was a basis on all those sources.

2   Q.   Those sources were primarily books that you read, magazine

3   articles?

4   A.   They were a wide variety of stuff.  It was everything from

5   actual videotapes of mujahideen leaders in Afghanistan to

6   academic pieces printed by such scholars as Barnett Rubin who

7   is a pretty well-known expert on Afghanistan, to first-hand

8   accounts to books to newspaper -- whatever would be useful.

9   But I mean, this was an academic paper and the sources were

10  somewhat controlled by my mentor, so there was a limit to what

11  I could and could not use.

12  Q.   When you were working on this thesis, I believe you said it

13  was reviewed by two professors?

14  A.   Which thesis?

15  Q.   I think the Bitter Harvest thesis?

16  A.   Yeah, it was reviewed by at least two or three different

17  people in the Government Department, yeah.

18  Q.   Who were they?

19  A.   Anthony Bennett and his colleagues, but I don't know

20  because he didn't share with me the people he shared them with.

21  Q.   You don't know who if anyone beside Anthony Bennett

22  reviewed your work?

23  A.   No, I know -- it was a thesis, I know he submitted that

24  paper to other people in the Government Department, but

25  typically with peer review, you're not told other than your

HA 09007

5B23PARH                    Kohlmann - cross

1   main mentor, you are not told about the other professors who

2   are given the responsibility of reading it.   The point is to

3   keep alive the idea of academic anonymity, and people can say

4   whatever they feel like or can make whatever comments they feel

5   like without fear of retribution, aftereffects.

6   Q.   When you were research assistant for Dr. Fandi, you were

7   involved in studying Saudi dissident groups; is that correct?

8   A.   Well, it was Dr. Fandi covers virtually all Middle Eastern

9   dissident groups in North Africa and Arabian Gulf, but a large

10  focus of the work I did was in militant Saudi dissident groups,

11  Osama bin Laden, the Arab Afghans; yes.

12  Q.   What were you doing?

13  A.   I was conducting specific research as to their activities

14  in Europe and elsewhere, and I was conducting an analysis of

15  the evolution of ideology, showing how the group the Committee

16  for the Defense of Legitimate Rights, and which was founded by

17  Dr. Mohammed al Massari.   I was analyzing over time the

18  evolution in thought and ideology of this group.   I was

19  analyzing its structure within the United Kingdom, its primary

20  causes, which causes it was associating itself with, and it was

21  done primarily through an analysis of raw materials I had

22  gotten directly from the committee and outside research I had

23  done tracking CDLR operatives, both in the United Kingdom and

24  here in the United States.

25  Q.   So let's back up for a moment.   Your source material then

HA 09008

5B23PARH                    Kohlmann - cross

1   for this particular work that you were doing with Dr. Fandi was

2   videotapes or audio tapes from CDLR; is that correct?

3   A.   Written communiques, written reports, e-mails, books that

4   they've written that they've distributed, audio and video

5   recordings of Dr. Mohammed al Massari.   Audio and video

6   recordings of other folks associated with CDLR.   I collected a

7   lot of -- these folks went on Internet news group and they

8   published a lot of public notices about what they were doing,

9   including copies of that communique and everything else.   I was

10  able to get copies of all of this and integrate it.

11  Q.   Off the Internet?

12  A.   That was one of my sources, yeah.

13  Q.   You also said there are some other sources.   What other

14  sources?

15  A.   Other sources were things that I obtained from Dr. Fandi,

16  such as materials he had gathered when he went to Saudi Arabia

17  to interview the clerics that provide support to bin Laden and

18  provide support to Mohammed al Massari.   I also used materials

19  I had gathered during my work at the Investigative Project,

20  such as original copies of documents written and distributed by

21  CDLR and other groups.   I also used research that I had done at

22  the Investigative Project identifying an operative of CDLR in

23  this country and his involvement in the purchase of a satellite

24  telephone for the use of Osama bin Laden.

25  Q.   Would it be fair to say you basically used your own

HA 09009

5B23PARH                    Kohlmann - cross

1    research on CDLR to support your research for this particular

2    project you were doing with Dr. Fandi?

3    A.   It was from a wide variety of sources.  It was actually

4    interesting.  I was working at the Investigative Project at the

5    time, so it was really a collective of the work I was doing,

6    both in my spare time in the university and also separately at

7    the Investigative Project, and then combined with the documents

8    and other information that was given to me directly by

9    Dr. Fandi.

10   Q.   But you just -- correct me if I'm wrong -- you just stated

11   the Investigative Project source that you used was your

12   research on CDLR?

13   A.   It was original documents that I had used in research on

14   CDLR -- it wasn't like I quoted a report that I had written.

15   What I did is I took an original document that the

16   Investigative Project had a copy of that nobody else did, and I

17   would take this document, explain what it was, explain the

18   context of it, and then explain its relevance to the paper.

19   But it was really only with original sources.  I won't quote --

20   for an academic paper I won't quote a report I did for a

21   private research group.

22   Q.   When you worked for the Investigative Project, you were

23   being paid, right?

24   A.   Yeah.

25   Q.   You said you were working 20, 25 hours?

HA 09010

1    A.  Depending, but yeah.

2    Q.  What was the methodology that was used at the Investigative

3    Project in terms of gathering research?

4    A.  It's remarkably similar to what my methodology is now.

5    It's a combination of multiple sources.  First of all,

6    obviously primary research, going out in the field, going to

7    Islamic conferences, listening to speeches given by Islamic

8    clerics, going to bookstores, purchasing videos, audio tapes.

9    Going out, conducting interviews with people in the field.

10   Either extremists or those who have contact with them.

11   Collecting open source information, reports from other academic

12   institutions, original information from terrorist groups,

13   communiques, videos.  The Investigative Project has kept a

14   library of audio tapes and videotapes that go back to the late

15   1990s.  There was material there, original material which is

16   useful to be exploited in certain cases such as this.

17   Q.  And you testified on direct examination that you use

18   databases; is that correct?

19   A.  That's correct.

20   Q.  You use Lexis Nexis?

21   A.  Yes, sir.

22   Q.  And other databases that are located on the Internet; is

23   that correct?

24   A.  Yes, some.  Yeah, yeah.

25   Q.  You use the Foreign Broadcast International Service?

HA 09011

5B23PARH                    Kohlmann - cross

1    A.   Foreign Broadcast Information Service, FBIS.

2    Q.   And you also testified that you provide informal

3    assistance, right; you testified that you provided informal

4    assistance to a wide variety of law enforcement entities.

5    A.   That's correct, yeah.

6    Q.   And by informal assistance, what exactly do you mean?

7    A.   I mean that if somebody comes to me from a law enforcement

8    agency and asks me for assistance on a particular case or a

9    particular matter, I will provide it to them.  As you know,

10   I'm -- I deal with the subject, that's part of my business.  I

11   don't volunteer information though.  I don't go out and

12   volunteer information.  The information I develop is almost

13   always at the specific request of a client.

14   Q.   So when say you provide informal information, is that an

15   occasion where you're not retained, that somebody just comes to

16   you and says, hey Evan, I need some information on this

17   particular topic, and you provide it on an informal basis; is

18   that what you are intimating?

19   A.   That happens, and occasionally I'm compensated.

20   Q.   When you are compensated, whom are you compensated by?

21   A.   By whatever agency is requesting the work I do.

22   Q.   Why do you call it informal assistance rather than a formal

23   actual retainer by that particular agency to provide them with

24   particular knowledge or expertise?

25   A.   Because very -- only in the cases when I'm testifying in

HA 09012

5B23PARH                    Kohlmann - cross

1    courts as an expert witness or I'm providing direct expertise

2    in a case do I have a contract.  Informal assistance could also

3    mean trading information to someone that needs it, right.  So I

4    may get paid to provide certain pieces of information.  That

5    pays me for my time to cover the costs of copying and providing

6    the information, but typically, speaking most of the -- the

7    support I provide, is I get compensation for my internal costs

8    of copying and providing it.  I don't -- generally speaking

9    it's informal, unless it's in a case.  If it's in a case such

10   as this, then I have a contract.

11   Q.  When you go through what you just stated, trading of

12   information, you give information and people give you

13   information, right?

14   A.  Sometimes.

15   Q.  You take that information that you're given and you use

16   that to base your opinion on at some point later on down the

17   road; is that correct?

18   A.  Typically I gather my own information.

19   Q.  I understand that.  But I'm asking you when you trade

20   information --

21   A.  No, it's not trading information.  It's I give information

22   to people and they pay me for it.

23   Q.  And no one gives you information in return?

24   A.  Generally speaking, no.  Occasionally I will get open

25   source information from other academics and I will get

HA 09013

5B23PARH                    Kohlmann - cross

1   information from outside sources.  But with the exception of

2   exhibits that are handed over to me directly during the context

3   of a case where I have a signed contract, it's a one-way flow

4   of information.  I am the open source, and I'm providing

5   information, open source information, to those that don't have

6   access to it.  But, like I said, other than the cases that I've

7   worked on specifically as an expert witness or a consultant in

8   an ongoing case, the information flow has been from me this

9   way.

10   Q.  And there's no occasion where any law enforcement personnel

11   have consulted with you and given you some information in

12   return for you giving them information?

13   A.  It doesn't work like that.

14   Q.  I didn't ask you that.  I asked you has it ever happened?

15   A.  No.  U.S. law enforcement, it doesn't work like that.  You

16   don't -- the information, number one is classified.  It would

17   never -- I don't have a security clearance, it would never be

18   traded with someone outside of the government without a

19   security clearance.  The only information I have access to is

20   from the government, that's given to me from the government

21   that's not publicly disseminated, is information that's given

22   to me in the context of an ongoing criminal case that I'm

23   either providing expert witness or consulting services in a

24   formal way.

25   Q.  What about foreign law enforcement; because you indicated

HA 09014