5B23PARH                    Kohlmann - cross

1   you work in foreign law enforcement as well?

2   A.   It more or less works the same way.

3   Q.   When you say more or less?

4   A.   Again, I've never had a case where I've been provided

5   documents by a foreign law enforcement service without me

6   having a specific contract to work as an expert witness on a

7   case.

8   Q.   I'm not limiting it to documents, sir.  I'm not limiting it

9   to documents.  I'm talking about the exchange of information

10  that someone may give you verbally.  Doesn't have to be a

11  document.  If someone tells you something.

12  A.   There is an underlying issue here and that is that if I was

13  provided that kind of information, it would spoil my own

14  perspective, my own perspective is focused on open source

15  information.  If I took information from inside sources, right,

16  if I traded that classified information, that would in many

17  ways pollute the way I do things.  If I'm retained on a

18  specific case as an expert and I have access to classified

19  documents or partially declassified document, that's different.

20  But generally speaking, in my dealings with foreign

21  governments, the information flow is unidirectional.  It is me

22  providing open source information about terrorism to them.  And

23  they -- they more or less, the only documents I receive from

24  them are exhibits in ongoing trials where they intend to use me

25  as a witness.

HA 09015

5B23PARH                    Kohlmann - cross

1   Q.   With respect to globalterroralert.  That's your particular

2   Web site?

3   A.   That's correct.

4   Q.   And you said that I believe on direct examination you had

5   some peer review that was undergoing with respect to that?

6   A.   One of the nice things about the World Wide Web, you can

7   edit any time by publishing stuff on the Internet, particularly

8   on places like the counter-terrorism blog or on my Web site.

9   What it does is it offers colleagues of mine, those interested

10  in my work, an opportunity to view what I am working on, to

11  comment on it, to offer their feedback.

12          For instance, I'll give you an example.  A few weeks

13  ago I produced a chart of leadership network of Abu Zarqawi in

14  Iraq.  Before releasing this publicly on the Net, I sent copies

15  of this chart to a number of colleagues, people in the academic

16  or information world who follow this very closely.  And I asked

17  them take a look at this, see what you think, see what, you

18  know, what do you think of the work.  Am I missing someone

19  here, is there someone here you think I'm adding too much

20  importance to, give me feedback.

21          After taking that feedback in from a number of

22  different people who a chance to review the chart, I edited it

23  once more and I put it out there.

24          Now, that being said, this is already the second

25  version of this chart I've published.  I published one version

HA 09016

5B23PARH                    Kohlmann - cross

1    back in May.  This latest version already encompasses a number

2    of changes additions, subtractions that I've made after having

3    published this, after having the opportunity of others to view

4    it to offer their comments.  So, yeah.

5    Q.   Okay.  Who are the people specifically that you use as a

6    peer review?

7    A.   Almost virtually all of them are academics.  I have --

8    Q.   Who are they?

9    A.   Who are they.  Okay.  Sure.  First of all there's of course

10   Andy McCarthy who is --

11   Q.   He's a former prosecutor, right?

12   A.   That's right.

13   Q.   He is not an academic.  Go ahead.

14   A.   Actually, he writes academic pieces now about terrorism law

15   so I think that's a manner of semantics.

16   Q.   Andy McCarthy is a former prosecutor?

17   A.   Oh, yes.

18   Q.   In the United States Southern District, right?

19   A.   Yes.

20   Q.   Go ahead.  Who is the next person?

21   A.   Next person who be Dr. Rohan Gunaratna.

22   Q.   Who is that?

23   A.   Dr. Rohan Gunaratna is probably one of the world's foremost

24   experts on terrorism.  He wrote the book --

25   Q.   Excuse me.  Don't -- in this instance could you not tell me



SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09017

1  that he is a foremost expert, but describe what particular

2  academic affiliation he has, where he works; that sort of

3  thing?

4  A.  Of course.  He is the director of a university

5  counter-terrorism study center in Singapore.  I don't know the

6  exact name of it, but he's affiliated directly with I believe

7  the government there.  It's at a university.  He teaches a

8  program there.  He's actually invited me to come there and join

9  him at that program.

10        I deal with Dr. Manoun Fandi still, my old mentor from

11  Georgetown.  He was up until recently at the National Defense

12  University.

13  Q.  Where is he now?

14  A.  He is now at the Baker Institute down in Texas.  The James

15  Baker Institute.

16  Q.  That's James Baker who was a former secretary of state?

17  A.  I mean, that's who the center is named after I guess, yeah,

18  sure.

19  Q.  Is that the same person or is it somebody different?

20  A.  As far as I know, yeah.

21        I deal with also academics out in a center out in

22  California, in Northern California which deals specifically --

23  I can't, I'm sorry I can't remember the name of this particular

24  program, but it's in Monterey, California.  It's the nuclear

25  nonproliferation program.

HA 09018

1   Q.  Who particularly do you deal with at that program for your

2   peer review?

3   A.  I deal with a number of individuals there.  It's --

4   Q.  Names please.

5   A.  I mean, I could give a list, but I can't name them all off

6   the top of my head.

7   Q.  Anybody that you can remember, name them please.

8   A.  I can keep going.  There's Dr. Urs Gehriger.

9   Q.  Let stop with this Northern California group and give me

10  the name of a person that you specifically are involved with

11  for peer review.

12  A.  I can provide you with the names, but honestly off the top

13  of my head, I deal with universities around the world.

14  Q.  I understand that, sir.  I am asking you right now you

15  don't know the name --

16  A.  Off the top of my head.  I didn't say that.

17  Q.  For that particular group, you don't know who the people

18  are right now, you cannot tell the Court who those people are;

19  is that correct?

20  A.  I can provide you their names if you like.  I can't off the

21  top of my head.

22  Q.  You can't do it right now?

23          THE COURT:  You've established that.  Move on.

24  Q.  Who is next?

25  A.  Dr. Urs Gehriger.

HA 09019

5B23PARH                    Kohlmann - cross

1   Q.  Who is that?

2   A.  Dr. Urs Gehriger is a professor in Switzerland who studied

3   this, who recently returned from a trip in Jordan where he met

4   with supporters of Abu Zarqawi in Iraq, where he gathered

5   first-hand information of him, and afterwards him and I have

6   been working on project studying I guess the track of Abu

7   Zarqawi's al Qaeda movement in Iraq and its connections with

8   Europe.

9   Q.  Who else?

10  A.  Okay.  There's Dr. Michael Brown at Georgetown University.

11  He was my faculty mentor.

12  Q.  That's separate from Bennett, right?

13  A.  Yeah.  He was the one that helped with my final thesis, the

14  person in charge of grading my final thesis.  There's Dr. Brian

15  Spooner at the university of Pennsylvania who I had studied

16  Afghanistan with during graduate-level classes while he was at

17  the law school there.

18  Q.  I'm sorry.  When you say you studied on graduate-level

19  courses, are these classes that were taught at the law school?

20  A.  No.

21  Q.  So you took additional classes at the University of

22  Pennsylvania?

23  A.  Yeah.

24  Q.  In addition to your law school classes, you took graduate

25  classes?

HA 09020

1   A.   What?

2   Q.   Graduate classes?

3   A.   Exactly.

4   Q.   You actually registered and took classes?

5   A.   Yeah.

6   Q.   You sat in on classes?

7   A.   No, they are on my transcript.

8   Q.   Okay.  So please continue with the people that you are

9   using in your peer review.

10   A.   I use John Charles Brisard who is a researcher who just

11   recently came out with a new book about Abu Zarqawi who is

12   affiliated with several research institutions in France.

13            There's a long list of names.  I can't recount

14   everyone off the top of my head.

15   Q.   All these people are people you submit your work to prior

16   to publishing; is that correct?

17   A.   I mean, not everyone every single time.  What I do is I

18   know a wide variety of people in this field.  What I'll do is

19   I'll take individual people who I think are particularly

20   knowledgeable about a given area.  If I'm writing about the

21   World Trade Center bombing here in New York or if I'm writing

22   about the 1996 New York City jihad plots case, I will go to

23   somebody like Andy McCarthy who has first-hand knowledge, who

24   has been writing quite a bit of academic material lately about

25   terrorism law here in the U.S, and he's probably a good

HA 09021

5B23PARH                          Kohlmann - cross

1  authority on that.  But if I was going to write a paper about

2  cyberterrorism for instance, I would go to the professors that

3  I took classes with at the University of Pennsylvania in cyber

4  crime.  Like Cheryl Krause for instance, Professor Cheryl

5  Krause.

6  Q.  Who also used to be an assistant United States attorney

7  here in this office?

8  A.  Cheryl Krause?

9  Q.  Yes?

10  A.  Not that I would know of.  Cheryl Krause was a professor at

11  the University of Pennsylvania and engaged in private practice

12  when I was taking classes with her.  But that would be another

13  person I would go to with academic papers to review them, sure.

14  But it depend, it really depends on the subject.  If I was

15  writing a paper about Bosnia, I would go to someone like Marko

16  Attilla Hoare, who is not an expert necessarily in terrorism,

17  but is an expert in the Balkans who knows quite a bit about

18  this and is someone who, I mean, is recognized, a recognized

19  expert on the subject.

20  Q.  Do you take -- when you say you would go to, is that a

21  review of your work or are you simply going to these people to

22  get information before you publish your work?

23  A.  No.  It's really more of a review thing.  Obviously when I

24  publish a book or if I publish a longer report, that sometimes

25  has its own separate review process.  For instance my book had

HA 09022

5B23PARH                    Kohlmann - cross

1     a specific peer review process engendered as part of it, one I

2     had no control over and one that was done very, very

3     specifically.

4              When it comes to other documents I do, it depends on

5     what I am working on.  If I am working on something official,

6     something that's a longer report, then it needs to be reviewed,

7     not for additional information, it needs to be reviewed to make

8     sure that everything I say is consonant with what my colleagues

9     also believe.  And if there is something they find that they

10    are not in agreement with, I encourage them to tell me about it

11    so I can bring it up, I can show them the source and we can

12    debate about whether or not which source is more reliable.

13    Q.   How many people you have on your list of people of peers

14    that review your materials are part of your private

15    counter-terrorism blog?

16    A.   How many of them?

17    Q.   Yes.

18    A.   Probably three or four.

19    Q.   Who are those?

20    A.   Zach Abuza, Matt Leavitt, Andy McCarthy and Lorenzo Vino.

21    Q.   Now, who selected the people that are involved in this

22    counter-terrorism blog?

23    A.   It was I believe the editor of the blog who is Andy

24    Cochran.

25    Q.   Andy Cochran?

HA 09023

1    A.  Hmm-hmm.

2    Q.  And when you say on direct examination that you informally

3    assisted the Congressional committee researching or

4    Congressional aids researching the 9/11 Commission report, what

5    did you mean by that?

6    A.  Congressional 9/11 Commission aids would approach myself,

7    and at that point I was working at the Investigative Project,

8    and would ask me to provide them with my break down of certain

9    particular areas that they were studying.

10           So for instance, if they were working on the Project

11   Bojinka, which was an attempted attack which was a plot in the

12   Philippines in 1995 to bring down commercial airliners

13   simultaneously, they would ask me what documents I had on this

14   subject, they would ask me what I knew about this subject, what

15   I knew about the particular players involved.  We would have a

16   discussion about the significance of the various players

17   involved.  But, in the end, they were very appreciative.  I

18   mean, they footnoted my book.

19   Q.  So, did you get -- when you talk about informal assistance,

20   were you compensated?

21   A.  No.

22   Q.  So it was different from informal assistance that you

23   testified about earlier?

24   A.  I mean actually, it's similar.  Most of the informal

25   assistance I give I am not compensated for.  Only very rarely

HA 09024

5B23PARH                    Kohlmann - cross

1    am I compensated for it.  In particular instances where a

2    particular information is worth more than just, you know,

3    "thank you."

4    Q.   Now, you mentioned, and I think it's Exhibit 1 -- do you

5    still have that in front of you?

6    A.   Yes, I do.

7    Q.   You mentioned that you were cited in the 9/11 Commission

8    report; is that correct?

9    A.   That's correct.

10   Q.   And what was chapter two about?

11   A.   You're asking me for the exact title?  I believe the

12   subject of chapter two was what happened with al Qaeda and

13   Osama bin Laden after the end of the Afghan war particularly.

14   I can tell what you my cite is to.  My cite --

15   Q.   I'm not asking what your cite is to.  I'm asking you, you

16   were cited in this report?

17   A.   Right.

18   Q.   What basis was the report citing you for?

19   A.   This section of chapter two dealt with regional conflicts

20   that al Qaeda had been involved with, conflicts such as Bosnia,

21   Kashmir, the Philippines.  Rather than go into lengthy detail

22   about al Qaeda's involvement in those particular areas, what

23   the 9/11 Commission staff did instead was to offer brief

24   summations of al Qaeda's involvement in those areas, and offer

25   footnotes for people that wanted to search for more

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09025

1   information.

2   Q.  And were these footnotes in some sort of order as to where

3   you can go for additional information?

4   A.  I don't understand your question.  Are they ranked?

5   Q.  Yeah, were they ranked?

6   A.  No.

7   Q.  They weren't ranked?  The fact that you were last in the

8   footnotes doesn't mean you are the least source; it just means

9   you are another source?

10  A.  The last part of that sentence had to do with Bosnia, so

11  that's I believe why the reference is last in the footnote.

12  But I don't have the 9/11 Commission report in front of me.  I

13  can't read it to you.  But I can tell that you the reason why

14  I'm cited last in there is because the part about Bosnia in

15  that sentence comes last.  It is just the way the sentence was

16  constructed.

17  Q.  It has to do with Bosnia, that was based your book that you

18  published?

19  A.  Yeah.  The sentence is referring to regional conflicts al

20  Qaeda has become involved with, and makes final reference to

21  Bosnia Herzegovina.

22  Q.  You said your book was pretty thick and not for public

23  consumption.  How many pages is that book?  You have it in

24  front of you?

25  A.  Yeah, I do.  It is 233 pages.

HA 09026

5B23PARH                          Kohlmann - cross

1    Q.   With respect to your methodology that you utilized --

2    A.   Sure.

3    Q.   -- for your book.  What did you do?

4    A.   What did I do to research this?

5    Q.   Yeah.  What methodology did you use?

6    A.   This began as a project in approximately April of 2002.  It

7    lasted for over two years.  It involved me going out and doing

8    a tremendous amount of research.  The first thing I did

9    obviously was compile together as many open sources as I

10   already had access to.  Then I would go out and conduct

11   interviews.

12           THE COURT:  You speak quite quickly.

13           THE WITNESS:  I apologize.

14           THE COURT:  It's difficult for the reporter to get it

15   all down.

16           THE WITNESS:  Sure.

17           THE COURT:  Now each time I've asked you, what you

18   tend to do is what many people who talk quickly do, is in your

19   next answer you talk more quietly but just as fast.  Forget the

20   New York part, just breathe between each sentence.

21           THE WITNESS:  No problem, your Honor.  Sorry about

22   that.

23   A.   It began as a project in approximately April of 2002.  The

24   idea behind the project was to begin, first of all, compiling

25   all of the open sources that I had access to already.

HA 09027

5B23PARH                    Kohlmann - cross

1    Q.  Can I just stop you for one moment?

2    A.  Sure.

3    Q.  When you talk about these open sources, could you detail

4    what these sources are that you use for your book?

5    A.  Sure.  Definitely.  First of all, items such as transcripts

6    from the Osama bin Laden trials here in New York which provided

7    a great deal of information.

8    Q.  By that you are talking about the trial that occurred in

9    2000?

10   A.  United States v. Osama bin Laden.

11   Q.  Involving the embassy bombings?

12   A.  That's correct.

13   Q.  That trial testimony you used in formulating your work

14   about al Qaeda's jihad in Europe?

15   A.  Certainly I did.

16   Q.  That was one of your primary sources; is that correct?

17   A.  That was -- I don't know if -- it's only -- I only used it

18   for part of what I wrote.  I mean, the other sources -- I mean,

19   it's very hard to say what's primary.  I have over, I mean, I

20   have something like 400 footnotes in here, and none of them

21   is -- I mean, that transcript from the Osama bin Laden trial

22   are used, I don't know, maybe 10 or 15 times.  Is that a

23   principal source?

24   Q.  I don't know.

25   A.  I mean, it was very helpful.  Exhibits from the trial were

HA 09028

5B23PARH                    Kohlmann - cross

1    very helpful, but just --

2    Q.   Which exhibits are you referring to from that trial?

3    A.   Sure.   A number of exhibits were submitted during that

4    trial, as ancillary to the case, such as notebooks of Wadih

5    el-Hage, Osama bin Laden's personal secretary, manuals that

6    were seized from al Qaeda members both in the United Kingdom

7    and East Africa.   These were all very useful.

8           More useful than that, specifically on the subject of

9    my book were original documents I had obtained from an

10   organization in the United Kingdom known as Azzam Publications.

11   Q.   Can we go back for one moment.   You said there were manuals

12   or was there one manual?

13   A.   No, there were multiple manuals.

14   Q.   Which manuals are you referring to?

15   A.   There was one manual that was I believe seized off a

16   computer, Wadih el-Hage's computer.   There was a second manual

17   that was seized from a residence of an al Qaeda member in

18   England, in Manchester.

19   Q.   That's two.   You said there were several.

20   A.   Those are the only two I can recall off the top of my head.

21   Q.   When you were going through your methodology, you mentioned

22   a United Kingdom source, right; what was that?

23   A.   Oh, Azzam Publications.   It is an organization that was

24   founded in the United Kingdom by supporters of Osama bin Laden

25   in order to help disseminate information, original information

HA 09029

1   about the Arab Afghans, particularly their involvement in

2   conflicts principally in Bosnia Herzegovina, causes in

3   Chechnya.  This site offered biographies and communiques and

4   photos from foreign fighters who had been killed in Arab Afghan

5   conflict zones.  Such as the Caucasus, such as Bosnia

6   Herzegovina, such as Kashmir.

7   Q.  What process did you use to vet that material for its

8   reliability and accuracy?

9   A.  I had actually contacted a close personal friend of Osama

10  bin Laden in Saudi Arabia over e-mail.

11  Q.  Who is that?

12  A.  His name Adel Batterjee.  Adel Batterjee was one of the

13  original financiers who help provide support to Osama bin Laden

14  in 1991.  He wrote a book where he detailed the early founding

15  and history of al Qaeda.  I convinced Adel Batterjee to send me

16  a copy of that book.  That book provided a great deal of

17  corroboration to much of the material printed on Azzam

18  Publications.

19  Q.  I am talking about specifically you mentioned they had

20  photographs and biographies.  What did you do to corroborate

21  that information?

22  A.  I took the names, the photos, the biographies, and I

23  compared them with other stuff that I gotten from other

24  sources, such as the book I got from Adel Batterjee.  Some of

25  these biographies dated back to the 1980s to Afghanistan, and

HA 09030

5B23PARH                    Kohlmann - cross

1   sure enough, the same people that Azzam Publications was
2   listing their photos, their biographies, these people who had
3   been killed fighting in Afghanistan, their biographies, their
4   names, all their identifying information, also appeared quite
5   often in other sources, namely including information from Adel
6   Batterjee.
7   Q.   Adel Batterjee, what was the relationship -- did you
8   research the relationship between Adel Batterjee and Azzam
9   publications?
10  A.   As far as I know, there was no relationship.
11  Q.   What did you do to determine that?
12  A.   I attempted to figure out who Adel Batterjee was in contact
13  with, but Adel Batterjee as far as I know did not have contact
14  with Azzam Publications.
15  Q.   When you say as far as you know, what did you undertake to
16  determine the relationship?
17  A.   I've studied Azzam Publications since about 1996.  I have
18  saved copies of all their various Web sites.  I've ordered all
19  of their books and all of their materials.  I've engaged in
20  e-mail conversations with the people that were in charge of
21  Azzam Publications.  I --
22  Q.   Did you research their financial support?
23  A.   To the extent I could.  I don't have access to bank
24  records.
25  Q.   You really don't know whether or not there was a financial

HA 09031

5B23PARH                    Kohlmann - cross

1   relationship --

2   A.  I have no idea.

3            THE COURT:  Mr. Wilford, it's 15 after one.  I think

4   it's an appropriate time.  I don't want to interrupt you.

5            MR. WILFORD:  That's fine, Judge.

6            THE COURT:  Let's meet back at 2:20.

7            MR. WILFORD:  Thank you.

8            THE COURT:  Do you have an estimate, sir, as to how

9   long you will be?

10           MR. WILFORD:  We're moving kind of rapidly, Judge, so

11  I would say another half an hour or so.  Maybe a little longer.

12           THE COURT:  Fine.  Please be seated gentlemen.

13  Mr. Metzner, are there other areas that this witness is going

14  to testify about that is within my ruling?  I was permitting

15  him to testify on the use of cells and the use of individuals

16  to provide logistical support.  Was there going to be separate

17  testimony on that or you are not going to have him testify on

18  that?

19           MR. BRUCE:  No.

20           THE COURT:  I'm sorry.  Mr. Bruce.

21           MR. BRUCE:  We were going have him testify about that,

22  your Honor.  Definitely.  I think his qualifications and the

23  research he's done about the history of al Qaeda would go to

24  that.

25           THE COURT:  His expert opinions, am I correct, you

HA 09032

5B23PARH                    Kohlmann - cross

1  just adduced an expert opinion in regard to Ammar al-Baluchi,

2  Majid Khan and Khalid Sheikh Mohammed as to their roles.

3         MR. BRUCE:  During this hearing.

4         THE COURT:  Yes.

5         MR. BRUCE:  Yes, I think your Honor asked first about

6  Ammar al-Baluchi as to what the witness's expert opinion was.

7  Since you seemed interested in that, I asked very briefly about

8  his opinion regarding Majid Khan and Khalid Sheikh Mohammed.

9         THE COURT:  What I am trying to find out is what his

10 expert opinions are going to be.  Then I can try to evaluate

11 whether or not he is an appropriate expert to render those

12 opinions.

13        MR. BRUCE:  Certainly.  I think he did give them.

14        THE COURT:  That's what I was asking.

15        MR. BRUCE:  Yes.

16        THE COURT:  Thank you.

17        (Luncheon recess taken)

18        (In open court)

19        THE COURT:  Everyone's present.  Proceed, Mr. Wilford.

20 BY MR. WILFORD:

21 Q.  Now, I believe we were talking about your methodology that

22 you used during the course of your book and also some of the

23 reports or informal exchanges that you've given to law

24 enforcement.

25        Now, in 20002, when you were discussing what you did

HA 09033

5B23PARH                    Kohlmann - cross

1   in London, you actually interviewed people that you've

2   classified as terrorists; is that correct?

3   A.   I've interviewed people that have either -- either are I

4   believe fairly classified as militants, have either been

5   indicted as alleged terrorists, or in some cases are even

6   specially designated terrorists.

7   Q.   And when you were talking about the methodology that you

8   use, you say you used independent documents on direct

9   examination?

10  A.   You're going to have to refresh my memory.   Independent

11  documents with regards to what?

12  Q.   You were asked specifically by Mr. Bruce what methodology

13  that you used in respect to this case.   This particular case.

14  A.   Okay.

15  Q.   You indicated that you used independent documents.

16  A.   Oh, okay.   Yeah, yeah.

17  Q.   What independent documents did you use?

18  A.   I used the 9/11 Commission report; I used material that I

19  had obtained from Azzam Publications in London; I used

20  documents such as James Comey's summary of the Jose Padilla

21  case that was released through the DOJ Pentagon; I also relied

22  on other open source documents like I think I quoted a few or I

23  cited a few news report in there.

24  Q.   When you say you cross checked everything --

25  A.   Yeah.

HA 09034

5B23PARH                    Kohlmann - cross

1   Q.  What did you use to cross check the information that was

2   contain in the report from James Comey -- or there was no

3   report actually, it was an affidavit.

4   A.  Yeah, excuse me, it was an affidavit.

5       You're asking what I did to confirm that?

6   Q.  Yes.  Cross check it.  You said you cross checked

7   everything.  What did you do to cross check the information in

8   that particular affidavit?

9   A.  Well, there's quite a bit of information out there about

10  Jose Padilla.  There's information referenced in the 9/11

11  Commission report.

12      Are you asking how I confirmed the information with

13  regards to Jose Padilla and Ammar al-Baluchi?

14  Q.  No, I'm asking you how you cross checked the information

15  contained in the James Comey report.

16  A.  I cross checked it with information that had been published

17  in the 9/11 Commission report, and I cross checked it with

18  information that had been published in open source documents I

19  believe.  I can't recall off the top of my head.  I'm sorry.

20  Q.  You don't know what open source document you used as part

21  of your methodology for cross checking?

22  A.  I have to go through all my notes.  I used the James Comey

23  document, and then I compared that with open source reporting

24  from the 9/11 Commission report and other documents.  I'd have

25  to take a look at my footnotes to take a look specifically.

HA 09035

130

5B23PARH                      · Kohlmann - cross

1    Q.  We're talking about the report that you prepared for this

2    case.

3    A.  That's correct, yeah.

4    Q.  Okay.  I want to come back to that in a moment.  I want to

5    take a look at Exhibit 3.

6    A.  Wait, let me check on that.  Yeah, I have it.

7    Q.  Have you Exhibit Number 3?  That's a Journal of

8    International Securities Affairs.  Who publishes that?

9    A.  It's published by the Jewish Institute for National

10   Security Affairs.  JINSA.

11   Q.  Who funds that organization?

12   A.  I believe it's a 501 (c)(3).  In fact I know it is.  It's a

13   tax except organization under Section 501 (c)(3), but I mean I

14   don't collect donations so I don't know.

15   Q.  Did you receive a fee for your report appearing in it?

16   A.  I think like $200.

17   Q.  You got a modest honorarium?

18   A.  Yeah.  It was more for the time I spent in editing and

19   whatnot.  It wasn't really profit.

20   Q.  You footnoted the materials that you relied upon; is that

21   correct?

22   A.  You mean in this?

23   Q.  Yeah.

24   A.  I believe so, but I can tell you for sure right now.

25          Yes, I did.

HA 09036

1    Q.  And the materials that you used for footnote number three,

2    that was the bill of particulars from United States of America

3    v. Enaam M. Arnaout?

4    A.  Arnaout, yes.

5    Q.  That's a bill of particulars that was prepared by the

6    United States government; is that correct?

7    A.  That's correct.

8    Q.  And in footnote four, you use the government's evidentiary

9    proffer supporting the admissibility of coconspirator

10   statements; is that correct?

11   A.  That's correct.

12   Q.  That was prepared by the United States attorney's office;

13   is that correct?

14   A.  That's correct.

15   Q.  And in footnote five, you use the government's response to

16   the defendant's position paper as to sentencing factors,

17   another document prepared by the government; is that correct?

18   A.  That's correct.

19   Q.  And in footnote 10, you use the affidavit of Special Agent

20   David Kane in United States of America v. Soliman S. Biheiri;

21   is that correct?

22   A.  That's correct.

23   Q.  That was a document prepared by an agent of the FBI?

24   A.  No.  Actually it was a document prepared by an agent of the

25   Bureau of Immigrations and Customs Enforcement, but it's a

HA 09037

5B23PARH                        Kohlmann - cross

1    public affidavit.

2    Q.   That's also a United States government employee?

3    A.   Yeah, yeah.

4    Q.   That's the basis of your research?

5    A.   Well --

6    Q.   One of the bases of your research?

7    A.   Those are I think three footnotes just quoted and there's

8    15 of them.

9    Q.   That's four.

10   A.   Okay, four.

11   Q.   And footnote 15?

12   A.   Yeah.

13   Q.   You use an Internet site?

14   A.   Actually, no I use the report from NATO.  That's the

15   official NATO Web site.  I mean that's --

16   Q.   That's a Web site?

17   A.   Well, that's a press release put out by NATO.  I could get

18   a paper copy of it but I included the URL.

19   Q.   The Web site.  You went to a Web site to get the

20   information?

21   A.   I don't know where I got it, but you --

22   Q.   You don't know whether or not you used a paper document or

23   the Web site in the preparation of this article?

24   A.   Honestly, there is a Web site there where you can access

25   that document, but I can't tell you for sure whether I had the

HA 09038

5B23PARH                    Kohlmann - cross

1   paper or whether I accessed it through the Web site.

2   Q.  With respect to the bill of particulars that we discussed

3   earlier, did you in fact cross check information contained in

4   the bill of particulars?

5   A.  Yes, I did.

6   Q.  What did you use for your cross check?

7   A.  I used the cross check, the book provided to me by Adel

8   Batterjee from Saudi Arabia which was printed by an

9   organization that was run by the defendant in this case, Enaam

10  Arnaout.  I also used numerous other documents that had been

11  seized from Bosnia Herzegovina which are known as the Tareekh

12  al-Musadat or the Tareekh Osama file.  These documents provide

13  the initial background and filing with regards to the formation

14  and history of al Qaeda as established in the 1980s in

15  Afghanistan, and included the opening minutes of the al Qaeda

16  organization, including the context of discussion between

17  senior al Qaeda leaders.  They included actual commands issued

18  by Osama bin Laden and the head of al Qaeda's military wing to

19  other al Qaeda operatives.  They also included references, many

20  references to the defendant in that case, Enaam Arnaout.

21  Q.  Where is that information footnoted or referenced in your

22  material in this article?

23  A.  If I use something for general context, if I use something

24  to verify something else, I don't necessarily footnote it.  I

25  footnote the best available source that has the most

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09039

1   information.  These briefs I felt provided very good

2   background.  The briefs themselves are discussing pieces of

3   evidence or actually exhibits submitted in the case.

4   Q.  When you say briefs, what are you referring to?

5   A.  I'm referring to here the briefs you just brought up here,

6   the bill of particulars.

7   Q.  The bill of particulars?

8   A.  The government's evidentiary proffer and the government's

9   response.  They contain references to pieces of actual physical

10  evidence that were submitted in that trial.  Evidence that was

11  never contested by the defendant, as far as I know.  And those

12  pieces of evidence are directly relevant because they are bills

13  of sale, they are copies of communications, they also contained

14  bits of information that was taken from the headquarters of

15  Benevolence International Foundation in Illinois.  It was

16  seized out of their trash.  It is the kind of thing where it's

17  physical evidence.  I felt justified in making references to

18  it.

19  Q.  When you were just a moment ago saying as far as you know

20  they were never contested by the defendant, what's the basis of

21  that?

22  A.  The defendant pled guilty.

23  Q.  Okay.  Besides the fact that he pled guilty, do you know

24  whether or not he filed a motion, whether or not there was any

25  litigation about it?

HA 09040

1    A.   The defendant may have challenged the basis of which the

2    exhibits were seized, but I don't believe he ever challenged

3    the authenticity.  I didn't work as a consultant in the case,

4    but as far as I know he never challenged the authenticity of

5    those documents.

6    Q.   Did you compare the defendant's response to the

7    government's response in making your determination as to the

8    reliability of this --

9    A.   I compared all documents.  But from the most relevant

10   document I had, including the book that was provided to me by

11   Adel Batterjee in Saudi Arabia, that directly had references to

12   the defendant and had references which did not match what the

13   defendant was saying, and this document was an original

14   document taken directly from Saudi Arabia and printed in 1991,

15   I felt that the defendant was not necessarily evincing the

16   complete truth in balancing together the government's account

17   with other documents, such as the Adel Batterjee book, with the

18   defendant's response papers.  Plus with press releases put out

19   by defense counsel in that case and by the defendant Enaam

20   Arnaout.  In the end I came -- I reached certain conclusions.

21   Q.   I'm sorry.  Maybe I misspoke.  So you understand my

22   question, my question was not the conclusion you came to, but

23   in coming to your conclusion in your methodology that you

24   adopted, did you review the defense papers that relate to the

25   government papers that you have footnoted in this article?

HA 09041

5B23PARH                          Kohlmann - cross

1   A.  I don't know if I reviewed every single one, but I did

2   review documents they submitted, including press releases they

3   submitted.

4   Q.  What documents that they filed in court related to these

5   issues in footnote three, four, and five did you review that

6   were filed by the defendant?

7   A.  I believe I reviewed the defendant's position paper as to

8   sentencing factors.

9   Q.  But not anything to do with the admissibility of

10  coconspirator statements or with the defendant's request for a

11  bill of particulars; is that correct?

12  A.  I honestly don't know.  I can't recall.  It's possible I

13  did.  I did work on this case now two years ago.  I can't tell

14  you every single document I relied on.

15  Q.  Let's move along.  I believe you testified that the FSBI --

16  is that it?

17  A.  FBIS, Foreign Broadcast Information Service.

18  Q.  That information is provided by the United States

19  government; is that correct?

20  A.  Well, it's translations, but the original information does

21  not come from the U.S. government, no.

22  Q.  Well, who hires the translators?

23  A.  Translator -- the translations are being done by U.S.

24  government agency.  They are being done by the U.S. government

25  translator.  The original material they are studying are not

HA 09042

1  U.S. government documents.

2  Q.  What agency supplies FBIS?

3  A.  The FBIS works as the open source arm of the Central

4  Intelligence Agency.

5  Q.  This is a Central Intelligence Agency site and the

6  information that's being provided by the Central Intelligence

7  Agency?

8  A.  No.  The information is being provided by different media

9  outlets worldwide.  It's translations.  All they are doing is

10  translating.  They don't add any analysis or -- they are just

11  taking original documents, translating them, and then making

12  them available in English.

13  Q.  Would you agree, Mr. Kohlmann, however, that the CIA

14  determines what information is going on that Web site and the

15  CIA alone makes that determination and no one else?

16  A.  I have to assume so.  It's part of the CIA.

17  Q.  They control what's on that Web site, right?

18  A.  I guess so.  I am not really in a position to know, though

19  I know what's on the Web site, I can't tell who makes the

20  decision about what goes on there.

21  Q.  When you were testifying, I believe that you attempted to

22  make a distinction on direct examination, you attempted to make

23  a distinction between your particular field and social science;

24  is that correct?

25  A.  I said it was a variation of a traditional social science,

5B23PARH                    Kohlmann - cross

1    yeah.

2    Q.  So you called it something -- I believe microhistory?

3    A.  That's actually a term that a colleague of mine gave it.

4    It's studying microhistories, yeah.

5    Q.  Which colleague was that?

6    A.  Marko Attila Hoare.

7    Q.  Even though you call it microhistory, the bottom line is,

8    it's still a social science; isn't that correct?

9    A.  Yeah, yeah, sure.

10   Q.  Now, as a social science, social scientists have for years

11   developed certain methodologies which have been accepted in

12   courts; isn't that correct?

13   A.  I guess so.  I don't really understand -- I don't really

14   have a basis to talk about what other people's methods are.  I

15   can speak to what my own methods are.

16   Q.  Have you ever heard of the qualitative approach?

17   A.  No.

18   Q.  Have you ever heard of ethnography?

19   A.  Yeah.

20   Q.  What's that?

21   A.  That's the study of ethnicities and how they influence

22   political and geographic development -- geopolitical

23   development, excuse me.

24   Q.  Doesn't that involve observations of the participants?

25   A.  Oh, yes.

HA 09044

1   Q.   And when you were undertaking your course of study at

2   Georgetown University, did you undertake any study with respect

3   to methodology utilized by social scientists to make their

4   findings reliable?

5   A.   Yeah.   In order to write my undergraduate honors thesis, it

6   was actually a year-long course.   That's how it appeared on my

7   resume or my transcript.   The first half of the course, the

8   first semester, the entire purpose of the first semester was

9   for the five of us who were writing theses to get together with

10  a senior member of Georgetown University's political science

11  faculty and for him to go through with us research techniques,

12  writing techniques, how a thesis is laid out, what qualitative

13  research is.   But you know, it's -- it depends on the subject

14  matter you are doing what particular methods you use.   It

15  happens that the microhistories study, because it's modern

16  history, it uses similar techniques I guess to historians, but

17  there's twists on them.

18  Q.   You just -- correct me if I'm wrong.   I asked if you ever

19  heard of the qualitative approach, and you said no.   Now you

20  just said that you learned the qualitative research method as

21  part of your study for your thesis; is that correct?

22  A.   It was never introduced to me as the qualitative approach,

23  being labeled.   I was instructed how to conduct qualitative

24  research, how to conduct research that was based on authentic

25  and reliable sources, how to dismiss sources that were

HA 09045

5B23PARH                    Kohlmann - cross

1   non-authentic, non-reliable propaganda.

2   Q.  And you make the determination as to what's propaganda and

3   what's not, right?

4   A.  It's not just me.  I would say that my opinion is based

5   upon the thoughts my colleagues as well.  Everything -- again,

6   everything comes back to peer review.  I'll offer my own

7   concept, I'll discuss this with my colleagues, I'll see what

8   they think.  If everything matches up, if I seem like I'm right

9   on, then you know, then that's my opinion.  If I feel like

10  there's still room for doubt, or if there's, you know, there's

11  need for me to do further research, then I'll do further

12  research.  There are some things that are easier to come to a

13  consensus on than others.

14  Q.  Did you, with respect to your preparation of your expert

15  testimony report in this case, did you review the unclassified

16  statements of Saifullah Paracha?

17  A.  I reviewed -- no, I don't believe I did.

18  Q.  Did you, sir, in the preparation of your expert report in

19  this case, review Exhibit 4 and 5?

20  A.  Yes, I did.

21  Q.  What else did you review?

22  A.  In addition I reviewed a 302 interview and a summary of the

23  interview conducted by agents of the Federal Bureau of

24  Investigation, with two relatives of Majid Khan, one his

25  father, and I believe his name is Khan Shaukat Ali, and Majid

HA 09046

1    Khan's brother.

2          MR. WILFORD:  May I have a moment, your Honor?

3          THE COURT:  Yes.

4          MR. WILFORD:  Your Honor, I have a request that the

5    government turn over to counsel the two documents that are

6    being referred to as a basis for our examination of his

7    methodology used in preparation of his expert report and his

8    ability to testify as an expert in this matter.

9          MR. BRUCE:  There's no basis under Rule 16 for that

10   kind of discovery, your Honor.  The underlying basis for an

11   expert's opinion are not provided for in discovery under Rule

12   16 or any of the Federal Rules of Evidence.

13         THE COURT:  I think that's right, Mr. Wilford.

14         MR. WILFORD:  Your Honor, I think it puts us in an

15   untenuous position in terms of establishing methodology.  The

16   witness is coming in and testifying he's developed an expert

17   report based upon certain information.

18         THE COURT:  This has to do, sir, this is one of the

19   things you used for as the basis for your opinion as to the

20   role of Majid Khan; is that correct?

21         THE WITNESS:  I used it to develop my opinion, but my

22   actual expert witness report was based primarily on the

23   summaries, the unclassified summaries.

24         THE COURT:  That's not what I am asking you.  The FBI

25   interviews with the Majid Khan family members, you used that

HA 09047

5B23PARH                    Kohlmann - cross

1   for purposes of developing your opinion as to the role that

2   Majid Khan played in al Qaeda, that is, that he was originally

3   a foot soldier and then a fixer; is that correct?

4          THE WITNESS:  Yes.

5          THE COURT:  Go ahead, sir.  I think Mr. Bruce is

6   correct, that you're normally not entitled to discovery of the

7   sources of the basis of an expert's opinion, expert's opinion.

8          MR. WILFORD:  Your Honor, this is information that the

9   government has in their possession.  I understand we are not

10  normally entitled to it.  By the same token, he is making his

11  methodology a subject of this particular examination.

12         THE COURT:  I'm denying the request.  I understand.

13  You're totally free to inquire into the methodology and explain

14  that's part of the methodology.  You are not entitled to have

15  as discovery, unless I am mistaken -- you can submit anything

16  you'd like to me on that -- you are not entitled to have it as

17  discovery all of the bases for the expert's report.

18         MR. WILFORD:  Your Honor, just so we're clear on this

19  point, I am not looking for all the bases.

20         THE COURT:  You are asking for this basis.

21         MR. WILFORD:  Specifically why in relation to the

22  expert report he prepared in this case, which goes to

23  methodology he employed, we are talking about his expert

24  opinion that's been formulated on certain materials the

25  government --

HA 09048

5B23PARH                    Kohlmann - cross

1          THE COURT:  Specifically the reference to Majid Khan's

2     role.

3          MR. WILFORD:  The government is giving us a portion of

4     those materials and not others.

5          MR. BRUCE:  But there's a reason why.  The

6     unclassified summaries were produced as Brady material.  As

7     we've discussed in great detail, they were not produced as part

8     of this exercise.

9          THE COURT:  Let's proceed.

10    BY MR. WILFORD:

11    Q.  In your expert report -- excuse me.

12          (Pause)

13    Q.  In your expert report when you concluded or arrived at your

14    opinion, you utilized those two documents from the FBI; is that

15    what you just mentioned related --

16    A.  Not my expert report.  I used them in forming my opinion.

17    In order to write my initial report, which is written before I

18    saw those documents, I used these documents.

19          MR. WILFORD:  So, he's referring to 4 and 5, your

20    Honor.

21          THE WITNESS:  That's correct.

22    Q.  When you then were shown these documents, that was after

23    your report was prepared?

24    A.  It was after the initial draft was prepared, yeah.

25    Q.  And when your report that you submitted to the government

HA 09049

5B23PARH                    Kohlmann - cross

1    or was it a draft when you --

2    A.   It was -- I believe the report I submitted to the

3    government, I had to file the report several weeks ago, so this

4    I believe I got the other two documents after I was done with

5    the report.

6    Q.   So you were shown these FBI documents subsequent to the

7    preparation of your report?

8    A.   I believe so, yeah.

9    Q.   And your report encompassed your opinion; is that accurate?

10   A.   My analysis and opinion, yeah, sure.

11   Q.   And did you arrive at an opinion with respect to Majid

12   Khan's role in your report?

13   A.   Yes, I did.

14   Q.   That was prior to seeing these other two documents?

15   A.   Well, yeah.  I already had the unclassified summaries.  The

16   other documents merely buttressed what I had already derived

17   from this document.

18            That's -- excuse me, that's Exhibit 5, your Honor.

19   Q.   Let's talk about the unclassified documents for a moment.

20   Do you know the source of those documents?

21            THE COURT:  4 and 5.

22            MR. WILFORD:  Yes, 4 and 5.

23   A.   The U.S. government?

24   Q.   Do you know where they came from?

25   A.   Not any more specific than that, no.

HA 09050

5B23PARH                    Kohlmann - cross

1    Q.   Do you know the circumstances under which those purported

2    statements were taken?

3    A.   You're talking specifically with Exhibits 4 and 5 now.

4    Q.   4 and 5.

5    A.   No.

6    Q.   And you contrast that with the 302 and the other documents

7    that related to Majid Khan's family interviews; do you know how

8    those were taken?

9    A.   Yeah, sure.

10   Q.   And --

11   A.   Well, with one document, yes; the other document, there are

12   some details I don't know the full details.

13   Q.   Okay.  With respect to the document that you do know the

14   details, how was it derived?

15   A.   It was done through an interview with an FBI agent, of an

16   individual I believe in Maryland.

17   Q.   With respect to the document you said you are not sure

18   about?

19   A.   It was an interview, but I don't know where it was

20   conducted.  It was an FBI interview with an FBI translator, but

21   there was no location marked on the document.

22   Q.   When you prepared your report, your expert report for the

23   government, did you have any information as to where Ammar

24   al-Baluchi is at this point?

25   A.   Yeah.  I'm on the -- I mean, where geographically or in

HA 09051

5B23PARH                    Kohlmann - cross

1    whose custody is he in?

2    Q.  In whose custody is he in.

3               MR. BRUCE:  Objection, your Honor.

4               THE COURT:  Just a moment.  Mr. Wilford, the

5    government's taking the position it can't confirm or deny.

6               MR. WILFORD:  That's the government's position.  But

7    their expert is not the government.

8               THE COURT:  All right.

9               MR. BRUCE:  In this context, your Honor, I'd rather

10   not have the government's expert try to opine on such a thing.

11   I mean, I don't see what relevance it has, and it's coming

12   dangerously close to getting --

13              THE COURT:  Yes, I think that's right.  What is the

14   relevance of that, sir?

15              MR. WILFORD:  The relevance, your Honor, goes to his

16   position.  He staked out a position with respect to his

17   expertise based on information contained in this documents that

18   he has.

19              THE COURT:  He said that this was given to him by the

20   government.

21              MR. WILFORD:  Right.  Part of his factoring in his

22   opinion would indeed be based upon where, his opinion as to

23   where or his knowledge as to where this particular individual

24   is at the time that these statements were made, Judge.

25              THE COURT:  I wouldn't frame it that way, no.  I

HA 09052

5B23PARH                    Kohlmann - cross

1   disagree that.

2          Go ahead. Next question.

3   Q. With respect to --

4          THE COURT: There is no relevance to where he is. Go

5   ahead.

6          MR. WILFORD: He said he didn't know where they were,

7   but he did know whose custody they were in, and that's the

8   question I asked, Judge.

9          THE COURT: I'll sustain the objection, given that

10  it's the government's expert. But he would be testifying to

11  something that is not coming from the government, presumably,

12  and therefore it may look as if because he is the government

13  expert, the government's weight is behind his conclusion. And

14  given the government position that they're not confirming or

15  denying where he is, I am going to sustain the objection.

16         Next question.

17         MR. WILFORD: Your Honor, if I may with respect to

18  that issue. Even though the government is not confirming or

19  denying, the basis upon which his ability to analyze that

20  statement goes to reliability of methodology that he used in

21  arriving at his expert opinion. In order to question the

22  reliability, some of the factors -- at least one of the factors

23  that go into that is how and which manner -- the circumstances

24  under which this particular statement --

25         THE COURT: Why don't you ask him whether he knows if

HA 09053

5B23PARH                    Kohlmann - cross

1   those were done on adversarial questioning or whether it was an

2   interview with a newsman.  I mean, that type of thing you can

3   ask.

4            MR. WILFORD:  Well, am I going to be allowed to ask

5   him was it a government entity that did this?  Because if he

6   says they are in custody, and that's his expert opinion, that's

7   not the government's confirming or denying.  That's what he's

8   basing his opinion on.

9            THE COURT:  Is the issue of custody something that the

10  government is not going to confirm or deny?  I thought the

11  issue was that the government can't confirm or deny where he

12  is.

13           MR. METZNER:  Both, your Honor.

14           THE COURT:  All right.  Proceed Mr. Wilford.  I'm

15  sustaining the objection.

16           MR. WILFORD:  Okay.

17  Q.  With respect to Khalid Sheikh Mohammed, same question.

18           MR. BRUCE:  Same objection.

19           THE COURT:  Same ruling.

20  Q.  And with respect to Majid Khan?

21           MR. BRUCE:  Same objection.

22           THE COURT:  Same ruling.

23           MR. WILFORD:  Thank you.

24  Q.  Now, with respect to your report, you indicated that Ammar

25  al-Baluchi was a financier; is that correct?

HA 09054

5B23PARH                      Kohlmann - cross

1   A.  That was one of his missions, yes.

2   Q.  You indicated that Khalid Sheikh Mohammed was a major

3   player of operations; is that correct?

4   A.  He was a primary, if not the primary, operational planner

5   on behalf of al Qaeda.

6   Q.  With respect to Majid Khan, you indicated he was a fixer, a

7   foot soldier, and an operator; is that correct, an operative?

8   A.  Yeah.  He was someone who had started as a lower level guy

9   and he, because of the attrition following 9/11 in terms of the

10  senior leadership of al Qaeda, he was promoted to a more

11  important role than he otherwise might have gotten.

12  Q.  When you made this determination, you used methodology; is

13  that correct?

14  A.  Yeah, sure.

15  Q.  And I believe you testified that your methodology was open

16  source database information and declassified information; is

17  that correct?

18  A.  It's any open source information, anything that's not

19  classified that's in the open sphere, that's reliable.

20  Q.  In making your determination as to whether or not either of

21  these three individuals were in the custody of the United

22  States, you used this same informational sources to arrive at

23  that conclusion, whatever it may be?

24  A.  I mean, I can only hazard a guess as to whose custody

25  they're in.  I wasn't there when they were arrested.  I don't

HA 09055

5B23PARH                    Kohlmann - cross

1    know who's holding them.  I don't know who conducted

2    interrogations.  I don't know.  I mean, I wasn't there.

3    Q.  Now, you testified that you were proffered as an expert on

4    about six different occasions; is that correct?

5    A.  Roughly, yeah.

6    Q.  And in only one of those occasions did you testify?

7    A.  Actually, no.  In three of those occasions I testified.

8    Q.  Three occasions you testified?

9    A.  Yes.

10   Q.  At trial?

11   A.  Yes.

12   Q.  You were qualified as an expert and testified at trial?

13   A.  Yes.

14   Q.  Those three occasions were all before the same judge; isn't

15   that correct?

16   A.  No.

17   Q.  Which were they?

18   A.  Two were before Judge Leonie Brinkema, and the third was

19   before a three judge panel in the Supreme Court of Bosnia

20   Herzegovina.

21   Q.  I was trying to narrow it down to cases where you testified

22   in criminal proceedings in the United States.  That was two

23   times?

24   A.  I testified as an expert witness, yes.

25   Q.  You testified as a fact witness.  We are not talking about

HA 09056

1   that.  We are talking as an expert witness?

2   A.   That's correct.

3   Q.   Those two times were both in front of Judge Brinkema?

4   A.   Judge Leonie Brinkema, correct.

5           THE COURT:  Is that al Timimi and Behkhala?

6           THE WITNESS:  Yes, your Honor.

7   Q.   Isn't it a fact that both of those cases involved

8   situations where people were involved in the training camps and

9   visiting training camps and recruited people overseas?

10  A.   Yes, they were.

11  Q.   And they were actually training camps that were located

12  either in Pakistan or Afghanistan; isn't that correct?

13  A.   No.  There were also allegations that a number of the

14  individuals involved in the group had also conducted jihad

15  training or attempted jihad training here inside the United

16  States.

17  Q.   These training camps were materials or withdrawn.

18          You had information about these training camps, is

19  that correct, from your various Internet excursions?

20  A.   Are you talking about al Qaeda training camps in

21  Afghanistan?

22  Q.   I am talking about the training camps you testified to as

23  an expert.

24  A.   The ones I was talking about in that case.

25  Q.   Which case are you referring to?

HA 09057

A.   You are talking about now in the Sabri Benkhala case and

the Ali al Timimi case.   The al Qaeda camps I discussed are the

ones that have been referenced in original materials taken from

al Qaeda.   Al Qaeda's opening minutes, Tareekh Osama file, the

early history, the book by Adel Batterjee which is again a 300

page ode to the beginning of al Qaeda, personal accounts by

Osama bin Laden, by others.

Q.   Keep going.

A.   I also used other documents in formulating my opinion,

including transcripts from the trial of Osama bin Laden et al

here in New York.   I also used documents seized elsewhere,

including groups like Lashkar E Tayiba, being the army of the

pure, which offered extensive information in its own

documentation, its own reporting about the various camps that

it uses, the kind of training that is conducted there.

Additionally, I have managed to purchase videotapes depicting

al Qaeda training camps, namely the al Farouq camp where a

number of the 9/11 hijackers were trained.

Q.   All of that information you just related to the Court deals

with training camps, right?

A.   Yeah.   I actually just missed one source.   I also relied on

the testimony of al Qaeda operatives who had gone to these

training camps and saw training there.   One of the more

important testimonies was that of Ahmed Ressam, an Algerian who

had allegedly attended Derunta and Kahlden camps.

HA 09058

5B23PARH                    Kohlmann - cross

1   Q.  And this information also in both of those trials were

2   relating to same subject matter; is that correct?

3   A.  You mean the two --

4   Q.  The two --

5   A.  You're talking about the Timimi case and Sabri Benkhala

6   case now?

7   Q.  Yes.

8   A.  They were generally related to the same issue, but the

9   charges were different I believe.

10  Q.  It was Lashkar E Tayiba?

11  A.  No.  The issues in this case, that I was testifying as an

12  expert on anyway, were al Qaeda, the Taliban, Lashkar E Tayiba,

13  history, ideology, leadership, structure, and then

14  additionally, the link between those three organizations, and

15  training camps used by these three organizations in

16  Afghanistan.

17  Q.  And the relationship between those organizations and the

18  training camps in Afghanistan?

19  A.  That's correct, yes.

20  Q.  Now, in this case, there's nothing to do with training

21  camps; is that correct?

22  A.  Nothing to do with training camps --

23  Q.  You haven't been presented with any information --

24  A.  Actually, no.  In my expert witness report --

25  Q.  I am not asking you about your expert witness report.  I

HA 09059

1    was asking you about whether or not you were presented with any

2    information related to training camps in this instance?

3    A.   Yes, I was.

4    Q.   What information was that?

5    A.   There were references in I believe both FBI summary

6    interviews of relatives in Majid Khan to seeking training, to

7    missions to seek training, and the people to go to -- to get to

8    training cramps.

9    Q.   Excuse me, Mr. Kohlmann.  Didn't you indicate that your

10   report was prepared prior to your receiving those documents?

11   A.   Yes, I'm sorry.  I wasn't certain you were referring to

12   only what was in my expert witness report.

13   Q.   Just so we're clear, the report you prepared, your expert

14   testimony report in this case, you were not presented with any

15   information about training camps in the preparation of that

16   report; isn't that correct?

17   A.   I don't -- I guess other than those documents, probably

18   not.

19   Q.   Well, when you say other than those documents, did you have

20   those documents when --

21   A.   No.  They were provided to me for purposes of my expert

22   opinion, but not the expert witness report.

23   Q.   They were provided to you later on?

24   A.   After I was finished with my expert witness report, yeah.

25   Q.   So they definitely had nothing to do with your report?

HA 09060

5B23PARH                    Kohlmann - cross

1          MR. BRUCE:  Objection to form.

2          THE COURT:  I'll allow it.

3   A.  I guess.

4   Q.  Now, when you --

5          MR. WILFORD:  I just need one moment, Judge.

6          (Pause)

7          MR. WILFORD:  Your Honor, may I approach the witness?

8          THE COURT:  Yes.

9   Q.  I'd like to have this exhibit shown to the witness as

10  3501-B.

11          Do you recognize that document, sir

12  A.  Yes, I do.

13  Q.  What do you recognize it as?

14  A.  This is a copy of my expert witness report in this case.

15  Q.  And you prepared that report?

16  A.  Yeah.

17  Q.  Personally?

18  A.  Yes, yes.

19          MR. WILFORD:  Do you have any objection to it for

20  purpose of the hearing?

21          MR. BRUCE:  No, your Honor.

22          MR. WILFORD:  I was moving it -- I was asking the

23  government if they had any objection for purpose of the

24  hearing.

25          THE COURT:  I'll take it for purposes of the hearing,

HA 09061

5B23PARH                    Kohlmann - cross

1   sure.  Certainly it's identical to what was attached to your

2   letter of September 20.

3         MR. BRUCE:  That's correct, your Honor.

4         THE COURT:  Fine.

5         (Defendant's Exhibit 3501-B received in evidence)

6   Q.  On the third page if you could be so kind as to turn to

7   that page.  This is a series of photographs on that page.

8   A.  Yes.  Yeah -- I'm -- I believe, yeah.

9   Q.  Okay.  You have several citations on that page related to

10  information concerning al-Baluchi; is that correct?

11  A.  Yes, I do.

12  Q.  All those citations are to the 9/11 report; is that

13  correct?

14  A.  That's correct.

15  Q.  There are no other sources whatsoever cited by you as a

16  basis for that information?

17  A.  The other -- that information was reported elsewhere, but

18  the most reliable source and I believe the original source for

19  the information was the 9/11 Commission report, and the

20  original sources that they based their report on.

21  Q.  Mr. Kohlmann?

22  A.  Yeah.

23  Q.  Could you just try to answer the question I asked you.

24  Okay.  The question was did you cite anything else besides the

25  9/11 Commission report as the basis for your opinion?

HA 09062

5B23PARH                    Kohlmann - cross

1    A.  Like I said, there were other sources that had this

2    information, but I felt upon judging this, the 9/11 Commission

3    report was the most reliable and the most authentic document

4    reporting them.  That's why I cite them.

5              So yes, that's the only cite I have for this

6    particular paragraph or two paragraphs.

7    Q.  And by that, you mean to say that there are sources that

8    appear on your open source databases that are unreliable?

9    A.  No.  That -- I wouldn't put 100 percent stock in them.

10   There are things -- there are newspaper reports that come out

11   from, like Asharkelsa, which is a Middle Eastern journal in

12   London.  Some of the information is very vague because it

13   contains admissions from people that have no reason to make

14   those admissions, in which case you are quoting them.  But

15   there are other publications that make outlandish allegations

16   that simply cannot be proven by fact and are not reliable

17   enough to be considered to be evidence to be submitted in an

18   expert report.

19   Q.  On the next page, the source material that you cite for the

20   first four full paragraph, is all material prepared by the

21   Department of Justice; isn't that correct?

22   A.  Yeah, but I also had other legal briefs that were submitted

23   in that case.  I don't know the titles of the briefs off the

24   top of my head, but there were at least two other briefs

25   submitted in that case that offered additional information that

HA 09063

5B23PARH                    Kohlmann - cross

1  buttressed the document by James Comey.

2  Q.  Were those briefs by the government or some government

3  entity?

4  A.  I can't recall off the top of my head.  I think one of them

5  may have been from the defense though.

6  Q.  Which one was that?

7  A.  I can't recall off the top of my head.  They are not cited

8  in here.  In the end I decided that the document that provided

9  the most reliable information, the most comprehensive, was the

10 document provided by James Comey.  I think it summarized other

11 documents well, other admissions well.  That's what I have

12 cited here.

13 Q.  When you say the document provided by James Comey, isn't it

14 a Department of Defense report that was prepared and given to

15 James Comey in his capacity as the number two man at the

16 Department of Justice?

17 A.  That's correct.

18 Q.  Those all relate to Jose Padilla?

19 A.  That's correct.

20 Q.  Now, turning to the next page, statement, I'm sorry,

21 footnotes 26 and 27.  Those both come from government-prepared

22 documents in cases that were pending in the Eastern District of

23 Virginia; isn't that correct?

24 A.  Actually, not pending at the time that these documents were

25 issued.  The case had already been settled.  This was the plea

HA 09064