5B23PARH                    Kohlmann - cross

1    agreement and the statement of facts.  This was at the very end
2    of the case after the defendant had already pled guilty.  But
3    yes, they did come from the government, yeah.  One of the
4    documents was the actual guilty plea agreement though from the
5    defendant.  So I mean, it's a government document but I believe
6    it's signed by the defendant.
7    Q.  Was it the plea or the plea agreement or plea minutes?
8    A.  Actually, if you look at footnote 26, you'll see I have
9    both here the statement of facts and the plea agreement.
10   Q.  The statement of facts were prepared by the government?
11   A.  Yes, that's correct.
12   Q.  The plea agreement was drafted by the government as far as
13   you know?
14   A.  I guess so.  I don't really have any personal knowledge for
15   knowing how it was drafted or who drafted it.
16   Q.  Now, in your social science methodology in preparation of
17   your expert report in this case, what is the margin for error?
18   A.  The margin for error?
19   Q.  Yeah.
20   A.  Pretty small.  Most of the people that were involved in
21   this case were already known to investigators.  They were known
22   to me.  I mean, I've been following Khalid Sheikh Mohammed and
23   his network since about 1999, and a lot of folks that have been
24   involved in here, there are multiple sources of information
25   about them.  There are some individuals that there are less,

HA 09065

5B23PARH                    Kohlmann - cross

1   but generally speaking everybody that comes out of the sources

2   that we have, is consonant.  I have not really found much to

3   question any of the material that I produced.

4   Q.  You didn't have any information with respect to Uzair

5   Paracha, did you?

6           MR. BRUCE:  Objection, your Honor.  He's not being

7   asked to offer an opinion on Uzair Paracha.  It has no

8   relevance.

9           THE COURT:  I'll allow that.

10  A.  I have no idea, other than the references that are in the

11  documents I provided, to what the defendant's role is.  That's

12  not what I was asked to do.

13  Q.  I didn't ask you with respect to -- you had no information

14  in your 20 million piece database related to Uzair Paracha,

15  zero; is that correct?

16  A.  Operatives that are low level enough very rarely come

17  across that kind of thing.

18          THE COURT:  The question is, if you know, is there any

19  reference to Uzair Paracha in your 20 million document

20  database?

21          THE WITNESS:  Yeah, probably in newspaper articles.

22          THE COURT:  Do you know if there is?

23          THE WITNESS:  I've never done a search, so, you know.

24  Q.  So you don't -- you don't know?

25  A.  Well, again, I save material almost every single day, and

HA 09066

5B23PARH                         Kohlmann - cross

1    granted, I'm sure because of the fact that this case was

2    related to al Qaeda in the United States, there's got to be a

3    newspaper article or something saved somewhere.  But I mean, I

4    haven't utilized it in preparing this.  I didn't refer to it.

5    I wasn't asked to talk about Uzair Paracha so --

6    Q.  Let me understand this.  You are being called as an expert

7    and your methodology does not include you finding out

8    information about the person that you are going to testify

9    about?

10           MR. BRUCE:  Objection, your Honor.  It's not the

11   person he is going to testify about.

12           THE COURT:  Sustained.

13           MR. WILFORD:  Your Honor, if I may --

14           THE COURT:  He just testified that he was not asked to

15   render any opinion in regard to Uzair Paracha.

16           MR. WILFORD:  If I may, your Honor.  This individual

17   was asked to review Government Exhibits 4 and 5 which are

18   unclassified statements which refer to Uzair Paracha.  He is

19   asked to make some conclusions with respect to those documents.

20   He in fact testified on direct examination at this proceeding

21   as to conclusions he reached based on those documents.

22           In order for him to have some knowledge about it, in

23   order to be able to distinguish between the two Uzairs that are

24   mentioned in the document, he had to have some ability to say

25   this Uzair Paracha is separate and distinct from a different

HA 09067

5B23PARH                    Kohlmann - cross

1    Uzair that's there.  It all goes to his methodology and his

2    ability to have reliability as an expert.

3               THE COURT:  I am not sure I followed that, sir.

4    What's your question of the witness?  Can he distinguish

5    between Uzair in quotes and Uzair Paracha?  That's not an

6    issue.

7               Why don't you ask a question.  Let me deal with it

8    that way.

9               MR. WILFORD:  I'm sorry to trouble the reporter.

10              (The record was read)

11              THE COURT:  I sustain the objection.

12              Did you include in what you did to prepare your expert

13   report any search or investigation into the activities of an

14   individual known as Uzair Paracha?

15              THE WITNESS:  No, your Honor, I didn't.

16              THE COURT:  All right.

17   Q.  Now, with respect to --

18              THE COURT:  Mr. Wilford, he just testified he did not

19   include investigation into the role of Uzair Paracha in what he

20   did.

21              Proceed.

22              MR. WILFORD:  Thank you, Judge.

23   Q.  With respect to Saifullah Paracha --

24   A.  I was also not requested to provide information or do a

25   search on him and I did not provide information nor do a search

HA 09068

5B23PARH                    Kohlmann - cross

1    on him.

2    Q.   With respect to materials you were provided, with -- you

3    did a search on Khalid Sheikh Mohammed?

4    A.   Yeah, but that wasn't necessarily because of materials I

5    was provided.  That was the expertise I was informed I would

6    need to give in this case.  That was the basis for the expert

7    testimony.  I was told that one of the subject was Khalid

8    Sheikh Mohammed.  That was why I did a search.  I was never

9    told I was needed to testify with regards to expert testimony

10   with regards to Saifullah Paracha or Uzair Paracha.

11   Q.   With respect to the information that you received, the two

12   documents in evidence --

13   A.   You are referring to 4 and 5?

14   Q.   4 and 5.  You relied upon the accuracy of those statements?

15   A.   I assumed that they were more or less accurate, yeah.

16   Q.   And you made that assumption based on your expertise in

17   this area; is that correct?

18   A.   Given the context of what's stated in here, given what's

19   being expressed in here, it seemed to me legitimate.  But I

20   only have these documents.  This is what I have to base on.

21   Q.   That's what I am asking you about, sir.  That's what it was

22   based on, right, those documents?

23   A.   Well, not -- my entire basis of my testimony or what I know

24   about the information presented in here?

25   Q.   Excuse me.  Excuse me.  Understand my question.  Let's be

HA 09069

5B23PARH                    Kohlmann - cross

1   clear about it, okay?

2            With respect to Government Exhibit 4 and Government

3   Exhibit 5, your basis of arriving at an opinion with respect to

4   those document was based on your belief those documents were

5   accurate?

6   A.   Yeah, that's correct, yeah.

7   Q.   Now --

8   A.   But I should add though they are consonant.

9   Q.   I am not asking you anything at this point, okay.

10           With respect to your opinion based upon your Internet

11  research, and the books you've read, is it your opinion that al

12  Qaeda is a fairly common term at this point?

13           MR. BRUCE:   Objection.

14           THE COURT:   Sustained, sustained.   I don't know what

15  that means.

16  Q.   Okay.   Is it your opinion that -- I'm sorry.

17           (Pause)

18  Q.   When you were -- when you are involved in your peer

19  discussions with your colleagues on the counter-terrorism blog,

20  and the people that you mention that you use for your peer

21  review, there's no dispute about the existence of al Qaeda, is

22  there?

23           MR. BRUCE:   Objection, your Honor.   This is argument.

24           THE COURT:   I'll allow it.

25  A.   I mean, there's -- I know that there is no dispute about

HA 09070

5B23PARH                    Kohlmann - cross

1    the existence of al Qaeda from my personal conversations with

2    individuals that have been involved in al Qaeda.  That's, I

3    mean, there is no absolutely no doubt in anybody's mind, any of

4    the colleagues that I work with, that al Qaeda exists period.

5    Q.  And I believe you responded to the government, just want to

6    be clear about this, that Osama bin Laden was one of the

7    leaders and founders al Qaeda; is that correct?

8    A.  Yes.

9    Q.  There's no dispute about that, correct?

10   A.  There is absolutely no dispute that he was one of the

11   leaders and founders of al Qaeda, no.

12   Q.  Okay .

13   A.  I mean no serious dispute, anyway.  There is no legitimate

14   dispute.

15   Q.  With respect to your expert testimony report, when you were

16   discussing Ammar al-Baluchi, KSM and Majid Khan, did you

17   discuss other individuals in your report, in that report?

18   A.  Yes, I did.

19   Q.  You weren't asked to discuss those individuals, were you?

20   A.  No, I was.

21   Q.  You were asked to discuss Mahwan Shaheed?

22   A.  I was asked to discuss virtually everyone that's in this

23   report.

24   Q.  So the government specifically asked you about --

25   withdrawn.  To include in this report information related to

HA 09071

5B23PARH                        Kohlmann - cross

1    your expert opinion regarding Mohammed Atta?

2    A.  No.  The government asked me to put together a report that

3    covered all connections between KSM and Ammar al-Baluchi,

4    excuse me, and other individuals who had committed or had

5    attempted to commit terrorist attacks against the United

6    States.  These are among them.

7    Q.  They didn't ask you to include anything about Saifullah

8    Paracha or Uzair Paracha?

9    A.  No.  But I wasn't -- yeah, I was not asked to produce

10   anything like that.

11            MR. WILFORD:  Thank you.

12            (Pause)

13            MR. WILFORD:  Your Honor, that will be all for the

14   defense at this point.

15            THE COURT:  Pardon me?

16            MR. WILFORD:  That will be all for defense at this

17   point.

18            THE COURT:  All right, thank you.

19            MR. BRUCE:  I'll be brief, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. BRUCE:

22   Q.  Mr. Kohlmann, excuse me --

23            (Pause)

24            MR. RICCO:  I'm sorry, Judge.

25            THE COURT:  It's all right.

HA 09072

5B23PARH                    Kohlmann - redirect

1    Q.  Mr. Kohlmann, when you testified on cross-examination that

2    on occasion you informally provide information to government

3    agencies and do not get paid for it, why are you willing to do

4    that?

5    A.  If I come across a piece of information that may have value

6    that potentially could be a life or death scenario and could, I

7    mean, could actually be useful and I'm asked to provide that

8    information, rather than being subpoenaed for it which I

9    probably would be anyway, I'm happy to turn that over.  If it's

10   any use in terms of justice.  It's to whoever would request it.

11   If a defense counsel came to me and had a specific request for

12   a document that would exonerate a client, I would provide that

13   too.

14   Q.  Now, on occasions where you indicated that you don't have a

15   formal contract with the government, but you do informally

16   provide some information on occasion, you were compensated for

17   it, correct?

18   A.  That's correct, yeah.

19   Q.  How is it determined how much you are paid on those

20   occasions?

21   A.  Well, in the case of me testifying in court or --

22   Q.  No.

23   A.  Separately?

24   Q.  When it's just informally exchanged.

25   A.  Usually just to cover whatever expenses I've incurred in

HA 09073

5B23PARH                    Kohlmann - redirect

1   terms of obtaining that information.  There is no precise

2   mathematical formula, but realistically it barely covers the

3   costs involved.

4   Q.  Now, I want to discuss al Qaeda's use of cells to perform

5   terrorist operations.  Do you have an expert opinion on that

6   subject, sir?

7   A.  Yes, I do.

8   Q.  And just in brief detail, without going into all of the

9   extended details of it, what is your expert opinion on that

10  subject?

11  A.  Well, my expert opinion is that al Qaeda as a network is a

12  relatively non-hierarchical amorphous network.  It's divided

13  into cells.

14  Q.  Slowly.

15  A.  Excuse me.  Groups of individuals who do not necessarily

16  have contact with each other, but often times only have contact

17  with one or two senior commanders.

18          The idea of a cell structure, where you have four or

19  five people involved in an individual unit, is that unit is a

20  single independent body, that it received orders from the

21  headquarters, it receives orders from the leaders of al Qaeda.

22  Yet the cell itself was responsible for carrying out many of

23  its most important tasks with al Qaeda assistance.

24          This means that the cell is less likely to be

25  infiltrated by law enforcement and intelligence.  It means cell

HA 09074

5B23PARH                    Kohlmann - redirect

1    members can be adequately trained in security procedures in

2    case someone is arrested.  What's more is there is a limit to

3    the amount of information that they can potentially provide,

4    that a lower level operative can potentially provide as to who

5    his superiors are, where his orders are coming from.  That

6    information is generally only known by the commanders of the

7    cells.

8    Q.  Okay.  Now, are those things that you have outlined of

9    benefit to al Qaeda?

10   A.  You mean the cell structure?

11   Q.  Yes.

12   A.  Yeah.  It is the reason why al Qaeda has continued to

13   proliferate as an organization, whereas other terrorist groups

14   have not.  It has effectively in many cases prevented

15   infiltration of terrorist networks.  It's prevented discovery

16   of a single cell from leading to the discovery of an entire

17   network.  So for instance, you know, if you capture one cell

18   that Khalid Sheikh Mohammed or another al Qaeda operative

19   commander is in charge, you don't necessarily find all the

20   other cells.  What's more, you don't necessarily immediately

21   know where the commander of these cells is located.

22   Q.  Now, for approximately how long during the course of your

23   career have you been studying the use of cells by terrorist

24   organizations?

25   A.  Since the start.  One of the first cells that I studied in

HA 09075

5B23PARH                    Kohlmann - redirect

1   depth was the 1993 World Trade Center bombing plot and the 1995

2   New York jihad plots case.  I've reviewed video recording of

3   cell members, I reviewed testimony from cell members, I've

4   reviewed documents prepared for the cases in court.  I reviewed

5   transcripts of FBI wire taps involving members of that cell.

6   Discussions with regards to their security procedures, their

7   ideology, their tactics, their goals.

8           I've done much the same with a variety of other

9   terrorist cells, including the Orube gang in 1996 in France,

10  which was a cell of Algerian armed Islamic group militants who

11  were attempting to raise money to fund a jihad in France.

12          The 1999 West Coast LAX plot involving Ahmed Ressam

13  and Mustafa Kamel, I traced that cell initially from

14  Afghanistan and the Balkans and then traced the path of the

15  cell members to from Europe to North America, organizing in

16  North America, then back to Afghanistan to seek training at al

17  Qaeda camps and ultimately their trajectories to attempted

18  terrorist targets here in the United States.

19          I've also studied countless other terrorist cells in

20  Balkans, in Kashmir, in Pakistan, in Afghanistan, in the United

21  Kingdom, in Denmark, in the United States, in Canada.

22  Virtually every country you can think of.

23  Q.  Now, once you've gathered all of this material about the

24  use of terrorist cells, how does your methodology in terms of

25  analyzing it and forming conclusions about the use of cells

HA 09076

1    compare to the methodology you've described already, regarding

2    the leaders and members of al Qaeda?

3    A.  It's virtually identical.  I tell you the first thing I do

4    is I go to original al Qaeda documents or al Qaeda documents

5    that have been seized and have been presented as exhibits in

6    court.  I take these manuals, then I compare them to the

7    testimony of former al Qaeda operatives who are either

8    testifying under oath on the stand or who I'm lucky enough to

9    have a personal interview with, which has happened on occasion.

10   Then I will take that information and then juxtapose it against

11   other original documents taken from terrorist groups.  Take

12   that and juxtapose it against analysis done by other experts

13   that deal with the idea of sleeper cell networks and terrorist

14   training camps.  Then ultimately I'll compare that to the world

15   at large.  See, you know, what other open source reporting is

16   there about this, does it match my research, does it say

17   anything I've missed here.  It's almost the exact same method.

18   It's really rigorous analysis.

19   Q.  Okay.  I want to also ask you about the subject matter of

20   al Qaeda's use of individuals to provide logistical support to

21   al Qaeda members or al Qaeda cells.  Do you have an expert

22   opinion on that subject?

23   A.  Yes, I do.

24   Q.  Can you again just in a nutshell without going into all the

25   details you would offer at trial, if permitted, explain your

HA 09077

1   opinion on that subject.

2   A.   Sure.  Again, through the process of reviewing al Qaeda

3   training manuals, from the process of reviewing testimony by al

4   Qaeda operatives under oath in court, by interviews with them,

5   I've gained an understanding of how the system works and of how

6   these individuals act within the cells.

7   Q.   How do individuals at times provide logistical support to

8   al Qaeda members or al Qaeda cells?

9   A.   Support is usually provided in the form of either false

10  documentation, passports, that kind of thing, in the form of

11  technological instruments that could be used in the commission

12  of terrorist attack such as cellular phone, a GPS device, a

13  satellite phone, also money is an issue.  Terrorist cells

14  sometimes raise their own money, however, often times they need

15  to have someone either as part of the cell or as a contact to a

16  larger network who will bring in the financing, either through

17  illegal means, through criminal means, or by receiving it from

18  a higher up within the terrorist organization.

19  Q.   Now, in reaching this opinion about logistical support,

20  have you relied on similar sources and methodology as for your

21  own expert opinions?

22  A.   Yeah.  This is all based upon the testimony of former al

23  Qaeda operatives, it is based on sworn testimony, it's based

24  upon authenticating al Qaeda training manuals.  There are

25  training manuals that lay out security procedures that al Qaeda

HA 09078

5B23PARH                    Kohlmann - redirect

1    uses in extreme detail.  Along with the kind of roles that are

2    assigned to different people within the cell and within the

3    network at large.

4    Q.  I want to shift gears now, sir, turn back to Government

5    Exhibits 4 and 5.  Now, do you give all of the information in

6    these statements, when you consider it, the same exact weight?

7

8          MR. WILFORD:  Objection.

9          THE COURT:  Rephrase it.  You mean does every

10   statement have the same weight as every other statement in

11   them?

12         MR. BRUCE:  Correct, your Honor.

13         THE WITNESS:  The answer is no.

14   Q.  Okay.  Can you explain why that is, in your opinion?

15   A.  Sure.  If someone makes an admission against interest, to

16   borrow a legal term, admitting something that is patently

17   against his interest to say, i.e. admitting he is an al Qaeda

18   member, boasting of a particular terrorist plot he is involved

19   in, that kind of thing, it is an admission against interest.

20   The person who is saying it has absolutely no reason to say it

21   unless it's the truth.  Whereas some statements in here are

22   denials, denials of particular elements of terrorist behavior

23   or terrorist activity.

24         That being said, you know, it's certainly possible

25   that this person is showing you denial.  However al Qaeda has

HA 09079

1   repeatedly emphasized to its operatives --

2        MR. WILFORD:  Objection --

3        THE COURT:  You can finish.

4        MR. WILFORD:  Your Honor, with respect, this is

5   information you indicated would not be permitted to be

6   testified to.

7        MR. BRUCE:  I am not offering it for that purpose,

8   your Honor.  Mr. Wilford on cross-examination talked about the

9   reliability of the information in these statements and I just

10  wanted the witness to be able to distinguish if he did so, what

11  weight he places on different statements.

12       THE COURT:  Let me hear the answer so far as it went.

13       (The record was read)

14       THE COURT:  That's all right.  What's coming up is not

15  going to be permitted at the trial.  For purposes of this

16  Daubert hearing just before me I'll take the answer, but it's

17  not permissible at trial.

18       MR. BRUCE:  I understand.

19       THE COURT:  Complete the sentence.

20       THE WITNESS:  Thank you, your Honor.

21       THE COURT:  Al Qaeda has repeatedly emphasized to its

22  operatives --

23  A.  In training manuals and in lessons that these operatives

24  have testified with in court that it is necessary to deceive

25  law enforcement --

HA 09080

5B23PARH                          Kohlmann - redirect

1          THE COURT:  I understand.  Go ahead.

2   Q.  Now, Mr. Wilford on cross-examination asked you about

3   several FBI reports of interviews of family members that you

4   reviewed in connection with this case.  Do you remember that?

5   A.  Yeah, that's correct.

6   Q.  And you indicated that you reviewed those reports after you

7   had finalized your own expert report?

8   A.  Yes, I believe so, yeah.

9   Q.  And you indicated that those reports buttressed the opinion

10  you had already reached?

11  A.  Yeah.  Yeah.

12  Q.  I just wanted to ask you what you mean by that.  Explain

13  that.

14  A.  In other words they added additional detail, they fleshed

15  out a little bit more background about Majid Khan I was not

16  previously aware of.  However they underlined his role within

17  al Qaeda and they confirmed exactly that.  That Majid Khan had

18  been a lower level al Qaeda operative, someone that was drawn

19  in relatively recently, but because of family connections,

20  because of the shortage of trained al Qaeda operatives with

21  U.S. citizenship, that his importance to the organization was

22  more than it otherwise would have been, and in fact he was

23  operating as a terrorist -- a terror cell plot commander,

24  someone who was organized with fixing a particular terrorist

25  plot here in the United States.

HA 09081

5B23PARH                    Kohlmann - redirect

1   Q.   Okay.  Now, Mr. Kohlmann, if permitted by the Court in this

2   case, do you intend to also offer an expert opinion on other

3   Taliban and al Qaeda members and associates and leaders?

4   A.   Yeah, sure.  Whatever is relevant to this case.

5   Q.   As outlined in your expert report and the slides you've

6   prepared?

7   A.   Yeah, I made a point to identify certain other important al

8   Qaeda leaders who may not be central to this case, but I feel

9   it's important to put all of this in perspective, so there's

10  not a loss of perspective.  You understand how this case fits

11  in with the larger global al Qaeda terrorist sleeper cell

12  network.

13  Q.   In reaching your conclusions about these other people who

14  haven't necessarily been mentioned by name today, what sources

15  and methodologies did you use in reaching those conclusions?

16         MR. WILFORD:  Objection.  Who are we talking about,

17  Judge?  This is in a vacuum, using methodology for these

18  people.

19         THE COURT:  All right.

20  Q.   Let me give you some examples with respect to Aafia

21  Siddiqui and Iyman Faris, did you use -- how does the

22  methodology you used with respect to the people you've already

23  talked about compare to those two individuals?

24  A.   It was almost identical.  In the case of Aafia Siddiqui I

25  was able to recover several electronic mail items that Aafia

HA 09082

5B23PARH                    Kohlmann - redirect

1    Siddiqui had sent out in the Internet back in the early 1990s

2    which indicated the source of activity she was involved in, who

3    she was fundraising for and what her personal political views

4    were.

5              In the case of Iyman Faris, again there were very

6    helpful government documents, his guilty plea and the statement

7    of facts issued after he pled guilty, which were openly

8    available and which laid out the facts of the case exactly as

9    Iyman Faris had pled guilty to.

10             MR. BRUCE:  Your Honor, if I could, I'd seek some

11   guidance from the Court at this time and see if defense counsel

12   has an objection.

13             I think between the expert report and the slides,

14   we've laid out the universe of people that, if allowed,

15   Mr. Kohlmann would testify about.  I'm prepared to go through

16   each name, for example, Abdullah Azzam, some of the people

17   we've seen in the slides if that's what the Court and defense

18   counsel want me to do.

19             MR. RICCO:  Your Honor, it seems to me if what

20   Mr. Bruce is saying if we have this information before us, if

21   it is going to establish the same methodology, we are just left

22   with 403 argument with respect to how much of this or what part

23   of this is admissible.  I don't disagree with what Mr. Bruce is

24   saying.

25             THE COURT:  I would like a summary of the slide show.

HA 09083

5B23PARH                    Kohlmann - redirect

1    All right.  Why don't you take him through what you have as the

2    slide show.  I take it the slide show, the slides except for

3    the last three, are you plan to use those during Mr. Kohlmann's

4    testimony, correct?

5         MR. BRUCE:  That's correct.

6         THE COURT:  Why don't you have him lay out in brief

7    what he would testify in regard to what's on your slide.

8         MR. BRUCE:  If it makes it easier for you to follow,

9    I'd like to state this slide show is a work in progress and we

10   continue to tweak it based on your Honor's rulings.

11        Why don't I hand up to you the latest version which is

12   also in color.

13        THE COURT:  This is later than October 24?

14        MR. BRUCE:  Yes.

15        THE COURT:  All right.

16        MR. BRUCE:  I'm going to hand the witness one also.

17   For purposes of the record, I am going to mark it Government

18   Exhibit 6.  I guess I should offer it for purposes of the

19   hearing.

20        THE COURT:  Mr. Wilford, any objection?

21        MR. WILFORD:  No, not for purpose of the hearing,

22   Judge.

23        THE COURT:  All right, admitted.  Mr. Wilford, you are

24   going to have the defendant in civilian clothes, correct?

25        MR. WILFORD:  Yes, your Honor.  I am going to submit

HA 09084

5B23PARH                    Kohlmann - redirect

1    an order to the court tomorrow to permit.

2              THE COURT:  Fine.

3              (Government's Exhibit 6 received in evidence)

4    Q.  Mr. Kohlmann, I just want to walk through this briefly.

5    First, I am using the first page, page one as the title page

6    United States v. Uzair Paracha, if you could flip to the second

7    page, entitled Osama bin Laden's influences and mentors.  Are

8    you with me there?

9    A.  Yes, yeah.

10   Q.  There is a name on that page at the top and a picture,

11   Sheikh Abdullah Azzam.

12             In your expert opinion, who is that, sir?

13   A.  Sheikh Abdullah Azzam was one the original founders of al

14   Qaeda.  He was a Palestinian cleric.  He had traveled to

15   Pakistan and Afghanistan during the 1980s to assist in the

16   creation of a mujahideen force, a Muslim force.

17             THE COURT:  I don't want to be perceived as being

18   facetious or anything.  I want to put in front of the witness a

19   sign that simply says slow down.  All right.  Again, I'm not

20   doing this to be cute.  I just think it may be helpful.

21             MR. WILFORD:  That's fine, Judge.

22             THE WITNESS:  I apologize, your Honor.

23             THE COURT:  I would not do that in front of a jury.  I

24   think it will help our record here.  Go ahead.

25   A.  Sheikh Abdullah Azzam, his goal was the formation of an

HA 09085

5B23PARH                        Kohlmann - redirect

1   international mujahideen brigade to reestablish the rule of a

2   greater Islamic empire.  Abdullah Azzam was the one who came up

3   with the idea for al Qaeda.  He was assassinated in 1989.

4   Q.  Now, the bottom picture --

5              THE COURT:  Who is Sheikh Abdul Rasool Sayyaf?

6              THE WITNESS:  Your Honor, Sheikh Abdul Sayyaf is a

7   major Afghan mujahideen leader in the 1980s.  He was one of the

8   primary leaders of the Islamic unity of Afghan mujahideen,

9   which was the body tasked with fighting the Soviet Union in

10  Afghanistan on behalf of Islamic forces.  Abdul Rasool Sayyaf

11  was also a mentor to both Khalid Sheikh Mohammed, Sahed Sheikh

12  Mohammed, and Abed Sheikh Mohammed.  And in addition provided

13  the first training camp from which al Qaeda fighters were

14  educated.

15             THE COURT:  What's your testimony with regard to Osama

16  bin Laden?

17             THE WITNESS:  Sheikh Osama bin Laden is the official

18  leader of al Qaeda.  He has been since the assassination of

19  Sheikh Abdullah Azzam in 1989.  Osama bin Laden has engaged in

20  multiple attempts to strike at the United States and likewise

21  has declared his intention to kill Americans civilian and

22  military.

23  Q.  Now, page three of this slide in essence we've covered.

24  Regarding bin Laden.

25             If you could turn to page four which is the

HA 09086

5B23PARH                    Kohlmann - redirect

1    organizational chart.  Let's move downwards and from left to

2    right we've covered bin Laden.  On the left hand side of the

3    second tier of that chart, there's the name Abu Hafs al-Masri.

4    Who is that individual, sir?

5    A.   Abu Hafs al-Masri is otherwise known as Mohammed Atef.

6    Mohammed Atef is the former head of al Qaeda's military wing

7    who was killed in November 2001, during a U.S. air strike in

8    Afghanistan.

9    Q.   Now, moving to the right on the page, there's the name

10   Ayman al-Zawahiri.  Who is that individual, sir?

11   A.   Dr. Ayman al-Zawahiri is considered to be the deputy

12   commander of al Qaeda.  He is the number two individual in

13   charge of the network.  He is deputy to Sheikh Osama bin Laden

14   and has been his deputy since approximately 1989.

15            MR. BRUCE:  Your Honor, unless you had questions about

16   the other three individuals, I think we've covered those

17   previously.  Unless you wanted to go back through them.

18            THE COURT:  No, it's all right.

19            MR. BRUCE:  Okay.

20            THE COURT:  When you were forming your opinion of

21   Khalid Sheikh Mohammed, sir, did you use the unclassified

22   summaries four and five that we've been talking about?

23            THE WITNESS:  No, I didn't.

24            THE COURT:  But you did in regard to Ammar al-Baluchi

25   and Majid Khan, correct?

HA 09087

5B23PARH                    Kohlmann - redirect

1          THE WITNESS:  That's correct, yes, I did.

2          THE COURT:  All right.  Proceed.

3   Q.  Then I'd like to turn to the slide, Mr. Kohlmann, which I

4   think would have the next name we haven't previously discussed,

5   the title at the top is Ali Abdul Aziz Ali a/k/a Ammar

6   al-Baluchi.  At the bottom it has pictures of Jose Padilla and

7   Tawfiq Attash.  I think we've previously discussed Jose

8   Padilla.  So I'd like to turn your attention to Tawfiq Attash.

9   Can you tell us who Tawfiq Attash is, Mr. Kohlmann.

10  A.  Tawfiq bin Attash is otherwise known as Khallad.  He is an

11  individual who worked as an al Qaeda operational planner,

12  expected to be the central mastermind behind the 2000 bombing

13  of the USS Cole in the port of Aden in Yemen.

14  Q.  If you can turn to the next page to the slide entitled

15  Majid Khan.  Can you tell us briefly who Ayman Faris is.

16  A.  Sure.  Iyman Faris is an al Qaeda operative who admits to

17  being tasked with attempting to break down at least one bridge

18  connecting the Island of Manhattan to its suburbs using either

19  a tool, a torch tool, or else by attempting to crash ultralight

20  aircraft into those structures.

21  Q.  Has he been charged or pled guilty in federal court?

22  A.  He has pled guilty to those charges.

23  Q.  The next picture Aafia Siddiqui.  Can you just reiterate

24  for us who she is.

25  A.  Sure.  Aafia Siddiqui is a former resident of Boston who

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09088

1   while she was here in the United States in the early 1990s was

2   raising money for organizations that included the Al-Kifah

3   Refugee Center, which was the U.S. branch of Makhtab-e-Khidmat.

4   That translates to office of -- excuse me, Makhtab

5   al-mujahideen, which translates to mujahideen services office.

6   Which was the direct precursor to al Qaeda.

7              Aafia Siddiqui also raised money in Pakistan for a

8   charity known as Mercy International.  Which at the time was

9   being run by Khalid Sheikh Mohammed's brother Zahed.

10  Q.  Although it's not on any of the slides, Mr. Kohlmann, can

11  you tell us who Mullah Mohammed Omar is?

12  A.  Mullah Mohammed Omar is the leader the Taliban movement in

13  Afghanistan.  Taliban translates as students.  Mullah Mohammed

14  Omar is a former member of the Afghan mujahideen who fought

15  against Soviet forces in Afghanistan during the 1980s.  Later,

16  he was in exile in Pakistan and helped lead a group of Islamic

17  students, madrassas students, students of religious school, to

18  cross over the border in Afghanistan and seize control of

19  territory there that was then under the control of war lords.

20  Q.  Did he seize control of territories in Afghanistan?

21  A.  Within approximately two years of entering Afghan

22  territory, Mullah Mohammed Omar and the Taliban Army control

23  over 95 percent of Afghan territory.  Shortly thereafter,

24  Mullah Mohammed Omar set up an alliance with Osama bin Laden

25  and his advisors, which led to Mullah Mohammed Omar being

HA 09089

1  proclaimed as the Khalif by Osama bin Laden by Abu Hafs, al

2  Qaeda's number one military commander, and by Dr. al-Zawahiri.

3            MR. BRUCE:  May I have a moment, your Honor?

4            THE COURT:  Yes.

5            MR. BRUCE:  I have nothing further, your Honor.

6            MR. WILFORD:  Just one moment.

7            Your Honor, if I may just briefly on the slide

8  presentation?

9            THE COURT:  Go ahead.

10 RECROSS EXAMINATION

11 BY MR. WILFORD:

12 Q.  When you turn to the page that's the third or fourth page

13 in that has the organization and structure of al Qaeda?

14 A.  Yeah.

15 Q.  2001 to 2003.  First of all, you prepared these slides; is

16 that correct?

17 A.  That's correct, yes.

18 Q.  And again, your preparation of these slides, I notice that

19 you have solid lines linking bin Laden to the three individuals

20 underneath him?

21 A.  That's correct.

22 Q.  And then you have a broken line with respect to Ammar

23 al-Baluchi and Majid Khan?

24 A.  Yeah.

25 Q.  What's the symbolism for that?

HA 09090

5B23PARH                        Kohlmann - recross

1    A.  I was concerned by looking at the chart one might get the

2    impression that this is my view of the entire al Qaeda network

3    between 2001 and 2003.  The dotted lines are supposed to

4    signify there are other players involved in this level.  This

5    is not this person, this person, this person direct

6    relationships.  There are other people involved in this

7    relationship and it's more complex than simply straight lines.

8    Q.  There may be people involved in that time period who would

9    fill the positions that you have here for al-Baluchi and Khan?

10   A.  No.  What I meant to show here is that there's a chain, a

11   chain of individuals that are underneath Khalid Sheikh

12   Mohammed.  What I meant to show here is that Ammar al-Baluchi

13   and Majid Khan are A, not the only two people in that chain,

14   and that Majid Khan may have had contact with other KSM

15   associates indirectly.  You know, it's not a direct

16   relationship.  It's not -- it could be, but it doesn't have to

17   be.  I wanted to show there's room for other operatives within

18   that network.

19   Q.  So, to be accurate, the chart should have some other places

20   along the Khalid Sheikh Mohammed role also?

21   A.  I'm sorry, I didn't hear you.

22   Q.  There should be some other places along Khalid Sheikh

23   Mohammed to indicate there are other people on that level?

24   A.  You mean you're referring to the level of the chart where

25   it says --

HA 09091

1           THE COURT:  I'm sorry.  As these things come up,

2    obviously, what I'd like from the parties, presumably the

3    government has list of these names that would be used to be

4    given to the court reporter and to me.

5           MR. BRUCE:  It's already been done with respect to the

6    court reporter.  She has it.

7           THE COURT:  Fine.  Okay.

8    A.  You're referring I believe to the level of the chart here

9    that's has the faces of Abu Hafs al-Masri, Ayman al-Zawahiri,

10   and Khalid Sheikh Mohammed.  As a matter of fact, on that

11   level, at the level of the senior operational planners of al

12   Qaeda, at least as far as before the death of Abu Hafs al-Masri

13   in November 2001, those are the three most important planners

14   on behalf of that network.  There's really -- these guys are

15   the three most important figures.  There are others that go

16   underneath them, but they are the primary players within al

17   Qaeda's network.

18   Q.  As far as you know?

19   A.  Yeah, okay, as far as I know.

20   Q.  Because you don't know everybody that's involved in al

21   Qaeda, right?

22   A.  I don't claim to, no.

23   Q.  With respect to the slide dealing with Majid Khan.  You

24   have the same solid line connection between these two

25   individuals and Majid Khan?

HA 09092

5B23PARH                    Kohlmann - recross

1    A.  That's correct.

2    Q.  That's to symbolize what?

3    A.  To that's to symbolize a direct connection between these

4    two individuals, a direct connection between Majid Khan and

5    Faris and direct connection between Majid Khan and Aafia

6    Siddiqui.

7    Q.  There is no direct connection between Faris and Siddiqui?

8    A.  I wasn't asked to prepare that for the purposes of this

9    report.  I don't know that that's not the case.  I don't know

10   that that's the case.  I honestly -- I wasn't asked to prepare

11   the relationship between those two individuals, so they may

12   have had contact.

13   Q.  You don't know; you can't offer any opinion on that, right?

14   A.  I can't offer any opinion as to whether the two of them had

15   contact.  I don't have any personal knowledge of it, no.

16   Q.  If I could have a question with respect to the KSM page of

17   the slides.

18   A.  Are you referring to the actual KSM only slide, correct?

19   Yeah okay.

20   Q.  Are all four of these photographs purportedly of KSM?

21   A.  Yes, they are.

22   Q.  And they're taken at different times?

23   A.  Yes, they were.

24   Q.  Do you know when these photographs were taken?

25   A.  I know that the photograph at the top left, the top right

HA 09093

5B23PARH                    Kohlmann - recross

1   and the bottom left were all taken I believe prior to 1997

2   since they were used I believe in wanted posters for KSM before

3   then.   The photo at the bottom right I believe was taken in

4   2003.

5              MR. WILFORD:  I don't have anything else, Judge.

6              MR. BRUCE:  Nothing further from us, Judge.

7              THE COURT:  Mr. Kohlmann, if you would, sir, step out

8   and we have a room there on the left.  Ms. Blakely, is it open?

9   You just wait there.

10             THE WITNESS:  Thank you very much, your Honor.

11             THE COURT:  I didn't mean to badger you on the speed.

12  We get a much better record if the witness is speaking slowly.

13             THE WITNESS:  I apologize.  Next time I'll try to be a

14  little slower.  Thank you.

15             (Witness excused)

16             THE COURT:  Government, let me summarize what I think

17  you want his testimony to be.  He'll talk somewhat about the

18  origin of al Qaeda, because this expert by the way is much

19  broader than the testimony you are going to have.  You are now

20  proffering him for, as I understand --

21             MR. BRUCE:  Well, if I can address that, your Honor.

22  As I -- and this is part of the reason on redirect I added some

23  subject matter.  As I understood the purpose of today's

24  hearing, it was to go purely to his qualifications and his

25  methodology, and not to sort of vet his entire expert opinion.

HA 09094

DAUBERT
(VOL 2)

5B3HPARC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          03 Cr. 1197 (SHS)

5   UZAIR PARACHA,

6            Defendant.

7   ------------------------------x

8

9                                   New York, N.Y.
                                    November 3, 2005
                                    3:30 p.m.

10

11  Before:

12                  HON. SIDNEY H. STEIN

13                                       District Judge

                        APPEARANCES

14

15  MICHAEL J. GARCIA
         United States Attorney for the
         Southern District of New York

16  ERIC BRUCE
    KARL METZNER

17       Assistant United States Attorneys

18  EDWARD WILFORD
    ANTHONY RICCO

19       Attorneys for Defendant

20

21

22

23

24

25

HA 09095

5B3HPARC

1          (In open court)

2          THE DEPUTY CLERK:  United States v. Uzair Paracha, 03

3    Cr. 1197.

4          Counsel, please state your names for the record.

5          MR. BRUCE:  Good afternoon, your Honor.  Eric Bruce

6    and Karl Metzner for the government.

7          THE COURT:  Good afternoon, gentlemen.

8          MR. WILFORD:  Good afternoon, your Honor.  For the

9    defendant, Edward Wilford and Anthony Ricco.

10          Mr. Paracha is present.

11          THE COURT:  Good afternoon.

12          Let's handle some administrative matters and then I

13    wish to give you my determinations on the expert testimony and

14    the 403 issues.

15          I signed the order that was presented to me by the

16    defense counsel permitting the defendant to be wearing civilian

17    clothes.  In fact, I prefer that he be wearing civilian

18    clothes.

19          MR. RICCO:  Those clothes have been delivered to the

20    MCC and accepted.

21          THE COURT:  All right.

22          I have received the jury questionnaire with the names

23    filled in on page 4.  If the questionnaire is acceptable to

24    both sides, I will present this to the jury administrator.

25          I take it, it is the jury administrator who makes the

HA 09096

5B3HPARC

1  copies, is that correct?

2      MR. METZNER:  Actually, I think they would like us to,

3  and we are happy to.

4      THE COURT:  Then I will give this back to you and you

5  can make the copies.

6      Is the jury questionnaire acceptable to the

7  government?

8      MR. METZNER:  It is, your Honor.

9      THE COURT:  To the defense?

10     MR. WILFORD:  Yes, your Honor.

11     THE COURT:  I am going to give this back to the

12  government.

13     As I stated, the jury administrator believes that the

14  questionnaires will be filled out by 3:00.  Then it is the

15  government that is going to make copies, is that correct?

16     MR. METZNER:  Yes, your Honor.

17     THE COURT:  The attorneys for both sides then will

18  work on them --

19     MR. BRUCE:  Yes.

20     THE COURT:  -- here, and if the defense wants the

21  participation of the defendant, that is fine as well.

22     MR. WILFORD:  I'm sorry, your Honor, I didn't hear

23  you.

24     THE COURT:  I said if the defense wants the

25  participation of the defendant in that process, that is

HA 09097

5B3HPARC

1    acceptable.

2            When do the lawyers want the panel to be back here?

3            We can have them back here Tuesday morning if you

4    think that that is adequate time for the attorneys to go over

5    them.  It is somewhat preferable to have them back here on

6    Tuesday, but it is nonsensical if you don't think you are going

7    to be ready Tuesday morning.

8            MR. WILFORD:  Your Honor, we have been trying to get

9    some sense of how long it would take, and just doing a rough

10   estimate, if each of the attorneys get half of the

11   questionnaires, that would be approximately 87 questionnaires,

12   spending five minutes on each one would take approximately

13   seven hours just to review all the questionnaires.  That is

14   without any discussion between ourselves or with our client in

15   terms of decisions that need to be made.

16           So what we propose is the following, and this is in

17   consultation with the government, that we get together at 1:00

18   on Tuesday, have the jury present at 2:15, and we should be

19   able to have our discussion between 1 and 2 and arrive at the

20   joint cause challenges and be able to present them to the

21   court.

22           THE COURT:  If I understand you, you want the panel

23   back here at 2 on Tuesday.

24           MR. WILFORD:  Yes, and perhaps we could probably meet

25   with the government at 12, which would give us an opportunity

HA 09098

5B3HPARC

1    to see if there were any differences that you could resolve or

2    whether or not it is actually necessary to have that particular

3    juror present for additional questioning.

4            THE COURT:  The parties can arrange whenever and

5    however they want to meet.  We will have the panel back here

6    or, rather, assemble wherever the jury administrator is having

7    them assemble, at 2 on Tuesday.

8            The first order of business, then, is the attorneys

9    and the defendant will come into the courtroom at 2.  You will

10   give me the list of those who both sides agree should be

11   excused for cause, and I will have that done.  The jury

12   administrator can do that.  But I want to see who they are.

13   Then we will jointly decide who is to be questioned further and

14   bring them up in groups.

15           Then I will have the jury administrator bring the

16   panel back at 2 on Tuesday.

17           In light of the fact that due to a prior appointment

18   by defense counsel we cannot have court on November 22nd --

19   that is the date, Mr. Wilford, is that right?

20           MR. WILFORD:  Yes, your Honor.

21           THE COURT:  I am trying to rearrange my schedule so we

22   will have at least a half a day on November 15th.

23           Do you remember I said we couldn't meet on November

24   15?

25           MR. WILFORD:  Yes.

HA 09099

5B3HPARC

1          THE COURT:  We will have at least half a day because,

2     again, I want to have the evidence go in as efficiently and

3     serially as possible.

4          We won't have court on the 22nd.  We will have at

5     least a half a day on November 15th.

6          Yes.

7          MR. BRUCE:  Excuse me, your Honor.  I am just curious,

8     do you know if we would be having court in the morning or in

9     the afternoon?

10         THE COURT:  Probably in the morning.

11         MR. BRUCE:  Just so we can arrange the witnesses.

12         THE COURT:  Now I want to give you my determinations

13    on the expert and the Rule 403 determinations.

14         I am going to be referring to the slides as given to

15    me yesterday.

16         For the record, government, were they denominated

17    something?  Are they government exhibit something, as revised?

18    Remember what you gave me yesterday was the revised list.

19         MR. METZNER:  6, your Honor.

20         THE COURT:  Government 6 at the Daubert hearing.

21         My determination is as follows:

22         On September 20, the government provided defendant

23    with notice of its intent to call Evan Kohlmann as an expert

24    witness to testify on certain matters.

25         On October 4th, the defendant submitted a letter

HA 09100

5B3HPARC

1   motion seeking an in limine ruling precluding admission of the

2   government's proposed expert testimony on several grounds,

3   including that expert testimony failed to meet the requirements

4   of Rule 702, as elucidated in the *Daubert* and *Kumho Tire* cases.

5   Alternatively, the defendant sought a pretrial Daubert hearing

6   to test the reliability of the expert's methodology.

7        On October 28th, I heard oral argument on this issue

8   and I issued preliminary rulings regarding the scope of the

9   expert testimony.  Specifically, I concluded that the expert

10  testimony regarding the origins and organizational structure of

11  al Qaeda, the identification of leaders and members, and an

12  explanation of certain alleged al Qaeda tradecrafts,

13  specifically its use of operating by cells and its use of

14  individuals to provide logistical support are permissible

15  topics for the expert.

16        I concluded, though, that expert testimony regarding

17  al Qaeda's alleged use of counter-interrogation techniques,

18  including disinformation, would not be permitted on the ground

19  that such testimony impermissibly usurps the jury's fundamental

20  function of judging the credibility of witnesses.  *See United*

21  *States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) and *United*

22  *States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998), rev'd in part

23  on other grounds, 856 F.2d 5 (2d Cir. 1988).

24        Additionally, the court granted defendant's request

25  for a Daubert hearing to test the reliability of the expert's

HA 09101

8

5B3HPARC

1    methodology and its application to the specific expert opinions

2    to be rendered.  That hearing was a full-day hearing and was

3    held yesterday, November 2nd.  As I say, I heard testimony for

4    the proposed expert as well as additional oral argument.

5            My rulings are as follows:

6            The government has met its burden of establishing by a

7    preponderance of the proof that its proposed expert, Evan

8    Kohlmann, has sufficient education, training, and knowledge to

9    be qualified as an expert, and that Kohlmann's methodology --

10   that is, his process of gathering sources, including a variety

11   of original and secondary sources, cross-checking sources

12   against each other, and subjecting his opinions and conclusions

13   to peer review -- is sufficiently reliable to meet the

14   standards for the admissibility of expert testimony set by the

15   Federal Rules of Evidence.

16           Everyone heard his qualifications yesterday.  He is

17   employed as the president and founder of globalterroralert.com,

18   a clearinghouse for information concerning terrorism.  He has

19   degrees in law and foreign service and Islamic studies, and he

20   has authored several thesis on topics related to the testimony

21   he proposes to give.  He has conducted research into terrorist

22   organizations specifically, including al Qaeda, as well as what

23   he calls Arab-Afghan groups of Mujahadeen fighters in various

24   locales who are affiliated, he claims, with al Qaeda.

25           He has also performed research into the development of

HA 09102

5B3HPARC

1   groups, including al Qaeda.  He has gathered various original

2   source materials, including audio and video materials and

3   publications authored by various terrorist groups.  He has

4   himself conducted a number of interviews with individuals who

5   are designated terrorists, or have associations with terrorist

6   groups.  He has had experience working at a think tank devoted

7   to research in terrorist organizations, whose name is the

8   Investigative Project.

9          His methodology consists of gathering multiple sources

10  of information, including, as I said, original and secondary

11  sources.  He testified that he juxtaposes new information

12  against existing information and evaluates new information to

13  determine whether his conclusions remain consonant with the

14  most reliable sources.  He works collaboratively with his peers

15  in his field, gathering additional information and seeking out

16  and receiving comments on his own work and cross-checking the

17  information he has on his own proprietary database.

18         The facts and sources that form the basis of his

19  opinions and inferences, although they do include secondary

20  sources, are, I find, of a type reasonably relied upon by

21  experts in his particular field.  That is the standard of

22  Federal Rule of Evidence 703.  Experts may testify to opinions

23  based on hearsay or other admissible evidence where experts in

24  that field reasonably rely on such evidence in forming their

25  opinions.  *United States v. Daly*, 842 F.2d 1380, 1387 (2d Cir.

HA 09103

5B3HPARC

1    1988).

2    He has relied on sources regularly relied upon in his

3    field, including the 9/11 Commission report, confessions of al

4    Qaeda members, information made available on the Foreign

5    Broadcast Information Service, and original sources from

6    terrorist groups.  He does rely on hearsay materials in

7    addition to the source materials.

8    As for peer review, he testified to various matters in

9    which his conclusions and opinions are subjected to review by

10    academics and other experts in his field.  He explained the

11    process by which his written publications are submitted for

12    comment and critique by academics and peers in his field before

13    publication, and how his postings on the internet, and

14    presentations of public forums, are subject to review by his

15    peers, the comments of whom he considers and incorporates when

16    he deems it appropriate in his analysis.

17    Whatever the pitfalls of this vetting process, and

18    obviously it is not the same peer review as in a formal

19    academic setting, it is a sufficiently reliable methodology to

20    meet the requirements of Rule 702, and the weight to be given

21    that testimony is for the jury to determine.  *See United States*

22    *v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004).

23    So my first conclusion is that his methodology is

24    sufficiently reliable.

25    The second finding is that the government has met its

HA 09104

11

5B3HPARC

1   burden of establishing by a preponderance that Kohlmann

2   reliably applied that methodology in reaching his conclusions

3   about the origins and structure of al Qaeda, the identification

4   of its leaders and its use of cells as a means of operating and

5   its use of individuals to provide logistical support, and that

6   testimony will be permitted, assuming the government chooses to

7   adduce it.

8        My third area of conclusion in regard to scope, I am

9   affirming my earlier ruling that Kohlmann will be permitted to

10  testify regarding, one, the origins and organizational

11  structure of al Qaeda; two, identification of its leaders;

12  three, explanation of al Qaeda tradecraft, insofar as its use

13  of cells and the use of individuals to provide logistical

14  support is concerned.  But I am not going to permit the expert

15  to testify regarding the two alleged al Qaeda operatives who

16  are specifically involved in the allegations of this case; that

17  is, Ammar al-Baluchi and Majid Khan.

18       I am concerned by the fact that Kohlmann's testimony

19  regarding al-Baluchi's and Khan's role in al Qaeda is based in

20  not insubstantial part on Kohlmann's review of the unclassified

21  summaries of statements made by those individuals that are the

22  same summaries that have been offered to the defendant as a

23  substitution for his constitutional right to have live

24  deposition or trial testimony from those witnesses.

25       My concern, based on the testimony of Mr. Kohlmann, is

HA 09105

5B3HPARC

1   that his proposed testimony regarding those two individuals is

2   too close to a summary of factual evidence from sources that

3   the government cannot introduce directly.  This is of

4   particular concern here where the government proposes no fact

5   witness on those issues that would permit the defendant to test

6   through cross-examination the credibility of that factual

7   evidence.  So there is going to be no evidence from Kohlmann on

8   Ammar al-Baluchi or Majid Khan.

9        Next, he will not be permitted to offer testimony

10   regarding Iyman Faris or Aafia Siddiqui.

11        I do not see the relevance of the proposed testimony

12   regarding Faris and, as the defense noted yesterday, the

13   description of his involvement in al Qaeda still refers to a

14   specific plot here in New York, which I have excluded.

15        Next, the expert will not be permitted to testify

16   regarding al Qaeda's use of counter-interrogation or

17   disinformation techniques.  I think I have already said that.

18        Next, 403 rulings.

19        Pursuant to Rule 403, with a specific finding that the

20   probative value is substantially outweighed by the danger of

21   unfair prejudice, I am excluding testimony concerning any

22   specific terrorist plot.  You know that ruling applies to 9/11

23   and the 1993 World Trade Center bombing because I have already

24   excluded those.  But now I am extending the 403 ruling to apply

25   to descriptions of any specific terrorist plot.  The probative

HA 09106

5B3HPARC

1   value of the specific plots is substantially outweighed by the

2   danger of unfair prejudice.

3       Mr. Paracha is not alleged to have any connection to

4   those plots, and describing them with specificity unnecessarily

5   focuses attention on them.

6       Kohlmann may refer to terrorist plots and attacks

7   generically without specifying individual plots and attacks.

8   In other words, he cannot talk about a plot to hijack 12

9   airlines or a plot to bomb embassies or a plot to bomb the USS

10  Cole.  He can talk about terrorist attacks in general.

11      Next, I am denying the defendant's Rule 403 objection

12  to general references to attacks against the United States.

13  Those references can stay in, and those are under the KSM

14  slide.  Those references are not unfairly prejudicial.

15      The defendant is alleged to have provided material

16  support to a person he knew to be an al Qaeda member in order

17  to make it possible for the al Qaeda member to enter the United

18  States.  The role of al Qaeda in the United States is therefore

19  pertinent to this case and the risk of unfair prejudice is

20  sufficiently taken care of by my elimination of references to

21  specific attacks, whether in the United States or anywhere in

22  the world.  So the reference to the United States may remain.

23      Just so there is no doubt in my mind, let's go through

24  the slides on Government 6.

25      The first substantive page, UBL's Influences and

HA 09107

5B3HPARC

1   Mentors, there is no objection, so that stays.  The expert can

2   identify those individuals.

3           The next page regarding Bin Laden, the fourth bullet

4   point goes out because it is specific.  The government can make

5   a generic reference to bombings if it wishes, or bombings in

6   1988 even.

7           The next slide, which is The Organization and

8   Structure of AQ, 2001 to 2003, the third level goes out because

9   there is not going to be anything on Ammar al-Baluchi and Khan.

10          The rest of the slide, that is, the first two levels,

11   have not been objected to and they are permissible.

12          The next slide, the KSM slide, the defendant objected

13   to the third bullet point, and I have specifically addressed

14   that.  That stays.

15          The reference to the United States I am permitting.

16          The fourth bullet point goes out for the reasons I

17   have said, at least in the form that now exists because it is a

18   reference to a specific plot.  The government should come up

19   with the generic if it wants.  Helped fund and plan a series of

20   terrorist plots in 1995, that is acceptable.  But that is up to

21   the government.

22          Then you have the Ammar al-Baluchi slide.  There are

23   two Ammar al-Baluchi slides.  They go out because they include

24   Ammar al-Baluchi, and also Jose Padilla and Tawfiq Attash.

25   They are out.  They are out on relevancy and 403.

HA 09108

5B3HPARC

1          The next slide is Majid Khan.  The entire slide is
2     out.

3          I am excluding Iyman Faris and Aafia Siddiqui as well
4     pursuant to 403.

5          The last slide I think is just a duplicate of what
6     went earlier.  I don't know if that is a mistake or you were
7     including it as a summation, the wrap up.  Again, the ruling is
8     the same.

9          I think that handles it.

10          Should we plan on meeting again on Monday just to see
11    if anything else has come up, or are we OK waiting until I see
12    you on Tuesday afternoon?

13          I think we are a little safer.  I may need to speak to
14    the parties on Monday.

15          Presumably, based on our two conferences ago, the
16    government is going to make a national security presentation to
17    me tomorrow, so I will need to render rulings based on that,
18    which I think probably you should come in, why don't we do it
19    on Monday.  I want you to have started to make some headway in
20    the questionnaires by then.

21          Shall we plan on Monday at 4:30?  If I don't need you,
22    I will let you know.

23          MR. WILFORD:  That is fine, Judge.

24          MR. BRUCE:  Your Honor, could I ask --

25          THE COURT:  Government, is that all right, 4:30?

HA 09109

1o

5B3HPARC

1    MR. BRUCE:  That is fine.  Of course.

2    If I could ask two questions about your ruling

3 regarding the expert.

4    THE COURT:  Yes, sir.

5    MR. BRUCE:  First, as I indicated last Friday,

6 Mr. Wilford indicated that the defense was willing to stipulate

7 that Majid Khan and Ammar al-Baluchi were al Qaeda members.

8    I would like to know if that stipulation is still

9 available.

10    THE COURT:  I think you all have agreed it is not

11 seriously at issue.

12    Mr. Wilford.

13    MR. WILFORD:  No objection.

14    THE COURT:  All right.  Then put that in writing,

15 gentlemen.

16    MR. WILFORD:  Yes.

17    THE COURT:  You said no objection.

18    MR. WILFORD:  No, I didn't say no objection.  I said

19 no, we are not willing to stipulate, Judge.

20    THE COURT:  I'm sorry.  I thought you said no

21 objection.

22    What is your current position?  You want to discuss

23 that with the government?

24    MR. WILFORD:  We will discuss that with the

25 government.

HA 09110

17

5B3HPARC

1          MR. BRUCE:  I think we need to reach some resolution.

2          THE COURT:  He is going to discuss it with you.  He

3    just doesn't want something on the record right now, but he is

4    going to discuss it with you right now.  As soon as we are

5    over, correct?

6          MR. WILFORD:  Yes.

7          MR. BRUCE:  If in fact, your Honor, we can't reach a

8    stipulation as to that --

9          THE COURT:  I am not going to force a stipulation.  By

10   the same token, you heard me say I think in reality it is not

11   an issue, but you should follow up with Mr. Wilford.

12         MR. BRUCE:  I will, and if it is not an issue, that

13   would be great.  That is why I hoped we could get a

14   stipulation.  But he just said he is not willing to do that.

15   So I don't have a lot of hope in that regard.

16         THE COURT:  It depends upon the glass is half full or

17   half empty.  He said he wants to talk to you.

18         MR. BRUCE:  OK.  If in fact we can't reach a

19   resolution, your Honor, I would like to visit the issue, and

20   maybe we have to revisit it on Monday, as to whether a

21   different expert who hasn't read the unclassified summaries,

22   perhaps even an FBI agent, could testify as to the al Qaeda

23   affiliation of these two individuals.  Because as I have tried

24   to lay out on a number of occasions, I think it is critical to

25   the case, it is clearly relevant, in our view, and, as you

HA 09111

16

5B3HPARC

1   indicated, it really shouldn't be in dispute.

2          But now we are left with a hole based on your Honor's

3   ruling as to what evidence is going to be presented to the

4   jury.  If we can reach an accommodation, that would be great,

5   but if not, we have to have some back up.

6          THE COURT:  I understand.

7          MR. RICCO:  I think on this subject we are on a long

8   run for a short slide.  I think this issue will be resolved

9   before we walk out of the courtroom.

10         THE COURT:  Fine.

11         MR. BRUCE:  That would be wonderful.

12         THE COURT:  What else?

13         MR. BRUCE:  The only other thing is, with respect to

14  specifically Aafia Siddiqui --

15         THE COURT:  I'm sorry.  What was the metaphor?

16         MR. RICCO:  Long run for a short slide.

17         THE COURT:  All right.

18         MR. BRUCE:  I don't know what it means either.

19         THE COURT:  I have an image.

20         MR. BRUCE:  Specifically with respect to Aafia

21  Siddiqui, your Honor, I understand your ruling.  I am not going

22  to reargue it now.

23         THE COURT:  To the extent she is relevant, you will

24  put her in through a fact witness.  She is not appropriate for

25  expert.  It is 403.  That is how I see it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA 09112

19

5B3HPARC

1        MR. BRUCE:  I would ask for permission to revisit it

2   after you have seen the proof if we think it is appropriate.

3        THE COURT:  Yes.

4        MR. BRUCE:  Thank you.

5        THE COURT:  4:30 on Monday.

6        Thank you, gentlemen.

7        (Adjourned)

HA 09113