UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA           :
:
    - v. -                         :        S1 06 Cr. 442 (LAP)
:
SYED HASHMI,                       :
    a/k/a "Fahad,"                 :
:
            Defendant.             :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**GOVERNMENT'S MEMORANDUM IN CONNECTION
WITH THE SENTENCING OF SYED HASHMI**


                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States
                                               of America

**BRENDAN R. MCGUIRE**
**JOHN M. HILLEBRECHT**
**Assistant United States Attorneys**
        - Of Counsel -

**TABLE OF CONTENTS**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           A.      Al Muhajiroun . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           B.      Hashmi's Conduct During Babar's January 2004 Visit to London . . . . . . . . . . . . 2

           C.      Hashmi's Conduct After Babar Departed to Pakistan . . . . . . . . . . . . . . . .. . . . . . . 4

           D.      Hashmi's Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           E.      Hashmi's Extradition to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           F.      Hashmi's Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     Applicable Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           A.      The Applicable Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

           B.      The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence . . . . . . . . . . . . . 8

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## TABLE OF AUTHORITIES

*Cases:*

*Gall v. United States*,
    553 U.S. 46, 128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Booker*,
    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 2332b(g)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 2M5.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S.S.G. § 3A1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 5G1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                        :

UNITED STATES OF AMERICA    :

     - v. -                          :          S1 06 Cr. 442 (LAP)

SYED HASHMI,                   :
     a/k/a "Fahad,"           :

          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN CONNECTION WITH THE SENTENCING OF SYED HASHMI

The Government respectfully submits this memorandum in connection with the sentencing of Syed Hashmi ("Hashmi") scheduled for June 9, 2010. As described below, in 2004, Hashmi agreed to provide material support to al Qaeda in the form of equipment and money to assist Abd al Hadi al Iraqi ("Hadi al Iraqi"), then al Qaeda's senior commander in charge of all al Qaeda soldiers waging attacks against U.S. and coalition forces in Afghanistan. In January 2004, when Mohammed Junaid Babar ("Babar") contacted Hashmi to inform Hashmi that he was working for al Qaeda and needed Hashmi's help in those efforts, Hashmi agreed to assist al Qaeda and did everything that Babar asked of him. Fully aware that Babar and others were working for al Qaeda, Hashmi knowingly and willingly embraced the opportunity to join them and lend his support to al Qaeda. Although Hashmi's applicable Guidelines sentencing range is 360 months to life imprisonment, the statutorily authorized maximum sentence is 180 months' imprisonment. Accordingly, the Government respectfully submits that a sentence of 180 months' imprisonment, as recommended by the Probation Office, would be appropriate in this case.

I.         FACTUAL BACKGROUND

    A.        Al-Muhajiroun

As set forth in the Probation Office's Presentence Report dated May 25, 2010 ("PSR"), Hashmi was a member of the New York faction of the radical Islamic organization known as Al-Muhajiroun, which operated in, among other places, New York, London and Pakistan. (PSR ¶ 13). Al-Muhajiroun was founded in 1985 and supports the overthrow of Western governments and the institution of an Islamic state. (*Id.*). In June 2002, while a member of ALM, Hashmi led an ALM-sponsored protest in midtown Manhattan during which he was videotaped yelling, among other things: "Jihad! Jihad! Jihad!"; "Bin Laden is not a terrorist"; and "Death, death to the Crusaders!" (*Id.*). Chants from Hashmi's fellow protesters included: "Death, death to the American Army! Death, death to the American Government!"; "Taliban, Taliban, take back Afghanistan!"; and "No peace, only war!" (*Id.*).

    B.        **Hashmi's Conduct During Babar's January 2004 Visit To London**

In September 2003, Hashmi moved from New York to London, where he resided until his arrest at Heathrow airport on June 6, 2006. (PSR ¶ 14). In January 2004, Mohammed Junaid Babar, a friend of Hashmi's from New York whom Hashmi had met through ALM in 2000, stayed with Hashmi for approximately two weeks during a visit to London. (PSR ¶ 15). While with Hashmi, Babar told Hashmi that he had recently met with Hadi al Iraqi, then al Qaeda's military commander in charge of all al Qaeda soldiers in Pakistan and Afghanistan, in the mountains of northwest Pakistan. (*Id.*). Babar also advised Hashmi that he had provided Hadi al Iraqi with money and gear, including boots, sleeping bags, and clothing, in support of al Qaeda's fighters who were launching attacks against U.S. and coalition forces in Afghanistan. (*Id.*).

2

Babar informed Hashmi that he was in London to meet with other al Qaeda supporters and to resolve a dispute that had arisen about who was actually working for Hadi al Iraqi. (*Id.*). This group of al Qaeda supporters included Omar Khyam, who was arrested in March 2004 and was later convicted for participating in a conspiracy to bomb soft targets in the United Kingdom. (*Id.*).

During Babar's two-week visit, Hashmi loaned Babar his cellphone, which Babar used to organize meetings with the group of al Qaeda supporters. (PSR ¶ 16). Throughout Babar's visit, Babar and Hashmi attended several meetings with other al Qaeda supporters during which those in attendance discussed their intention to provide money and gear to Hadi al Iraqi and al Qaeda. (*Id.*). At least one individual ("CC-1") also discussed his intention to travel to Pakistan and fight for Hadi al Iraqi and al Qaeda. (*Id.*). Email communications between Hashmi and Babar exchanged after Babar returned to Pakistan in February 2004 establish that Hashmi relayed CC-1's flight information to Babar so that Babar could meet CC-1 at the airport and bring CC-1 to Hadi al Iraqi to fight against U.S. and coalition forces. (*Id.*).

In addition, during Babar's stay, CC-1 gave Babar two or three garbage bags full of gear for Hadi al Iraqi, including jackets and waterproof pants. (PSR ¶ 17). Babar used Hashmi's cellphone to coordinate the receipt of this gear from CC-1. (*Id.*). After receiving the gear, Babar and Hashmi took the gear out of the bags and inspected it together in Hashmi's apartment. (*Id.*). Babar then stored this gear in Hashmi's bedroom for the remainder of his stay – with Hashmi's approval. (*Id.*).

Toward the end of Babar's stay with Hashmi, Babar asked Hashmi for money to purchase a return airline ticket from London to Pakistan so that he (Babar) could deliver the gear in

3

Hashmi's apartment to Hadi al Iraqi.  (PSR ¶ 18).  Hashmi and Babar then walked to an ATM machine near Hashmi's apartment and Hashmi withdrew over $300 worth of British pounds from his bank account.  (*Id.*).  Hashmi then gave that approximate sum to Babar, which Babar used to purchase his return ticket to Pakistan.  (*Id.*).

In early February 2004, CC-1 drove to Hashmi's apartment to pick up Babar so that he could drive Babar to the airport for his flight to Pakistan the next day.  (PSR ¶ 19).  When CC-1 arrived at Hashmi's apartment, he called Hashmi's cellphone to advise Babar and Hashmi that he was in front of Hashmi's building.  (*Id.*).  Babar, with Hashmi's assistance, then carried the two or three garbage bags of gear that were in Hashmi's bedroom to CC-1's car.  (*Id.*).  Babar and CC-1 ultimately hand delivered the gear that was stored in Hashmi's bedroom to Hadi al Iraqi during subsequent meetings with Hadi al Iraqi in Pakistan in February 2004.  (*Id.*).

### C. Hashmi's Conduct After Babar Departed To Pakistan

Before leaving London for Pakistan, Babar asked Hashmi to serve as a London-based intermediary between him (Babar), who would be Pakistan, and Omar Khyam and CC-1, who resided in London.  (PSR ¶ 20).  Hashmi agreed to serve this role.  (*Id.*).  Email messages between Hashmi and Babar as well as Hashmi's telephone records from February and March 2004 demonstrate that Hashmi relayed important messages to Babar from Khyam and CC-1, including CC-1's flight information for his trip to Pakistan to fight with Hadi al Iraqi.  (*Id.*).

### D. Hashmi's Arrest

On June 6, 2006, Hashmi was arrested at Heathrow Airport by English law enforcement officers pursuant to the charges in this case.  (PSR ¶ 21).  Hashmi was arrested while he was attempting to board a flight to Pakistan.  (*Id.*).  When the officers attempted to place Hashmi

4

under arrest, he violently resisted them by attempting to punch and kick them.  (*Id.*).  As a result, he had to be subdued on the floor and his shoes had to be removed.  (*Id.*).  At this time, Hashmi was also shouting and spitting at the officers.  (*Id.*).  In response to learning that he was being arrested based on terrorism charges in the United States, Hashmi said that he was happy that U.S. soldiers and British soldiers were dying in Afghanistan and in Iraq, and he proceeded to call the arresting officers "crusaders," "sons of monkeys," and "pigs," among other things.  (*Id.*).

The following day, during the drive from the police station to court, Hashmi stated, in sum and substance, that (i) the Muslim religion will take over; (ii) Western society is dying; and (iii) his views and actions are justified because the West is killing his Muslim brothers in Afghanistan and Iraq.  (PSR ¶ 22).

E.   **Hashmi's Extradition To The United States**

Hashmi was ordered extradited to the United States in May 2007.  (PSR ¶ 23).  On May 25, 2007, officers picked up Hashmi at an English prison to drive him to the airport for his flight to the United States.  (*Id.*).  During that drive, Hashmi stated the following, in sum and substance and without being questioned:  (i) he had met some good "brothers" in the prison where he had stayed, a facility holding other charged terrorists; (ii) he had learned a lot from them; and (iii) it was the best experience of his life.  (*Id.*).

F.   **Hashmi's plea**

On April 27, 2010, the day before trial was scheduled to begin, Hashmi appeared before the Court and pled guilty to Count One of the Indictment.  (PSR ¶ 6).  Hashmi pled guilty pursuant to a plea agreement, which provides that the parties agree, *inter alia*, that a sentence of

180 months' imprisonment is an appropriate sentence. In addition, the plea agreement provides that neither party will seek or suggest that the Court consider any other sentence. (*Id.*).

During the plea proceeding, Hashmi admitted the following: (i) in January 2004, while he was residing in London, an individual he knew from New York stayed with him; (ii) during this stay, Hashmi agreed to permit the individual to store certain equipment – waterproof socks, ponchos, sleeping bags and similar items – at his apartment; (iii) Hashmi understood that the individual planned to deliver the equipment to al Qaeda for use in Afghanistan; (iv) in order to assist the individual with this plan, Hashmi gave him approximately $300 in U.S. currency or its equivalent in British pounds so that the individual could buy an airline ticket to deliver the equipment to al Qaeda in Pakistan; and (v) at the time of his actions, Hashmi understood that the United States considered al Qaeda a terrorist organization and he knew that his actions were unlawful. (Plea Transcript at 14-16).

## II.   APPLICABLE LEGAL PRINCIPLES

Under current law, sentencing courts must engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). First, the district court must determine the applicable Guidelines range, and, in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112. Second, the district court must consider whether a departure from that Guidelines range is appropriate. *Id.* Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113.

Although the Guidelines are no longer mandatory, district courts must continue to "consult" the Guidelines and "take them into account" when sentencing. *United States* v. *Booker*, 543 U.S. 220, 264 (2005); *accord United States* v. *Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) ("In [*Booker*], the Court retained an important role for the Sentencing Commission, leaving untouched the statutory direction to district courts that they should consult the Guidelines range when imposing sentence.") (citing *Booker*, 543 U.S. at 245-46). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 46, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49, and must "remain cognizant of them throughout the sentencing process," *id.* at 50 n.6. It also is the Court's duty to form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant," and to then impose a sentence "sufficient, but not greater than necessary," to accomplish the objectives of criminal sentencing. 18 U.S.C. § 3553(a); *see United States* v. *Cavera*, 500 F.3d at 188 ("In addition to taking into account the Guidelines range, the district court must form its own view of 'the nature and circumstances of the offense and the history and characteristics of the defendant.'") (*en banc*).

### III. DISCUSSION

#### A. The Applicable Guidelines Range

The Government agrees with the Probation Office's analysis with respect to the applicable Guidelines' range for Hashmi. Specifically, the Government agrees that the base offense level for Count One is 26 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2M5.3(a). (PSR ¶ 27). The Government also agrees that, pursuant to U.S.S.G. § 2M5.3(b)(1)(E), a two-level adjustment is appropriate based on the fact that the offense involved the provision of funds and material support with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act. (PSR ¶ 28). Additionally, because the offense involved or was intended to promote a "Federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5), the offense level should be increased by 12 levels pursuant to U.S.S.G. § 3A1.4(a). (PSR ¶ 29).[1] Finally, because Hashmi accepted responsibility by pleading guilty prior to trial, the offense level is decreased by two levels under U.S.S.G. § 3E1.1(a). (PSR ¶ 33).

Based on the foregoing, the Government agrees that Hashmi's applicable Guidelines offense level is 38. Because the terrorism enhancement in U.S.S.G. § 3A1.4 applies, pursuant to U.S.S.G. § 3A1.4(b), Hashmi's Criminal History Category is Category VI. (PSR ¶ 39). Accordingly, based on a Guidelines' offense level of 38, and a Criminal History Category of VI, the resulting Guidelines range is 360 months' to life imprisonment. However, because the statutorily authorized maximum sentence permitted under Count One is 15 years, pursuant to

---

[1] Under 18 U.S.C. § 2332b(g)(5), a "Federal crime of terrorism" is defined as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

U.S.S.G. § 5G1.1(a), the Guidelines range applicable to Hashmi is 15 years' imprisonment. (PSR ¶ 61).

### B. The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence

The history and characteristics of Hashmi counsel for a 15 year sentence. Years prior to the charged conduct in this case, as a young man living in Queens, Hashmi developed, maintained and expressed violent jihadist beliefs in support of the killing of non-Muslims, the terrorist mission of al Qaeda, and the destruction of Western society. From at least 2000 until his arrest in 2006, he was a faithful follower of Shaykh Omar Bakri Mohammad, the founder of ALM who resided in London in 2003 when Hashmi moved there. Over the last twenty-five years, though Bakri has repeatedly denied that ALM itself employs violence, he has actively called upon others to adopt violence as a legitimate tool and praised those groups, including al Qaeda, who have used violence to achieve terrorist objectives. For example, in the wake of al Qaeda's August 1998 bombings of two U.S. embassies in East Africa that killed over two-hundred people, ALM issued an official statement entitled "USA You Must Pay, Maybe Tomorrow If Not Today," which praised the attacks. More recently, on September 11, 2002, Bakri and ALM organized and promoted a conference under the name "September The 11th 2001: A Towering Day in History." An online flyer for the event, emblazoned with the images of airliners crashing into the World Trade Center, called upon Muslims "to struggle against their enemies verbally, financially, and physically."

Through his own words and actions, Hashmi revealed that he was a true disciple of Bakri and agreed with his shaykh's views on the use of violence. While in New York, he was one of the most active members of ALM's New York chapter as he organized demonstrations, led

9

protests and remained in frequent contact with Bakri.  During one of these protests in June 2002, which occurred in midtown Manhattan and was captured on videotape, Hashmi led a group of ALM members and supporters in a series of chants that advocated violence and death against United States soldiers and the United States Government. In addition, Hashmi expressed his support for al Qaeda's leader, Usama bin Laden.

      In light of these extreme and violent views, it is no surprise that Hashmi chose to act on his beliefs in 2004 by agreeing to provide material support to a senior al Qaeda military commander and those who worked for him.  It is also important to note, however, that Hashmi maintained his jihadist viewpoint through the period of his arrest in 2006 and his extradition to the United States in 2007.  As described in the Presentence Report, when officers attempted to place Hashmi under arrest at Heathrow Airport before he attempted to travel to Pakistan, he physically resisted them in every way he could and had to be subdued onto the floor.  And when he was told that he was being arrested based on U.S. terrorism charges, he said that he was happy that U.S. soldiers and British soldiers were dying in Afghanistan and in Iraq.  (PSR ¶ 21).  The next day on the way to court, Hashmi revealed more of his alarming views, all of which were entirely consistent with Bakri's extreme, anti-Western ideology.  Indeed, Hashmi proclaimed that Western society was dying and attempted to explain his conduct by claiming that his actions were justified because the West was killing his Muslim brothers in Afghanistan and Iraq.  (PSR ¶ 21).  Finally, in May 2007, after spending eleven months in an English prison that held other charged terrorists, Hashmi's views clearly had not changed.  When officers picked him up to drive him to the airport for his flight to the United States, without being questioned, Hashmi said that he had learned a lot from some of the "brothers" he had met in prison and that

it was the best experience of his life. (PSR ¶ 22).

In assessing the nature of the offense here, Hashmi's actions must be placed in their proper context. Babar contacted Hashmi in January 2004 to seek his help in supporting al Qaeda because he knew that Hashmi also believed in al Qaeda's terrorist mission and would be willing to play his role within the secretive support network upon which al Qaeda depends. When Babar met with Hashmi in London, he told Hashmi all about who Hadi al Iraqi was, his prior meetings with Hadi al Iraqi in the remote mountains of Pakistan, and his purpose for being in London. Upon learning all of this, Hashmi did not hesitate and only wanted to know more. He embraced the opportunity, attended meetings with Babar and other al Qaeda supporters, and provided Babar and al Qaeda with everything they requested, including an apartment to store the equipment for Hadi al Iraqi and his soldiers, a cellphone for Babar and Hashmi to use to arrange the meetings, and cash for an airline ticket to ensure that Babar could personally deliver the equipment to Hadi al Iraqi and his soldiers.

Al Qaeda depends upon a wide array of individuals across the world to survive and to accomplish its terrorist objectives. Not all of these individuals are sworn al Qaeda members who are personally involved in armed combat with soldiers or violent attacks on civilians. The global support network that al Qaeda has established relies upon interdependent groups of facilitators and sympathizers who embrace al Qaeda's violent ideology and stand ready to turn that ideology into action. While each of the facilitators and sympathizers play different roles, it is their collective willingness to act in support of al Qaeda's mission when needed that renders each of them essential to the organization.

History has demonstrated that some within al Qaeda's network are United States citizens

who exploit the benefits of their citizenship to identify vulnerabilities within the United States or align themselves against the United States for the operational advantage of al Qaeda. These individuals constitute a particularly pernicious threat to the national security of the United States. Under the cloak of their U.S. citizenship, these facilitators and sympathizers can remain in the United States undetected as well as travel freely around the world on their U.S. passports, gathering information and developing expertise for the benefit of al Qaeda. Indeed, al Qaeda has publicly acknowledged the unique value that United States citizens provide to its terrorist mission. Accordingly, while it is self-evident that specific deterrence is important in this case, deterring other United States citizens as well as those who are permitted to reside here from working to undermine our national security by aiding foreign terrorist organizations is vital.

Through the teachings of Omar Bakri Mohammad and his membership in ALM, Syed Hashmi, a U.S. citizen who grew up in Queens, developed an anti-American jihadist ideology and stood ready to do his part for al Qaeda. In 2004, when he was told that al Qaeda needed his help, he joined the organization's global support network and did everything that was asked of him. This is not a case where a defendant provided money or material support to a terrorist organization with only a general sense of how he was helping the organization. To the contrary, Hashmi knew exactly what he was doing and where the equipment stored in his apartment was going. More importantly, he fully appreciated that he was directly assisting a senior al Qaeda commander and aiding al Qaeda's military forces who were attacking and killing U.S. and coalition soldiers in Afghanistan.

## IV. CONCLUSION

Based on the foregoing, the Government respectfully submits that a sentence of 15 years' imprisonment is appropriate in this case.

Dated: June 7, 2010

                                    Respectfully submitted,

                                    PREET BHARARA
                                  United States Attorney

                      By:    /s/ Brendan R. McGuire
                             BRENDAN R. MCGUIRE
                             JOHN M. HILLEBRECHT
                             Assistant United States Attorneys
                             (212) 637-2220/2262

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following by ECF and electronic mail on June 7, 2010:

David Ruhnke, Esq.
davidruhnke@ruhnkeandbarrett.com

Sean Maher, Esq.
sean@wvmlawfirm.com

Anthony Ricco, Esq.
tonyricco@aol.com

/s/ Brendan R. McGuire
Brendan R. McGuire